Filed 8/24/17

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| RON BRIGGS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | S238309 |
| v. | ) | |
| | ) | |
| EDMUND G. BROWN, JR., | ) | |
| as Governor, etc., et al., | ) | |
| | ) | |
| Respondents; | ) | |
| | ) | |
| CALIFORNIANS TO MEND, NOT END, | ) | |
| THE DEATH PENALTY, etc., | ) | |
| | ) | |
| Intervener. | ) | |

In the November 2016 election California voters approved Proposition 66, the Death Penalty Reform and Savings Act of 2016. (Gen. Elec. (Nov. 8, 2016) § 1.) The measure's various provisions are intended to facilitate the enforcement of judgments and achieve cost savings in capital cases. Petitioner Ron Briggs seeks writ relief from this court, challenging the constitutionality of certain aspects of the proposition. Governor Edmund G. Brown, Jr., Attorney General Xavier Becerra, and the Judicial Council of California oppose the petition as respondents. They are joined by intervener Californians to Mend, Not End, the Death Penalty, a campaign committee representing the proponents of the initiative. The issues raised are of sufficient public importance to justify the exercise of our original

SEE CONCURRING AND DISSENTING OPINIONS

jurisdiction in the interest of a prompt resolution. (*Legislature v. Eu* (1991) 54 Cal.3d 492, 500.)[1]

Petitioner asserts four grounds for relief. He claims Proposition 66 (1) embraces more than one subject, as prohibited by the California Constitution; (2) interferes with the jurisdiction of California courts to hear original petitions for habeas corpus relief; (3) violates equal protection principles by treating capital prisoners differently from other prisoners with respect to successive habeas corpus petitions; and (4) runs afoul of the separation of powers doctrine by materially impairing the courts' ability to resolve capital appeals and habeas corpus petitions, and to manage their dockets in general.

Petitioner's constitutional challenges do not warrant relief. However, we hold that in order to avoid serious separation of powers problems, provisions of Proposition 66 that appear to impose strict deadlines on the resolution of judicial proceedings must be deemed directive rather than mandatory.

## I. THE TERMS OF PROPOSITION 66

Proposition 66 includes a series of findings and declarations to the effect that California's death penalty system is inefficient, wasteful, and subject to protracted delay, denying murder victims and their families justice and due

---

[1] Petitioner Briggs, together with John Van de Kamp, sought an original writ from this court the day after the election. After the Secretary of State certified the election results, we granted petitioner's motion to file an amended and renewed petition. Because both petitions name the Judicial Council as a respondent, Chief Justice Tani Cantil-Sakauye, as chair of the council, and Justice Ming Chin, as vice-chair, are recused.

We stayed the implementation of Proposition 66 to provide time to resolve petitioner's challenge. After receiving papers in opposition, we issued an order to show cause why the relief sought should not be granted, and continued the stay pending our decision. While the stay was in effect, Mr. Van de Kamp died, leaving Briggs as the sole petitioner.

process. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) § 2, p. 212 (Voter Guide).) The measure enacts a series of statutory reforms, which may be grouped into three general categories: (1) provisions to expedite review in capital appeals and habeas corpus proceedings; (2) provisions governing the confinement of prisoners sentenced to death and the administration of the death penalty; and (3) provisions pertaining to California's Habeas Corpus Resource Center. Petitioner does not directly challenge each one of the measure's provisions. We summarize them all, however, as context for his claim that Proposition 66 unconstitutionally addresses more than one subject. (See part II.A, *post*.)[2]

A. *Expedited Review*

Proposition 66 amends Penal Code section 190.6 to give the Judicial Council 18 months to adopt rules and standards for expediting appeals and state habeas corpus review in capital cases.[3] (§ 190.6, subd. (d).) "Within five years of the adoption of the initial rules or the entry of judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases." (*Ibid*.) The Judicial Council is directed to monitor the review process and amend the rules and standards as necessary to complete proceedings within the five-year period. (*Ibid*.)

Section 190.6, subdivision (b), an existing provision, sets a seven-month limit on the filing of the opening brief in a capital appeal, except upon a showing

---

[2]    As in previous challenges to initiative measures, "we caution that our summary description and interpretation of the measure by no means preclude subsequent litigation regarding the meaning or legality of its provisions, apart from the specific issues considered herein." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 341, citing *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 242 (*Brosnahan*), and *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 220.)

[3]    Hereafter, unspecified statutory citations are to the Penal Code.

3

of good cause or when the trial transcript exceeds 10,000 pages. Subdivision (e) of section 190.6 is amended by Proposition 66 to provide that "[t]he failure of the parties or of a court to comply with the time limit in subdivision (b) shall not affect the validity of the judgment or require dismissal of an appeal or habeas corpus petition. If a court fails to comply without extraordinary and compelling reasons justifying the delay, either party or any victim of the offense may seek relief by petition for writ of mandate. The court in which the petition is filed shall act on it within 60 days of filing." (*Ibid.*)

Section 1239.1 declares it the duty of this court to expedite review in capital cases. We must appoint counsel for indigent appellants as soon as possible, and grant extensions of time for briefing only "for compelling or extraordinary reasons." (§ 1239.1, subd. (a).) Proposition 66 calls on us and the Judicial Council to reevaluate the competency standards for appointed counsel in death penalty appeals and habeas corpus proceedings. "Experience requirements shall not be limited to defense experience." (Gov. Code, § 68665, subd. (b).)

The initiative measure extensively revamps the procedures governing habeas corpus petitions in capital cases. Under current practice, habeas corpus proceedings are initiated in this court, which appoints counsel and provides for their compensation.[4] Under the initiative measure, however, "[a] petition filed in any court other than the court which imposed the sentence should be promptly transferred to that court unless good cause is shown for the petition to be heard by another court. A petition filed in or transferred to the court which imposed the

---

[4] See Supreme Court Policies Regarding Cases Arising From Judgments of Death, policy 3, standards governing filing of habeas corpus petitions and compensation of counsel in relation to such petitions, originally adopted effective June 6, 1989.

4

sentence shall be assigned to the original trial judge unless that judge is unavailable or there is other good cause to assign the case to a different judge." (§ 1509, subd. (a).)  The superior court is made responsible for appointing counsel to represent indigent prisoners in capital cases.  (§ 1509, subd. (b); Gov. Code, § 68662, as amended by Prop. 66.)

The initial habeas corpus petition must be filed within a year of the appointment of counsel.  (§ 1509, subd. (c).)  An untimely initial petition, and any "successive" petition, "shall be dismissed unless the court finds, by the preponderance of all available evidence, whether or not admissible at trial, that the defendant is actually innocent of the crime of which he or she was convicted or is ineligible for the sentence."  (§ 1509, subd. (d).)[5]  Habeas corpus proceedings "shall be conducted as expeditiously as possible, consistent with a fair adjudication.  The superior court shall resolve the initial petition within one year of filing unless the court finds that a delay is necessary to resolve a substantial claim of actual innocence, but in no instance shall the court take longer than two years to resolve the petition."  (§ 1509, subd. (f).)  The court must "issue a statement of decision explaining the factual and legal basis for its decision." (*Ibid*.)  Petitions that are pending in this court "may" be transferred to the sentencing court.  (§ 1509, subd. (g).)

---

[5]     " 'Ineligible for the sentence of death' means that circumstances exist placing that sentence outside the range of the sentencer's discretion.  Claims of ineligibility include a claim that none of the special circumstances in subdivision (a) of Section 190.2 is true, a claim that the defendant was under the age of 18 at the time of the crime, or a claim that the defendant has an intellectual disability, as defined in Section 1376.  A claim relating to the sentencing decision under Section 190.3 is not a claim of actual innocence or ineligibility for the purpose of this section."  (§ 1509, subd. (d).)

5

Under existing law, there is no right to appeal from a superior court's *denial* of habeas corpus relief. The petitioner may obtain review by filing a new petition in a higher court. (*In re Reed* (1983) 33 Cal.3d 914, 918, fn. 2.) The People have a statutory right to appeal a *grant* of relief in a capital case directly to this court, under section 1506. Proposition 66 alters these procedures by permitting either party to take an appeal from a superior court's decision on an initial habeas corpus petition to the court of appeal, and by specifying that "[a] successive petition shall not be used as a means of reviewing a denial of habeas relief." (§ 1509.1, subd. (a).) The issues on appeal are limited to those raised below, and to claims of ineffective assistance of trial counsel if habeas counsel's failure to raise such claims itself constituted ineffective assistance. (§ 1509.1, subd. (b).) To pursue an appeal from a denial of relief on a successive petition, the petitioner must obtain a certificate of appealability from the superior court or the court of appeal based on a substantial claim for relief pertaining to actual innocence or ineligibility for the death sentence. (§ 1509.1, subd. (c).) Appeals under section 1509.1, subdivision (c) "shall have priority over all other matters and be decided as expeditiously as possible."

B. *Conditions of Confinement and Administration of the Death Penalty*

Proposition 66 requires that prisoners sentenced to death perform work in prison and pay 70 percent of their wages and other trust account funds toward restitution. (§ 2700.1.)

The measure amends section 3600 to allow the Department of Corrections and Rehabilitation (the Department) to house male prisoners under a sentence of death in any California prison that the Department finds will "provide a level of security sufficient for that inmate. The inmate shall be returned to the prison designated for execution of the death penalty after an execution date has been

6

set."[6]  The Department must "maintain at all times the ability to execute" a judgment of death.  (§ 3604, subd. (e).)

Section 3604.1 provides an exemption from the Administrative Procedure Act (Gov. Code, § 11340 et seq.) for "standards, procedures, or regulations" governing administration of the death penalty.  (§ 3604.1, subd. (a).)  It also permits execution by lethal injection to be carried out by means other than intravenous, "if the warden determines that the condition of the inmate makes intravenous injection impractical."  (§ 3604.1, subd. (b).)  The sentencing court is given exclusive jurisdiction over challenges to the method of execution.  Such claims must be dismissed if delayed without good cause.  If the method is found invalid, the court is to order the use of a valid method.  If a federal court enjoins use of a method of execution, the Department must, within 90 days, adopt a method conforming to federal requirements.  (§ 3604.1, subd. (c).)

Section 3604.3, subdivision (a) authorizes physicians to attend executions for the purposes of pronouncing death and assisting the Department in developing protocols.  Physicians and other licensed health care professionals are protected against disciplinary proceedings for any actions authorized by statute.  (§ 3604.3, subd. (c).)  The purchase of medical supplies and equipment used in executions is exempted from the provisions of the Pharmacy Law (Bus. & Prof. Code, § 4000 et seq.).  (§ 3604.3, subd. (b).)

C.  *The Habeas Corpus Resource Center*

The Habeas Corpus Resource Center provides counsel, investigative staff, and experts for prisoners in capital habeas corpus proceedings.  Currently the center is governed by a five-member board of directors chosen by the Appellate

---

**6**    Female prisoners sentenced to death are housed in the Central California Women's Facility in Chowchilla.

7

Projects.[7]  The board appoints an executive director, who is confirmed by the California Senate.  (Gov. Code, former § 68664.)  Proposition 66 modifies the governance of the center "to expedite the completion of state habeas corpus proceedings in capital cases, and to provide quality representation in state habeas corpus for inmates sentenced to death."  (Gov. Code, § 68660.5.)

The initiative measure abolishes the center's board of directors, and authorizes this court to appoint its executive director.  (Gov. Code, § 68664, subd. (b).)  Salaries for the executive director and the center's attorneys are set at the levels of comparable positions at the office of the State Public Defender.  (Gov. Code, § 68664, subd. (e).)  Government Code section 68661, subdivisions (g) and (h) are amended to specify that the center's role is limited to habeas corpus representation.  It may not engage in other litigation or expend funds on any other form of advocacy.  (Gov. Code, § 68661.1, subd. (b).)  Government Code section 68661, subdivision (*l*) is amended to require that the center's annual report list all cases in which it is providing representation.  In cases that have been pending for more than a year, the center must state reasons for the delay and identify remedial actions.  Government Code section 68661.1, subdivision (a) imposes limits on the center's representation in federal habeas corpus proceedings.

## II.  DISCUSSION

We consider only the objections raised by the amended and renewed petition before us.  "We have no occasion at this time to consider other possible attacks," and "except as necessary to resolve the basic questions before us, we do

---

[7]      The Appellate Projects were established to fulfill the responsibility of each District Court of Appeal to "adopt procedures for appointing appellate counsel for indigents not represented by the State Public Defender in all cases in which indigents are entitled to appointed counsel."  (Cal. Rules of Court, rule 8.300(a)(1).)

not consider in this case possible interpretive or analytical problems" that might arise from the measure in the future. (*Raven v. Deukmejian*, *supra*, 52 Cal.3d at pp. 340-341.) We review here a facial challenge to the constitutionality of Proposition 66, and express no view on claims that may be presented by individual prisoners based on their own circumstances.

We are guided by policies this court has consistently followed in cases challenging the validity of initiative measures. " '[T]he Constitution's initiative and referendum provisions should be liberally construed to maintain maximum power in the people.' " (*Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1032, quoting *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675; see also *Carlson v. Cory* (1983) 139 Cal.App.3d 724, 728.) Under article IV, section 1 of the California Constitution, "[t]he legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum." "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (*Id*., art. II, § 8, subd. (a).) We have declared it "our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise." (*Legislature v. Eu*, *supra*, 54 Cal.3d at p. 501.)

" 'We do not consider or weigh the economic or social wisdom or general propriety of the initiative. Rather, our sole function is to evaluate [it] legally in the light of established constitutional standards.' " (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814, quoting *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization*, *supra*, 22 Cal.3d at p. 219, and citing *Ferguson v. Skrupa* (1963) 372 U.S. 726, 730; see *Brown v. Superior Court* (2016) 63 Cal.4th 335, 352, fn. 11.) " '[A]ll presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration

9

of invalidity.  Statutes must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.'  [Citations.]  If the validity of the measure is 'fairly debatable,' it must be sustained.  [Citations.]"  (*Calfarm*, at pp. 814-815.)

With these principles in mind, we turn to petitioner's challenges.

A.  *The Single-subject Claim*

"An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."  (Cal. Const., art. II, § 8, subd. (d).)  Our jurisprudence in this area is well developed.  "[W]e have upheld a variety of initiative measures in the face of a single-subject challenge, emphasizing that the initiative process occupies an important and favored status in the California constitutional scheme and that the single-subject requirement should not be interpreted in an unduly narrow or restrictive fashion that would preclude the use of the initiative process to accomplish comprehensive, broad-based reform in a particular area of public concern.  (See, e.g., *Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 41 [upholding 1974 Political Reform Act (Proposition 9)]; *Brosnahan*, *supra*, 32 Cal.3d 236, 245–253 [upholding the Victims' Bill of Rights (Proposition 8)]; *Raven v. Deukmejian*, *supra*, 52 Cal.3d 336, 346–349 [upholding Crime Victims Justice Reform Act (Proposition 115)]; *Legislature v. Eu*, *supra*, 54 Cal.3d 492, 512–514 [upholding the Political Reform Act of 1990 (Proposition 140)].)"  (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1157.)

"[T]he single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship.  [Citation.]  It is enough that the various provisions are reasonably related to a common theme or purpose."  (*Legislature v. Eu*, *supra*, 54 Cal.3d at p. 513.)  Accordingly, we have upheld initiative measures " 'which fairly disclose a reasonable and common sense relationship among their various components in furtherance of a common

10

purpose.' [Citation.]" (*Id.* at p. 512; accord, *Senate of the State of Cal. v. Jones*, *supra*, 21 Cal.4th at p. 1157.) The governing principle is that " ' "[a]n initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, *all of its parts are 'reasonably germane'* to each other," and to the general purpose or object of the initiative. [Citations.]' " (*Legislature v. Eu*, at p. 512.) The "reasonably germane" standard is applied "in an accommodating and lenient manner so as not to unduly restrict . . . the people's right to package provisions in a single bill or initiative." (*Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 764; cf. *Brown v. Superior Court*, *supra*, 63 Cal.4th at pp. 349-351.)

A review of other comprehensive criminal justice reforms enacted by initiative, and upheld against single-subject challenges, demonstrates that Proposition 66 passes the "reasonably germane" test. The "Victims' Bill of Rights" at issue in *Brosnahan*, *supra*, 32 Cal.3d 236, included provisions providing for (1) restitution to crime victims; (2) an inalienable right to safe public schools; (3) a sweeping restriction on judicially created rules of evidentiary exclusion; (4) new limitations on grants of bail; (5) the use of prior felony convictions for impeachment purposes; (6) abolishment of the diminished capacity defense and reinstatement of the *M'Naghten* test for legal insanity;[8] (7) sentence enhancements for habitual criminals; (8) victim participation in sentencing proceedings; (9) plea bargain restrictions; and (10) limitations on commitments to the California Youth Authority (now the Division of Juvenile Justice). (*Brosnahan*, at pp. 242-245.)

---

[8] *M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722; see *People v. Skinner* (1985) 39 Cal.3d 765, 768.

11

The *Brosnahan* court found it "readily apparent" that these provisions shared "a common concern, 'general object' or 'general subject,' promoting the rights of actual or potential crime victims. . . . [T]he 10 sections were designed to strengthen procedural and substantive safeguards for victims in our criminal justice system. These changes were aimed at achieving more severe punishment for, and more effective deterrence of, criminal acts, protecting the public from the premature release into society of criminal offenders, providing safety from crime to a particularly vulnerable group of victims, namely school pupils and staff, and assuring restitution for the victims of criminal acts." (*Brosnahan*, *supra*, 32 Cal.3d at p. 247.)

In *Raven v. Deukmejian*, *supra*, 52 Cal.3d 336 (*Raven*), the court examined the "Crime Victims Justice Reform Act," which provided for (1) postindictment preliminary hearings; (2) restricting certain state constitutional criminal rights to afford no greater protection than is provided by the federal Constitution; (3) the people's right to due process and a speedy public trial; (4) greater flexibility with regard to joinder and less with regard to severance; (5) admissibility of hearsay at preliminary hearings; (6) reciprocal discovery in criminal cases and related measures relating to preliminary examinations; (7) reformation of the voir dire process; (8) additional felonies in the felony-murder statute; (9) special circumstance reforms; (10) new provisions governing the crime of torture; (11) appointment of counsel willing and able to proceed in a timely manner in felony cases; and (12) a requirement that felony cases be set for trial within 60 days of arraignment absent good cause for an extension, with writ review of such determinations. (*Id*. at pp. 342-345.) The *Raven* court found *Brosnahan* controlling. It held that "the various elements" of the measure before it "unite[d] to form a comprehensive criminal justice reform package," with "the single

subject" being "promotion of the rights of actual and potential crime victims." (*Raven*, at p. 347)[9]

*Manduley v. Superior Court* (2002) 27 Cal.4th 537 (*Manduley*) involved the "Gang Violence and Juvenile Crime Prevention Act of 1998."  That initiative measure included 13 provisions relating to criminal gang activity, four provisions amending the Three Strikes law, and 17 provisions amending Welfare and Institutions Code sections pertaining to the juvenile justice system.  The *Manduley* court observed that the "general object of the initiative is to address the problem of violent crime committed by juveniles and gangs — not simply to reduce crime generally."  (*Id*. at pp. 575-576.)  It noted that broader criminal justice reforms were upheld against single-subject challenges in *Raven* and *Brosnahan*.  (*Id*. at p. 576.)

Although the Three Strikes reforms in *Manduley* "at first blush, might not bear an obvious relationship to juvenile or gang offenders," the court decided "upon closer scrutiny we cannot properly conclude that they are not reasonably related to the goal of the initiative."  (*Manduley*, *supra*, 27 Cal.4th at p. 577.) "Even if some of the crimes added to the list of violent and serious felonies are *more likely* to be committed by an adult who is not a gang member, the offenses nonetheless constitute crimes that commonly are committed by members of street gangs and/or juvenile offenders and thus bear a reasonable and commonsense relationship to the purpose of the initiative."  (*Id*. at p. 578.)  "Thus, despite the collateral effects of these provisions upon adults who are not gang members, and

---

[9]    Though it found no violation of the single-subject requirement, the *Raven* court struck down the provision restricting judicial interpretation of the state Constitution as an impermissible constitutional revision.  (*Raven*, *supra*, 52 Cal.3d at p. 355.)

13

despite the circumstance that [one provision] has the incidental effect of adding strikes that the Legislature previously had [not] included in the list of violent and serious felonies, the provisions remain relevant to the common purpose of" the measure. (*Id*. at pp. 578-579.)

Proposition 66 is more focused on a single subject than the initiative measures upheld in *Brosnahan*, *Raven*, and *Manduley*. Petitioner posits that Proposition 66 is intended to expedite review in capital cases, and contends four provisions are unrelated to that purpose: (1) the requirement that prisoners work and pay restitution (§ 2700.1); (2) the exemption of execution protocols from the Administrative Procedure Act (§ 3604.1, subd. (a)); (3) the protections provided to licensed medical professionals involved in executions (§ 3604.3, subd. (c)); and (4) the abolishment of the Habeas Corpus Resource Center's board of directors (Gov. Code, § 68664, subd. (b)). Petitioner frames the purpose of Proposition 66 too narrowly. It is not solely concerned with the process of reviewing capital judgments. As the findings and declarations prefacing the measure make clear, it was intended as an extensive reform of the entire system of capital punishment to make it more efficient, less expensive, and more responsive to the rights of victims. (Voter Guide, *supra*, p. 212.) With that purpose in mind, it is readily apparent that the provisions identified by petitioner are reasonably germane to the "comprehensive criminal justice reform" approved by the voters. (*Raven*, *supra*, 52 Cal.3d at p. 347.)

Restitution is a significant aspect of a criminal sentence and a benefit to victims. (See § 1202.4; *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1386.) "Imprisonment pending execution of a death sentence is a part of the punishment for the crime" (*People v. Rittger* (1961) 55 Cal.2d 849, 852), and work requirements are a normal feature of imprisonment (§ 2700). The exemption from the Administration Procedure Act removes procedural impediments to execution

14

protocols that are evident in published cases. (See *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1083-1084*; Morales v. California Dept. of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 729, 732.) Allowing medical professionals to participate in executions without fear of disciplinary action by licensing authorities is reasonably calculated to facilitate the process of capital punishment. Placing the attorneys who work for the Habeas Corpus Resource Center under the supervision of this court, instead of an independent board of directors, is related to the goal of improving the efficiency of their efforts. Even under petitioner's constricted view of Proposition 66's purpose, the Habeas Corpus Resource Center reforms would qualify as reasonably germane, given that the center is directly involved in the postconviction review process.

B. *The Jurisdictional Habeas Corpus Claims*

Petitioner's jurisdictional challenges to Proposition 66's habeas corpus reforms are based on article VI, sections 10 and 11 of the California Constitution.[10] Section 10 of article VI governs writ jurisdiction, including habeas corpus. It confers original habeas corpus jurisdiction on all three levels of the judicial system: "The Supreme Court, courts of appeal, superior courts, and their judges have original jurisdiction in habeas corpus proceedings." (Art. VI, § 10.) Article VI, section 11 governs appellate jurisdiction. Generally, the courts of appeal have jurisdiction over appeals when the superior courts have original jurisdiction, with one exception: "The Supreme Court has appellate jurisdiction when judgment of death has been pronounced." (Art. VI, § 11, subd. (a).) These provisions deal with jurisdiction in its most fundamental sense: the power of a

---

[10] Undesignated references to article VI, sections 10 and 11 are to the state Constitution.

court to hear and decide a case. (See 2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 1, p. 575.)

Sections 10 and 11 of article VI are divergent in effect. This court has exclusive *appellate jurisdiction* in capital cases under section 11. But original *habeas corpus jurisdiction*, even in capital cases, is shared by all the state courts under article VI, section 10. (See *In re Carpenter* (1995) 9 Cal.4th 634, 645-646.) As we have noted, the existing practice in California has been that initial habeas corpus petitions in capital cases are filed with this court. That, however, is not a jurisdictional requirement. Article VI, section 10 confers jurisdiction on the superior courts and courts of appeal to entertain such petitions as well.

Petitioner contends Proposition 66 violates article VI, section 10 by (1) requiring initial habeas corpus petitions to be transferred to the sentencing court, absent good cause for another court to hear them (§ 1509); (2) conferring "exclusive jurisdiction" on the sentencing court over challenges to the method of execution (§ 3604.1, subd. (c)); and (3) specifying that successive petitions may not be used as a means of reviewing a denial of habeas corpus relief (§ 1509.1, subd. (a)). Petitioner also argues that section § 1509.1, subdivision (a) deprives this court of its exclusive appellate jurisdiction in capital cases under article VI, section 11, by requiring appeals in habeas corpus cases to be taken to the courts of appeal. All these claims fail.

1. *Transfer to the Sentencing Court*

In challenging section 1509's provisions for the transfer of habeas corpus petitions to the sentencing court, petitioner urges a strict reading of article VI, section 10. He claims the procedural limitations in section 1509, subdivision (a) are inconsistent with the constitutional grant of original habeas corpus jurisdiction

16

to all state courts.[11]  As to matters of procedure, however, the framers of our state Constitution left considerable leeway for legislative prescription of habeas corpus procedures.  Article VI, section 10 was drafted in 1966, when California comprehensively revised its Constitution to "rephrase" existing provisions "in more modern, concise language and if necessary to organize [them] in a more logical framework."  (Cal. Const. Revision Com., Proposed Revision (1966), p. 13 (Commission Report).)  Article VI, which governs the judicial branch, was modified to "remov[e] obsolete language, delet[e] unnecessary procedural provisions, and introduc[e] the constitutional flexibility needed to permit a modern and efficient administration of California's judicial system."  (Judicial Council of Cal., Ann. Rep. (1967) pt. 1, ch. 3, p. 65 (Council Report).)

With respect to section 10 of article VI, the California Constitution Revision Commission explained that former provisions "concerning the issuance and returnability of writs of habeas corpus" had been deleted "because *the matter can be dealt with by the Legislature* under the grant of original jurisdiction." (Commission Report, *supra*, at p. 90, italics added; quoted in *Griggs v. Superior Court* (1976) 16 Cal.3d 341, 349 (conc. & dis. opn. of McComb, J.).)  The Judicial Council, in its report on the revisions, similarly explained that "[t]he procedure for the exercise of this original [writ] jurisdiction is *left to promulgation by statutes and rules*," while also noting that "the authority of the named courts to issue writs of habeas corpus is specifically preserved . . . ."  (Council Report, *supra*, pt. 1, ch.

_____

[11]  "This section applies to any petition for writ of habeas corpus filed by a person in custody pursuant to a judgment of death. . . . A petition filed in any court other than the court which imposed the sentence should be promptly transferred to that court unless good cause is shown for the petition to be heard by another court. A petition filed in or transferred to the court which imposed the sentence shall be assigned to the original trial judge unless that judge is unavailable or there is other good cause to assign the case to a different judge."  (§ 1509, subd. (a).)

17

3, p. 75, italics added; quoted in *Griggs*, *supra*, 16 Cal.3d at pp. 349-350 (conc. & dis. opn. of McComb, J.).)

We have recognized that "[b]y removing 'unnecessary' provisions from article VI, and allowing those matters to be regulated by statute, the commission's revisions of article VI effectively broadened the scope of the Legislature's control over judicial procedures." (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 94 (plur. opn. of Kennard, J.); see *Leone v. Medical Board* (2000) 22 Cal.4th 660, 667.) Thus, the provisions of article VI, section 10 do not tightly constrain the scope of procedural legislation, although a statute may not substantially impair the courts' original writ jurisdiction. (*Powers*, at p. 110; *Leone*, at p. 668.) A chapter of the Penal Code is devoted to habeas corpus procedures, which coexist with judicially developed rules. (§ 1473 et seq.; see *In re Roberts* (2005) 36 Cal.4th 575, 582 (*Roberts*).) The power of the people to enact procedural reforms by way of initiative measure is no less than that of the Legislature. (*Legislature v. Deukmejian*, *supra*, 34 Cal.3d at p. 674.)

Contrary to petitioner's argument, section 1509 actually *preserves* the original writ jurisdiction of all three levels of the state courts, by providing that "[a] petition filed in any court other than the court which imposed the sentence *should* be promptly transferred to that court *unless good cause is shown for the petition to be heard by another court*." (§ 1509, subd. (a), italics added.) A petition filed in another court is not dismissed, as it would be if jurisdiction were absent. Instead, section 1509 provides for the transfer of a petition to the sentencing court. As a matter of judicial policy, we have adopted the same rule for habeas corpus petitions challenging parole determinations. "[A]mong the three levels of state courts, a habeas corpus petition challenging a decision of the parole board *should* be filed in the superior court, which *should* entertain in the first instance the petition." (*Roberts*, *supra*, 36 Cal.4th at p. 593, italics added.)

18

Like section 1509, *Roberts* calls for petitions filed elsewhere to be transferred to the sentencing court. "[W]hen a habeas corpus petition challenging the denial of parole or suitability for parole is filed in the superior court in a county other than that in which the petitioner's conviction and sentence were imposed, the filing court *should* transfer the petition to the superior court in the county of commitment in the first instance, prior to any determination being made that the petitioner has made a prima facie case." (*Roberts*, *supra*, 36 Cal.4th at p. 593, italics added.) This rule does not deprive the appellate courts of their original writ jurisdiction, which they may exercise in appropriate circumstances. (*In re Kler* (2010) 188 Cal.App.4th 1399, 1403-1404.) Section 1509 essentially adopts the procedure developed in *Roberts*. It does not infringe on the jurisdiction conferred by article VI, section 10.

Petitioner further contends that Government Code section 68662 unconstitutionally authorizes the superior courts to appoint counsel for prisoners in habeas corpus proceedings conducted under Penal Code section 1509. There is no constitutional infirmity here. Article VI, section 10 does not regulate such matters.[12]

---

[12] Petitioner speculates that if it is the superior court that appoints counsel in habeas corpus proceedings, prisoners would be left without representation in appellate court proceedings. This concern has no *jurisdictional* ramifications. Furthermore, as practical matter no indigent prisoner in a capital case goes without posttrial representation in California. (See *In re Sanders* (1999) 21 Cal.4th 697, 717-718; *In re Anderson* (1968) 69 Cal.2d 613, 633.) Whether such duties are undertaken by counsel appointed by the superior court, by this court, or perhaps by one of the appellate projects, is a matter that can be addressed by the rules and standards of administration contemplated by section 190.6, subdivision (d).

2. *Jurisdiction over Challenges to Execution Methods*

Section 3604.1, subdivision (c) confers on the sentencing court "exclusive jurisdiction to hear any claim by the condemned inmate that the method of execution is unconstitutional or otherwise invalid." Petitioner contends this provision unconstitutionally strips the courts of appeal and this court of the original habeas corpus jurisdiction granted by article VI, section 10. Proponents defend the statute by arguing that challenges to execution methods are not ordinarily brought in habeas corpus proceedings, but in civil suits that do not implicate the jurisdictional provisions of article VI, section 10. (E.g., *Glossip v. Gross* (2015) __ U.S. __ [135 S.Ct. 2726]; *Morales v. California Dept. of Corrections & Rehabilitation*, *supra*, 168 Cal.App.4th 729; *Sims v. Department of Corrections & Rehabilitation*, *supra*, 216 Cal.App.4th 1059.) They acknowledge, however, that exceptions may be found recognizing the availability of habeas corpus relief with respect to methods of execution. (See *Hill v. McDonough* (2006) 547 U.S. 573, 583; *In re Reno* (2012) 55 Cal.4th 428, 462, fn. 17; *In re Anderson* (1968) 69 Cal.2d 613, 631-632.)

Unlike section 1509, which preserves the original jurisdiction of the appellate courts, section 3604.1, subdivision (c) makes no provision for exceptions in extraordinary circumstances. Nevertheless, it does not explicitly interfere with the reviewing courts' jurisdiction. The jurisdiction conferred by our Constitution "may not lightly be deemed to have been destroyed." (*Garrison v. Rourke* (1948) 32 Cal.2d 430, 435.) An intent to divest a court of jurisdiction "is not read into the statute unless that result is expressly provided or otherwise clearly intended." (*Ibid*.) We avoid conflicts between statutes and constitutional grants of jurisdiction whenever possible, by "construing legislative enactments strictly against the impairment of constitutional jurisdiction." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 253.)

20

Here we read section 3604.1, subdivision (c) narrowly, as addressing only the appropriate *superior court* in which to challenge the method of execution. Under section 1509, subdivision (a), a habeas corpus petition filed in a court other than the sentencing court must be transferred to the sentencing court unless there is good cause for another court to hear it. Section 3604.1, subdivision (c) modifies this procedure in one respect: it precludes the transfer of habeas corpus claims regarding execution methods to a superior court other than the sentencing court. As so interpreted, the statute does not prevent a court of appeal or this court from hearing a habeas corpus challenge to a method of execution, upon a showing of good cause.

As discussed next, section 1509.1, subdivision (a) grants the courts of appeal jurisdiction to review superior court habeas corpus rulings. We note that neither petitioner nor proponents argue that section 3604.1, subdivision (c) bars the courts of appeal from reviewing rulings on execution methods. The existence of such appellate jurisdiction lends support to the conclusion that the exclusive jurisdiction provisions of section 3604.1, subdivision (c) are intended to apply only at the superior court level.[13]

3. *Appellate Review*

Section 1509.1, subdivision (a) states: "Either party may appeal the decision of a superior court on an initial petition under Section 1509 to the court of appeal. . . . A successive petition shall not be used as a means of reviewing a denial of habeas relief."[14] These provisions are a significant departure from the

---

[13] Petitioner makes no claim that section 3604.1, subdivision (c) infringes on the jurisdiction of superior courts other than the sentencing court.

[14] Section 1509.1, subdivision (a)'s use of the term "successive petition" is inconsistent with this court's terminology. We have used the term "new petition" for habeas corpus petitions seeking review of a lower court's ruling. (*In re Clark*

*(Footnote continued on next page.)*

21

existing procedure that would govern a capital habeas corpus petition filed in superior court. A petitioner currently has no right to appeal from a superior court denial of habeas corpus relief. Instead, review is obtained by filing a new habeas corpus petition in a higher court. (*Clark*, *supra*, 5 Cal.4th at p. 767, fn. 7; *Reed*, *supra*, 33 Cal.3d at p. 918, fn. 2.) The People, on the other hand, have a statutory right to appeal from a superior court's grant of relief on habeas corpus. Section 1506 provides: "An appeal may be taken to the court of appeal by the [P]eople from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant or otherwise granting all or any part of the relief sought, in all criminal cases, *excepting criminal cases where judgment of death has been rendered, and in such cases to the Supreme Court*." (Italics added.)

Petitioner contends the provision of section 1509.1, subdivision (a) that requires appeals to be taken to the courts of appeal interferes with this court's exclusive appellate jurisdiction in capital cases under article VI, section 11. He claims the provision barring the use of successive petitions for purposes of review violates the original writ jurisdiction of the courts of appeal under article VI, section 10. Thus, petitioner asserts that the courts of appeal cannot exercise *appellate* jurisdiction in capital habeas corpus proceedings, while also contending they cannot be deprived of their power of review by way of *writ*.

There is some support for the claim that our exclusive jurisdiction under article VI, section 11 extends to habeas corpus proceedings. The provisions of

---

*(Footnote continued from previous page.)*

(1993) 5 Cal.4th 750, 767, fn. 7 (*Clark*); *In re Reed*, *supra*, 33 Cal.3d at p. 918, fn. 2 (*Reed*).) We have used "successive petition" to refer to one raising claims that could have been presented in a previous petition. (See *In re Robbins* (1998) 18 Cal.4th 770, 788, fn. 9; *Clark*, at pp. 769-770.)

22

section 1506 appear to presume that it does, by specifying that appeals from a grant of habeas corpus relief must be taken to this court in "criminal cases where judgment of death has been rendered." The same presumption was expressed, in dicta, by *In re Ketchel* (1968) 68 Cal.2d 397. The *Ketchel* court noted that an appeal from a habeas corpus ruling in favor of a capital prisoner was taken "pursuant to article VI, section 11 . . . and . . . section 1506." (*Id*. at p. 399.) Nevertheless, upon closer examination we are persuaded that article VI, section 11 does not preclude statutory authorization for the courts of appeal to exercise appellate jurisdiction in capital habeas corpus proceedings. As explained below, appellate review of habeas corpus rulings is distinct from review of the underlying judgment of death.

We examined the extent of our exclusive jurisdiction in *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117 (*Thompson*). Thompson filed suit to compel prison authorities to allow his spiritual adviser to remain with him until shortly before his execution. The superior court issued an injunction. The court of appeal dismissed the authorities' appeal on the ground that the matter was within this court's exclusive jurisdiction under article VI, section 11. (*Thompson*, at p. 121.) We disagreed. Reviewing the relevant constitutional history, we noted that all predecessor provisions had specified that our exclusive appellate jurisdiction was limited to " 'criminal cases where judgment of death has been rendered.' " (*Id*. at p. 123; see Cal. Const., former art. VI, § 4, as amended Nov. 8, 1904; *id*., as amended Nov. 5, 1918; *id*., as amended Nov. 6, 1928.) In the 1966 constitutional revision, the reference to "criminal cases" was deleted when the exclusive jurisdiction provision was transferred to article VI, section 11. However, we found nothing in the history of the 1966 revision indicating "an intent to alter the *scope* of our exclusive jurisdiction over capital cases." (*Thompson*, at p. 124.)

"As a result, this court's exclusive death penalty jurisdiction, as currently described in section 11 of article VI, is the same as it was in section 4 of former article VI, applying only to *criminal cases* in which a judgment of death has been rendered." (*Thompson*, *supra*, 25 Cal.4th at p. 124.) Because *Thompson* was "not a criminal case," but rather a civil suit for declaratory and injunctive relief, we concluded "the appeal [did] not fall within this court's exclusive jurisdiction." (*Ibid*.) *Thompson*'s description of our exclusive jurisdiction as limited to the criminal case in which judgment was rendered is consistent with the understanding expressed by the Judicial Council in its report on the 1966 constitutional revision that framed article VI. "Under Section 11, the direct appellate jurisdiction of the Supreme Court is restricted to those cases in which judgment of death has been pronounced." (Council Report., *supra*, pt. 1, ch. 3, p. 76.) In a number of decisions, we have made it plain that a habeas corpus proceeding is *not* a part of the criminal case in which the judgment of conviction is pronounced. Therefore, our exclusive jurisdiction does not extend to habeas corpus proceedings.

*In re Scott* (2003) 29 Cal.4th 783 (*Scott*), was a capital habeas corpus case in which we issued an order to show cause and appointed a referee to take evidence on claims of ineffective assistance of counsel. (*Id*. at pp. 791-792.) At the evidentiary hearing, Scott invoked his constitutional and statutory rights not to be called as a witness in a criminal case. (Cal. Const., art. I, § 15; Evid. Code, § 930.) We rejected the attempt, holding that a habeas corpus proceeding is "civil in nature" for purposes of the privileges at issue.[15] (*Scott*, at p. 815.) The

---

[15] We refrained in *Scott* from deciding "whether a habeas corpus proceeding is civil or criminal for other purposes," noting that "[i]t is a special proceeding and not entirely analogous to either category." (*Scott*, *supra*, 29 Cal.4th at p. 815, fn. 6.)

proceeding "is not itself a criminal case, and it cannot result in added punishment for the petitioner. Rather, it is an independent action the defendant in the earlier criminal case institutes to challenge the results of that case." (*Ibid*.) In support of that principle, *Scott* cited *France v. Superior Court* (1927) 201 Cal. 122, 126-127, where the court declared that "[t]he writ of *habeas corpus*, . . . although granted to inquire into the legality of one imprisoned in a criminal prosecution is not a proceeding in that prosecution, but, on the contrary, is an independent action instituted by the applicant therein to secure his discharge from such imprisonment."

*In re Barnett* (2003) 31 Cal.4th 466 (*Barnett*) considered whether prisoners sentenced to death, and represented by counsel, are entitled to submit pro se claims related to their habeas corpus petitions. We noted that no such right pertains on appeal when the defendant has an attorney, and emphasized that "an inmate's rights regarding legal representation in a state habeas corpus proceeding are even more limited than on an appeal." (*Id*. at p. 474.) Habeas corpus relief is " 'further removed from the criminal trial than is [appellate] review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature.' " (*Ibid*., fn. omitted, quoting *Pennsylvania v. Finley* (1987) 481 U.S. 551, 556–557, and citing *Scott*, *supra*, 29 Cal.4th at p. 815.)

In *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, we construed section 1054.9's provisions governing discovery in habeas corpus proceedings brought by prisoners sentenced to death or life without parole. The People argued that section 1054.9 was an unconstitutional attempt by the Legislature to amend Proposition 115, which regulates discovery in criminal cases.[16] We framed the

---

[16] "The Legislature may not amend an initiative statute without subsequent voter approval unless the initiative permits such amendment, 'and then only upon

*(Footnote continued on next page.)*

25

issue as "whether discovery to prosecute (or prepare) a habeas corpus matter comes within a 'criminal case[]' under section 1054.5," a provision of Proposition 115. (*Pearson*, at p. 572.) We decided it did not, because "[a] habeas corpus matter has long been considered a separate matter from the criminal case itself." (*Ibid*.) *Pearson* referred to *In re Carpenter*, *supra*, 9 Cal.4th at pp. 645–646, which held that the superior court had jurisdiction over a habeas corpus petition challenging the judgment in the underlying criminal case, even though it lacked jurisdiction in the criminal case because it was on appeal.

The holding in *Pearson* turned on the independent nature of habeas corpus proceedings. "Although section 1054.9's discovery may occur before the actual habeas corpus petition is filed, it is part of the prosecution of the habeas corpus matter, not part of the underlying criminal case. [¶] Proposition 115's discovery provisions all deal with the underlying trial. For this reason, we have held that they do not apply to habeas corpus matters (although they may provide guidance in crafting discovery orders on habeas corpus). ([*Scott*, *supra*,] 29 Cal.4th 783, 813–814.)" (*Pearson*, *supra*, 48 Cal.4th at p. 572.)[17]

---

*(Footnote continued from previous page.)*

whatever conditions the voters attached to the Legislature's amendatory powers.' " (*Pearson*, *supra*, 48 Cal.4th at p. 568.)

[17]     In one limited circumstance, a habeas corpus proceeding is seen as an extension of the underlying criminal action. If it is assigned to the same judge who presided at trial, it is deemed a "continuation" of the trial so that the parties are barred from exercising a peremptory challenge under Code of Civil Procedure section 170.6. (*Maas v. Superior Court* (2016) 1 Cal.5th 962, 979.) The reason for this rule, which applies in any subsequent proceeding closely related to the original case, is to prevent litigants from disqualifying the judge most familiar with the facts in the hope of obtaining a more favorable result. (*Ibid*.) The rule is confined to its context, however, and does not alter the fundamental character of

*(Footnote continued on next page.)*

*Scott*, *Barnett*, and *Pearson* make it clear that regardless of whether habeas corpus proceedings are deemed civil or criminal in nature (compare *Scott*, *supra*, 29 Cal.4th at p. 815, fn. 6, with *Barnett*, *supra*, 31 Cal.4th at p. 474), they are separate actions. Accordingly, they are not cases "in which a judgment of death has been rendered," and do not come within our exclusive jurisdiction under article VI, section 11. (*Thompson*, *supra*, 25 Cal.4th at p. 124.) This conclusion harmonizes the appellate jurisdiction provisions in section 11 of article VI with the writ jurisdiction provisions of section 10, which include no limitation applicable to capital cases. As we have explained, there would be no constitutional impediment to a court of appeal exercising its original jurisdiction over a habeas corpus petition seeking review of a superior court denial of relief in a capital case. (See *Clark*, *supra*, 5 Cal.4th at p. 767, fn. 7.) It would be anomalous if this court had *exclusive* jurisdiction to review habeas corpus rulings on appeal in capital cases, but *shared* jurisdiction with the courts of appeal over habeas corpus petitions filed for the same purpose of reviewing a superior court ruling.[18]

For these reasons, section 1509.1, subdivision (a) does not violate the state Constitution by granting appellate jurisdiction to the courts of appeal in capital habeas corpus proceedings. As petitioner points out, however, it does conflict

_____

*(Footnote continued from previous page.)*

the habeas corpus proceeding as "an independent, collateral challenge to an earlier, completed criminal prosecution." (*Id*. at p. 975.)

[18] In *In re Steele* (2004) 32 Cal.4th 682, we recognized the courts of appeals' writ jurisdiction to review trial court decisions in capital habeas corpus proceedings. We held that rulings on discovery motions under section 1054.9 are reviewable "by a petition for writ of mandate in the Court of Appeal." (*Steele*, at p. 692; see art. VI, § 10 [granting original jurisdiction to all three court levels in mandamus proceedings as well as habeas corpus proceedings].)

with section 1506, which requires the People to appeal directly to this court if they wish to challenge a grant of relief to a capital habeas petitioner. Proposition 66 does not expressly repeal this provision of section 1506, but an implied repeal is plainly effected. Although there is a presumption against repeals by implication, "[w]hen a later statute enacted by initiative is inconsistent and cannot operate concurrently with an earlier statute enacted by the Legislature, the later statute prevails." (*Burlington Northern & Santa Fe Ry. Co. v. Public Utilities Commission* (2003) 112 Cal.App.4th 881, 890; see *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1038 (*Professional Engineers*).)

The provision of section 1509.1, subdivision (a) allowing "[e]ither party [to] appeal the decision of a superior court on an initial petition . . . to the court of appeal" cannot operate concurrently with the provision of section 1506 requiring a People's appeal to be taken to this court in a capital habeas corpus proceeding. Proposition 66 was manifestly intended to occupy the field of habeas corpus review of superior court rulings in capital cases. (See *Professional Engineers*, *supra*, 40 Cal.4th at p. 1038.) The terms of section 1509.1, subdivision (a) "demonstrate a clear intent by the electorate to supersede prior law," displacing the provisions of section 1506 governing People's appeals from superior court rulings. (*Professional Engineers*, at p. 1039.)[19]

---

[19] Section 1506 also provides that "in all criminal cases where an application for a writ of habeas corpus has been heard and determined in a court of appeal, either the defendant or the [P]eople may apply for a hearing in the Supreme Court." Should a court of appeal determine that good cause exists under section 1509, subdivision (a) for it to hear a capital habeas corpus petition, this provision of section 1506 would be applicable. No provision of Proposition 66 addresses review in these circumstances.

28

Petitioner further argues that section 1509.1, subdivision (a) is unconstitutional because it makes an appeal the *exclusive* means of reviewing a superior court habeas corpus ruling. The statute declares that "[a] successive petition shall not be used as a means of reviewing a denial of habeas relief," abolishing the existing practice under which review may be obtained by filing a new petition in a higher court. (§ 1509.1, subd. (a).) Petitioner claims this restriction infringes on the original habeas corpus jurisdiction of the appellate courts under article VI, section 10. We disagree.

It is true that the former method of seeking review by filing a new petition was based on the appellate courts' original habeas corpus jurisdiction. (*Reed*, *supra*, 33 Cal.3d at p. 918, fn. 2; *In re Michael E.* (1975) 15 Cal.3d 183, 193, fn. 15.) However, it does not follow that the discontinuation of that practice violates article VI, section 10. Section 1509.1, subdivision (a)'s bar against renewed petitions in a higher court speaks not to jurisdiction, but to the *use* of habeas corpus for a particular purpose. Statutory restrictions on the subject matter of renewed petitions are an accepted means of combatting abusive practices. (See § 1475; *Clark*, *supra*, 5 Cal.4th at pp. 770-774.) The courts themselves have developed a number of "procedural bars" in an attempt to put reasonable limits on collateral attacks by way of habeas corpus. (*Clark*, at pp. 763-770.) These include a long-established rule that habeas corpus may not be employed as a substitute for appeal, either by challenging claims rejected on an earlier appeal (*In re Waltreus* (1965) 62 Cal.2d 218, 225), or by raising claims that could have been but were not raised on appeal (*In re Dixon* (1953) 41 Cal.2d 756, 759). Under section 1509.1, subdivision (a), review of habeas corpus rulings is now available to petitioners on appeal. The statute's bar on renewed petitions is a procedural one, limited in scope and similar in effect to the *Waltreus* and *Dixon* rules. It is a reasonable effort to avoid duplication, consistent with settled law that habeas corpus does not

serve as a second appeal. (*In re Harris* (1993) 5 Cal.4th 813, 825-827.) It does not prevent a court from exercising its writ jurisdiction, but merely provides it with another tool for disposing of repeated claims.

Thus, section 1509.1, subdivision (a) does not violate article VI, section 10. We note that prisoners are free to challenge the restriction on grounds peculiar to their own circumstances.

## C. *The Equal Protection Claim*

Petitioner argues that Proposition 66's restrictions on successive habeas corpus petitions by prisoners sentenced to death violate the equal protection clauses of the state and federal Constitutions. Section 1509, subdivision (d) requires that "a successive petition whenever filed" be dismissed unless the court finds the prisoner actually innocent or ineligible for the death penalty. This rule is a substantial revision of the policy established in *Clark*, *supra*, 5 Cal.4th 750. Under *Clark*, successive petitions are permitted even "absent justification for the failure to present all known claims in a single, timely petition," if the prisoner can establish that a "*fundamental* miscarriage of justice occurred." (*Id*. at p. 797.)[20] Nevertheless, petitioner's equal protection claim stumbles at the threshold.

---

[20] *Clark* explained that a "fundamental miscarriage of justice" occurs when "it can be demonstrated: (1) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; (3) that the death penalty was imposed by a sentencing authority which had such a grossly misleading profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury would have imposed a sentence of death; (4) that the petitioner was convicted or sentenced under an invalid statute." (*Clark*, *supra*, 5 Cal.4th at pp. 797-798, fns. omitted.)

Petitioner also relies on the provisions of section 1473 governing habeas corpus petitions based on claims of "false evidence." However, section 1473 does not mention successive petitions. While it may apply to such petitions, petitioner

*(Footnote continued on next page.)*

30

" 'Broadly stated, equal protection of the laws means "that no person or class of persons shall be denied the same protection of the laws [that] is enjoyed by other persons or other classes *in like circumstances* in their lives, liberty and property and in their pursuit of happiness." [Citation.]' [Citation.] It does not mean, however, that ' "things . . . different in fact or opinion [must] be treated in law as though they were the same." [Citation.]' [Citation.] '[N]either the Fourteenth Amendment of the Constitution of the United States nor the California Constitution [citations] precludes classification by the Legislature or requires uniform operation of the law with respect to persons who are different.' [Citation.] Thus, . . . a threshold requirement of any meritorious equal protection claim 'is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner. [Citation.]' [Citation.] 'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for [the particular] purposes of the law challenged." ' " (*People v. Guzman* (2005) 35 Cal.4th 577, 591-592, italics added.)

Petitioner argues that prisoners sentenced to death are situated similarly to noncapital prisoners because both groups have the same interest in freedom from an illegal or unjust conviction or sentence. Such a characterization of the interest at stake is overly broad. The question is whether capital and noncapital prisoners are similarly situated for purposes of section 1509's restrictions on the filing of successive petitions. Proponents point out that in California only capital prisoners

*(Footnote continued from previous page.)*

does not suggest it overrides the *Clark* limitations, or explain why section 1509 may not further limit false evidence claims in successive petitions consistently with equal protection principles.

31

are guaranteed postconviction counsel and funds for investigation, and thus they are better able than noncapital prisoners to present a comprehensive initial habeas corpus petition. (See *In re Reno*, *supra*, 55 Cal.4th at pp. 456-457 (*Reno*).) The reason for these guarantees arises from considerations unique to the death penalty: "In a capital case, a detailed and comprehensive *first* state habeas corpus petition serves an important purpose, for courts can rest assured that, between the trial, the appeal, and the habeas corpus petition, the defense has had ample opportunity to raise all meritorious claims, the adversarial process has operated correctly, and both this court and society can be confident that, before a person is put to death, the judgment that he or she is guilty of the crimes and deserves the ultimate punishment is valid and supportable." (*Id*. at p. 456, fn. omitted.)

With respect to successive petitions, *Reno* set out the significant differences between capital and noncapital prisoners. We observed that the justification for a comprehensive first habeas corpus petition in a capital case "all but disappears for second and subsequent petitions in this court. Absent the unusual circumstance of some critical evidence that is truly 'newly discovered' under our law, or a change in the law, such successive petitions rarely raise an issue even remotely plausible, let alone state a prima facie case for actual relief. In the 18 years since [] *Clark*, *supra*, 5 Cal.4th 750, experience has taught that in capital cases, petitioners frequently file second, third, and even fourth habeas corpus petitions raising nothing but procedurally barred claims." (*Reno*, *supra*, 55 Cal.4th at pp. 457-458, fns. omitted.) Such abusive successive writ practices are not nearly so common in noncapital cases.

*Reno* noted that the prevalence of meritless successive writ petitions "has threatened to undermine the efficacy of the system for adjudicating petitions for collateral relief in cases involving the death penalty." (*Reno*, *supra*, 55 Cal.4th at p. 442.) Accordingly, we "establish[ed] some new ground rules for [successive]

32

petitions in capital cases that will speed this court's consideration of them without unfairly limiting petitioners from raising (and exhausting) justifiably new claims." (*Id*. at p. 443.) We deemed these new rules necessary because abusive practices were a problem *specific to capital cases.* "The abusive nature of the instant petition is by no means an isolated phenomenon. In those capital cases in which we have affirmed the judgment on appeal and then denied a typically lengthy first habeas corpus petition, we often — years later — receive [a successive] petition running several hundred pages long. Evaluation of the [successive] petition requires several weeks if not months of dedicated work by members of the court. As here, quite often the petition is nothing more than a repetition or reframing of past claims and unsubstantiated assertions of ineffective assistance of counsel. Rarely if at all does the petitioner justify his or her untimely presentation of claims.

"These practices, along with other factors, have created a significant threat to our capacity to timely and fairly adjudicate such matters. We are of course aware that '*death row inmates have an incentive to delay assertion of habeas corpus claims that is not shared by other prisoners*.' ([] *Clark*, *supra*, 5 Cal.4th at p. 806 (conc. & dis. opn. of Kennard, J.); see *Rhines v. Weber* (2005) 544 U.S. 269, 277–278 [suggesting capital defendants 'might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death'].) Yet those capital defendants whose appeals are fully briefed, and those habeas corpus petitioners whose briefing also is complete who may desire resolution, must sit and wait while we attend to these time-consuming but generally meritless [successive] petitions. Some death row prisoners with meritorious legal claims may languish in prison for years waiting for this court's review while we evaluate petitions raising dozens or even hundreds of frivolous and untimely claims. We are not the only state court of last resort concerned that

33

abusive [successive] petitions threaten the court's ability to function. (See *Commonwealth of Pennsylvania v. Spotz* (2011) 610 Pa. 17, 171 (conc. opn. of Castille, C. J.) [estimating that the time required to evaluate an abusive postconviction petition in capital cases renders the Pa. Supreme Ct. 'unable to accept and review about five discretionary appeals'].)" (*Reno*, *supra*, 55 Cal.4th at pp. 514-515, italics added.)

The new rules announced in *Reno* established page limits for successive petitions in capital cases and permitted certain claims to be presented in abbreviated form. (*Reno*, *supra*, 55 Cal.4th at pp. 515-516.) We also required counsel to clearly identify those claims that were earlier raised and rejected and in what proceedings, those claims that could have been raised earlier, those that were truly new, and those presented pursuant to federal court order requiring the exhaustion of state claims. (*Id*. at p. 443.) We advised counsel that in the future, abusive writ practices could result in financial sanctions. (*Id*. at p. 514.) We adopted these extraordinary measures to address issues peculiar to the successive petition process in capital cases. Section 1509 tackles the same problems. Our exhaustive discussion in *Reno* explains how successive petitions in capital cases present special difficulties, and demonstrates that capital and noncapital petitioners are not similarly situated with respect to section 1509.

Petitioner relies on *Allen v. Butterworth* (Fla. 2000) 756 So.2d 52, in which the Florida Supreme Court commented that a statute imposing deadlines on capital postconviction procedures violated equal protection. (*Id*. at p. 54.) The comment was dictum. The *Allen* court conducted no equal protection analysis, and based its holding instead on separation of powers grounds. (*Ibid*.; see *Abdool v. Bondi* (Fla. 2014) 141 So.3d 529, 546.) In *Abdool*, the same court rejected an equal protection challenge to a different statute restricting the time for capital defendants to file postconviction motions. Holding that the statute did not unjustifiably treat capital

34

defendants differently from noncapital defendants, the court added: "[E]ven if we were to find that equal protection is implicated, there is no constitutional violation. . . . death sentences are necessarily different [from] other sentences. Unlike incarcerative sentences, which are carried out over a period of time, a death sentence is not accomplished until execution. Thus, defendants who have been convicted and sentenced to death are necessarily treated differently." (*Abdool*, at p. 546.) These observations are consistent with our conclusion here.[21]

Our holding on the equal protection claim raised by petitioner poses no bar to other constitutional challenges to section 1509, one of which we discuss next. It merely reflects the reality that successive habeas corpus petitions in capital cases present problems distinct from those in noncapital cases.

D. *The Separation of Powers Claims*

Petitioner contends Proposition 66 violates the separation of powers doctrine by defeating or materially impairing the exercise of judicial functions in various ways. After a review of separation of powers principles, we discuss petitioner's attack on section 1509's restrictions on untimely and successive

---

[21]     Petitioner also relies on *State v. Noling* (Ohio 2016) 75 N.E.3d 141. There, the Ohio Supreme Court decided that equal protection principles were violated by a statute requiring capital offenders to obtain leave from that court to file an appeal from the denial of a postconviction motion for DNA testing. Other offenders had unfettered access to the court of appeals after such a denial. (*Id*. at pp. 145-146.) The court disagreed with an argument that capital and non-capital offenders were not similarly situated. "[T]he statutory scheme relevant here concerns applications for postconviction DNA testing. . . . That certain applicants are sentenced to death and others to prison terms is nearly irrelevant under the statute." (*Id*. at p. 148.)

The Ohio court's reasoning is consistent with the equal protection principle that the pertinent inquiry is whether persons are similarly situated *for purposes of the law challenged*. (See *People v. Guzman*, *supra*, 35 Cal.4th at p. 592.) As explained above, the successive petition restrictions of section 1509, subdivision (d) address issues arising particularly in capital postconviction proceedings.

habeas corpus petitions. We then address his arguments about Proposition 66's time limits and other measures intended to expedite proceedings. [22]

1. *Governing Principles*

"The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) "Although the language of California Constitution article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation], or that the actions of one branch may not significantly affect those of another branch." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52 (*Mendocino*).)

"Of necessity the judicial department as well as the executive must in most matters yield to the power of statutory enactments. [Citations.] The power of the legislature to regulate criminal and civil proceedings and appeals is undisputed." (*Brydonjack*, *supra*, 208 Cal. at pp. 442-443; accord, *Mendocino*, *supra*, 13

---

[22] In passing, petitioner claims the separation of powers doctrine is violated by the provisions of Government Code section 68665, calling on this court and the Judicial Council to reevaluate the competency standards for appointed counsel in capital postconviction proceedings. He relies on *Brydonjack v. State Bar* (1929) 208 Cal. 439, 442–443 (*Brydonjack*), where we construed a statute to avoid any restriction on our power to determine the qualifications for admission to the bar. *Brydonjack* is inapposite. Here the statute in no way infringes on our authority over admission to the practice of law. It merely provides guidelines for the exercise of our discretion over the qualifications of appointed counsel. (See Gov. Code, § 68665, subd. (b).)

36

Cal.4th at p. 54.)[23]  The scope of this power is broad, but not unlimited.  "[T]he legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions. . . . '[T]he mere procedure by which jurisdiction is to be exercised may be prescribed by the Legislature, unless . . . such regulations should be found to substantially impair the constitutional powers of the courts, or practically defeat their exercise.  [Citations.]"  (*Brydonjack*, at p. 444; accord, *Mendocino*, at p. 54.)

We have emphasized that "[t]he separation of powers limitation on the Legislature's power to regulate procedure is narrow.  Chaos could ensue if courts were generally able to pick and choose which provisions of the Code of Civil Procedure to follow and which to disregard as infringing on their inherent powers. The same concern applies to the Evidence Code, which, after all, generally limits a court's ability to consider evidence.  In most matters, the judicial branch must necessarily yield to the legislative power to enact statutes.  [Citations.]  Only if a legislative regulation truly defeats or *materially impairs* the courts' core functions . . . may a court declare it invalid."  (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1104 (*Le Francois*); see *Legislature v. Deukmejian*, *supra*, 34 Cal.3d at p. 674 [initiative measures are subject to the same constitutional limitations as statutes passed by the Legislature].)  Our observations in *Le Francois* apply equally to the Penal Code's procedural provisions.

---

[23]    Not all states grant such extensive authority over procedural law to the legislative branch.  In Florida, the Supreme Court has "exclusive power to 'adopt rules for the practice and procedure in all courts.'  Art. V, § 2(a), Fla. Const." (*Allen v. Butterworth*, *supra*, 756 So.2d at p. 54.)  Because of that significant difference, the separation of powers holding in *Allen* affords no support to petitioner.

2. *The Restriction on Untimely and Successive Petitions*

Section 1509, subdivision (c) states a general rule that an initial habeas corpus petition must be filed within one year of the superior court's order under Government Code section 68662, which directs the court either to appoint counsel for an indigent prisoner, find that the prisoner rejected an offer of an appointment, or deny an appointment on the ground that the prisoner is not indigent. Section 1509, subdivision (d) provides: "An initial petition which is untimely under subdivision (c) or a successive petition whenever filed shall be dismissed unless the court finds, by the preponderance of all available evidence, whether or not admissible at trial, that the defendant is actually innocent of the crime of which he or she was convicted or is ineligible for the sentence."

Petitioner contends the restrictions imposed by section 1509, subdivision (d) amount to a material impairment of the courts' inherent authority to consider successive and untimely petitions. He points out that the statute's limitations on habeas corpus claims go well beyond those this court has developed in cases such as *In re Robbins*, *supra*, 18 Cal.4th 770, and *Clark*, *supra*, 5 Cal.4th 750. What he does not point to is any authority holding that our power to prescribe limitations on habeas corpus petitions is *exclusive*, so that legislative action on that subject would violate the separation of powers. To the contrary, in *Clark* we recognized that legislation may be enacted "to control abuses of the writ and thereby spare courts with jurisdiction over habeas corpus petitions the burden of repetitious petitions." (*Clark*, at p. 771.) It is not unusual for initiative measures to "adopt various changes in procedural or substantive law previously mandated by this court." (*Raven*, *supra*, 52 Cal.3d at p. 348.) Petitioner cites no case in which such reforms have been struck down as material impairments of the judicial function because they alter judicially established rules.

As noted, we have long accorded priority to the legislative branch respecting measures "to regulate criminal and civil proceedings and appeals." (*Brydonjack*, *supra*, 208 Cal. at pp. 442–443; see *Le Francois*, *supra*, 35 Cal.4th at p. 1104.) Accordingly, to violate the separation of powers an initiative measure must do more than merely curtail procedures developed by this court. In *Mendocino*, we pointed out that while the courts have inherent power to act in certain areas without specific constitutional or legislative authorization, that does not mean a statute "necessarily violates the separation of powers doctrine whenever it legislates with regard to such an inherent judicial power or function." (*Mendocino*, *supra*, 13 Cal.4th at p. 57; see *People v. Standish* (2006) 38 Cal.4th 858, 879-880.)

Thus, section 1509, subdivision (d) is not objectionable simply because it legislates in an area where we have exercised our inherent authority. We note that some judicially imposed habeas corpus limitations have barred claims that do not go to the prisoner's actual innocence, such as those based on the admission of illegally obtained evidence. (See *Clark*, *supra*, 5 Cal.4th at p. 767.) Proposition 66 goes further in this direction, but that does not make it an invasion of a core *judicial* function. *Courts* continue to exercise their authority to entertain habeas corpus petitions under section 1509, as they did under the previous common law limitations. The new restrictions may limit claims that this court previously allowed *prisoners* to pursue, such as petitions seeking relief when a change in the law affects the validity of the statute under which the prisoner was convicted or sentenced. (See *Reno*, *supra*, 55 Cal.4th at p. 466; *Clark*, at p. 798; compare *Lott v. State* (Mont. 2006) 150 P.3d 337, 342.) Going forward, prisoners may seek to challenge such limitations in the context of their individual cases. We express no view on their prospects for relief, holding only that the modifications imposed by section 1509 do not materially impair the functioning of the courts.

3. *Time Limits*

Petitioner argues that a variety of time limits and calls for expedited proceedings in Proposition 66 interfere with the courts' inherent power to fairly and effectively address all the matters before them. We note that grants of priority to certain matters, and directives to conduct proceedings as speedily as possible, are a common feature of procedural statutes.[24] These legislatively imposed priorities have never been held to impair the courts' authority to control the disposition of the cases on their dockets. Accordingly, the provisions of Proposition 66 imposing a duty on this court to "expedite the review" of capital cases, appoint counsel "as soon as possible," and grant extensions of time for briefing only for "compelling or extraordinary reasons" (§ 1239.1, subd. (a)) are within the ordinary range of legislative authority. The same is true for provisions that require superior courts to conduct habeas corpus proceedings "as expeditiously as possible" (§ 1509, subd. (f)), and that declare it a purpose of the statutes governing the Habeas Corpus Resource Center "to expedite the

---

[24] For example, see sections 1048 (setting calendar priorities for criminal cases) and 1050, subdivision (a) (giving criminal cases "precedence over . . . any civil matters" as to trial setting); Welfare and Institutions Code sections 315 (detention hearing for dependent minor "shall be held as soon as possible" and no later than next judicial day after petition is filed), 632, subdivision (a) (same provision for delinquent minors), 395, subdivision (a)(1) (appeals in dependency cases given "precedence over all other cases"), 800 (same provision for delinquency appeals); Code of Civil Procedure sections 35 (trial calendar preference for election matters), 36 (trial calendar preference for the aged, children, and the very ill), 44 (preference on appeal for probate proceedings, election contests, and certain defamation cases), 460.5 (calendar preference and other provisions for expediting proceedings in libel and slander actions), 1062.3, subdivision (a) (declaratory relief actions "shall be set for trial at the earliest possible date and shall take precedence over all other cases"), 1291.2 (general calendar preference for arbitration cases); and Family Code section 3454 (expedited appellate procedures in child support enforcement cases).

completion of state habeas corpus proceedings in capital cases" (Gov. Code, § 68660.5).

Petitioner also challenges the specific time limits provided in sections 190.6, subdivision (d) and 1509, subdivision (f). Section 190.6, subdivision (d) imposes a five-year limit on the completion of the appellate and initial habeas corpus review processes.[25] Section 1509, subdivision (f) requires the superior court to resolve an initial petition within one year unless a substantial claim of actual innocence requires a delay, and sets a two-year boundary for the completion of every initial habeas corpus proceeding.[26] A more searching inquiry is necessary to determine whether such restrictions violate the separation of powers.

The subject is not a new one. We have long recognized that imposing fixed time limits on the performance of judicial functions raises serious separation of powers concerns. In *Garrison v. Rourke*, *supra*, 32 Cal.2d 430 (*Garrison*), we declared that "[a] time limitation for the court's action in a matter subject to its determination is not mandatory (regardless of the mandatory nature of the language), unless a consequence or penalty is provided for failure to do the act within the time commanded." (*Id.* at pp. 435-436; see *Kabran v. Sharp Memorial*

---

[25] "Within 18 months of the effective date of this initiative, the Judicial Council shall adopt initial rules and standards of administration designed to expedite the processing of capital appeals and state habeas corpus review. Within five years of the adoption of the initial rules or the entry of judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases." (§ 190.6, subd. (d).)

[26] "Proceedings under this section shall be conducted as expeditiously as possible, consistent with a fair adjudication. The superior court shall resolve the initial petition within one year of filing unless the court finds that a delay is necessary to resolve a substantial claim of actual innocence, but in no instance shall the court take longer than two years to resolve the petition." (§ 1509, subd. (f).)

*Hospital* (2017) 2 Cal.5th 330, 343; *People v. Allen* (2007) 42 Cal.4th 91, 102.) At issue in *Garrison* was the effect of a statute requiring the trial court to rule on an election contest within 10 days.[27] The court missed the deadline but subsequently issued a ruling. The losing party contended the court had lost jurisdiction when the time limit was exceeded. (*Garrison*, at pp. 433-434.)

The *Garrison* court rejected the claim, invoking the separation of powers doctrine. "While the courts are subject to reasonable statutory regulation of procedure and other matters, they will maintain their constitutional powers in order effectively to function as a separate department of government. [Citations.] Consequently an intent to defeat the exercise of the court's jurisdiction will not be supplied by implication. To what extent the Legislature may constitutionally enact regulations affecting procedure which will defeat or interfere with the exercise of jurisdiction or of the judicial power [citations], is not necessary to determine in the absence, as here, of provisions clearly indicating that intent." (*Garrison*, *supra*, 32 Cal.2d at p. 436.) Reasoning that the primary aim of the statute before it was not speed, but ensuring the fairness of an election, *Garrison* declined to give the term "shall" its normal mandatory interpretation, which would "lead to the result of defeating the aims and purposes of the statute and of raising serious constitutional questions." (*Id*. at p. 437.)

*Garrison* relied in part on *In re Shafter-Wasco Irr. Dist.* (1942) 55 Cal.App.2d 484 (*Shafter-Wasco*), which involved a time limit on the resolution of

---

**27** Elections Code former section 8556: "The court shall continue in special session to hear and determine all issues arising in contested elections. After hearing the proofs and allegations of the parties and within ten days after the submission thereof the court shall file its findings of fact and conclusions of law, and immediately thereafter shall pronounce judgment in the premises, either confirming or annulling and setting aside the election. The judgment shall be entered immediately thereafter."

an appeal.  An uncodified statute governing the dissolution of irrigation districts provided that an action contesting the validity of such a dissolution " 'shall be speedily tried and judgment rendered.  Either party shall have the right to appeal at any time within thirty days after the entering of such judgment, and the appeal must be heard and determined within three months after the taking of such appeal.' " (*Shafter-Wasco*, at p. 486.)  The respondents moved to dismiss the appeal after the three-month period expired.  The court noted that "all the proceedings in this appeal have been taken within the times established for appeals in ordinary cases," yet the time set for decision had elapsed before the respondents' brief was due.  (*Ibid*.)  "The question here presented may be thus stated:  May the Legislature divest this court of its constitutional jurisdiction over the case and its duty to decide it by limiting the time in which a decision must be rendered, to a period within which it is impracticable, if not impossible, to decide the issues?"  (*Id*. at p. 487.)

"Of course it is within the power of the Legislature to impose reasonable rules and regulations governing the exercise of a constitutional power.  It is equally true that those constitutional powers may not be so restricted by unreasonable rules as to virtually nullify them.  If the statute in question be strictly construed as mandatory and as divesting this court of jurisdiction in three months after the appeal was taken we would have had to decide the case . . . one month and two days after the record was filed here, three days after appellant's opening brief was filed and twenty-seven days before respondents' brief was due for filing.  We regard such a limitation on our constitutional power to decide the case as unreasonable . . . .  While the record is not formidable it is not inconsiderable.  While we have not examined it, there may be presented serious questions for decision that might require careful consideration which could not be given within

the time provided by the statute." (*Shafter-Wasco*, *supra*, 55 Cal.App.2d at p. 487.)

The court acknowledged that a statute declaring an appeal "*must* be heard and determined within three months" would "usually [be] construed as mandatory." (*Shafter-Wasco*, *supra*, 55 Cal.App.2d at p. 488.)  However, relying on the rules favoring statutory construction to avoid absurd or unjust results, account for statutory context, and uphold a statute's constitutionality when reasonably possible, the court concluded that the time limit before it was "directory and was intended to give this appeal as early a hearing and decision as orderly procedure in this court will permit."  (*Id.* at p. 489.)  Otherwise, the court would have held the statute "an unreasonable limitation on the constitutional powers of the appellate and supreme courts."  (*Id.* at p. 488.)

In *Garrison* and *Shafter-Wasco*, the courts preserved jurisdiction and maintained the separation of powers by holding that time limits phrased in mandatory terms were merely directory.[28]  In *People v. Engram* (2010) 50 Cal.4th

---

[28]    Courts in other states have held that deadlines on judicial decisionmaking violate the separation of powers doctrine.  (E.g., *State v. Buser* (2015) 302 Kan. 1, 8-9; *In re Grady* (Wis. 1984) 348 N.W.2d 559, 570; *Coate v. Omholt* (Mont. 1983) 662 P.2d 591, 593; *Sands v. Albert Pike Motor Hotel* (Ark. 1968) 434 S.W.2d 288, 291-292; *State ex rel. Kostas v. Johnson* (Ind. 1946) 69 N.E.2d 592, 595; *Atchison, T. & S. F. Ry. Co. v. Long* (Okla. 1926) 251 P. 486, 489; *Schario v. State* (Ohio 1922) 138 N.E. 63, 64; see also, e.g., *Resolute Ins. Co. v. Seventh Jud. Dist. Ct. of Okl. Co., Okl.* (W.D.Okla. 1971), 336 F.Supp. 497, 503; *U.S. v. Brainer* (D.Md. 1981) 515 F.Supp. 627, 636; Ryan, *Rush to Judgment:  A Constitutional Analysis of Time Limits on Judicial Decisions* (1997) 77 B.U. L.Rev. 761; but see *State ex rel. Emerald People's Util. v. Joseph* (Or. 1982) 640 P.2d 1011, 1014 [three-month limit for deciding appeals "does not on its face necessarily 'unduly burden or unduly interfere with the judiciary in the exercise of its judicial functions' "].)

The California approach has the benefit of allowing time limits set by the legislative branch to function as nonbinding guidelines, when reasonably possible.

*(Footnote continued on next page.)*

44

1131 (*Engram*) we examined the separation of powers problems posed by a statute prescribing a mandatory calendar preference.  A criminal prosecution had been dismissed under the speedy trial statute (§ 1382) because no judge was available to hear the case.  The prosecutor challenged the dismissal, contending the preference for criminal cases provided in section 1050 required the trial court to assign the case to available courtrooms where juvenile, family law, and probate matters were heard.[29]  (*Engram*, at pp. 1143-1144.)

The *Engram* court disagreed.  "It is well established, in California and elsewhere, that a court has both the inherent authority and responsibility to fairly

---

*(Footnote continued from previous page.)*

A similar construction of a mandatory limit as "directory" was applied in *Waite v. Burges*s (Nev. 1952) 245 P.2d 994, 996.

[29]    At the time, section 1050, subdivision (a) provided:  "The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time.  To this end, the Legislature finds that the criminal courts are becoming increasingly congested with resulting adverse consequences to the welfare of the people and the defendant.  Excessive continuances contribute substantially to this congestion and cause substantial hardship to victims and other witnesses.  Continuances also lead to longer periods of presentence confinement for those defendants in custody and the concomitant overcrowding and increased expenses of local jails.  It is therefore recognized that the people, the defendant, and the victims and other witnesses have the right to an expeditious disposition, and to that end it shall be the duty of all courts and judicial officers and of all counsel, both for the prosecution and the defense, to expedite these proceedings to the greatest degree that is consistent with the ends of justice.  *In accordance with this policy, criminal cases shall be given precedence over, and set for trial and heard without regard to the pendency of, any civil matters or proceedings.*  In further accordance with this policy, death penalty cases in which both the prosecution and the defense have informed the court that they are prepared to proceed to trial shall be given precedence over, and set for trial and heard without regard to the pendency of, other criminal cases and any civil matters or proceedings, unless the court finds in the interest of justice that it is not appropriate."  (Italics added; see *Engram*, *supra*, 50 Cal.4th at pp. 1150-1151.)

and efficiently administer all of the judicial proceedings that are pending before it, and that one important element of a court's inherent judicial authority in this regard is 'the power . . . to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.' (*Landis v. North American Co.* (1936) 299 U.S. 248, 254–255; see, e.g., *Hays v. Superior Court* (1940) 16 Cal.2d 260, 264 ['There is nothing novel in the concept that a trial court has the power to exercise a reasonable control over all proceedings connected with the litigation before it. Such power necessarily exists as one of the inherent powers of the court and such power should be exercised by the courts in order to insure the orderly administration of justice.']; *Plachte v. Bancroft, Inc.* (N.Y.App.Div. 1957) 161 N.Y.S.2d 892, 893 ['It is ancient and undisputed law that courts have an inherent power over the control of their calendars, and the disposition of business before them, including the order in which disposition will be made of that business.'].) As this court observed in *Brydonjack* [, *supra*,] 208 Cal. [at p. 442]: 'Our courts are set up by the Constitution without any special limitations; hence the courts have and should maintain vigorously all the inherent and implied powers necessary to properly and effectively function as a separate department in the scheme of our state government.' " (*Engram*, *supra*, 50 Cal.4th at p. 1146.)

In *Engram* we acknowledged the Legislature's power to enact rules of procedure, but quoted *Brydonjack* for the fundamental limitation noted above: " 'The sum total of this matter is that the legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions.' " (*Engram*, *supra*, 50 Cal.4th at p. 1147, quoting *Brydonjack*, *supra*, 208 Cal. at p. 444.) We discussed two examples in which the courts refused to give mandatory effect to statutes requiring

46

a continuance of trial. In *Lorraine v. McComb* (1934) 220 Cal. 753, 754 (*Lorraine*), a statute provided that "the court shall postpone a trial" upon the agreement of counsel. The requirement was held to be directory only, to avoid impinging on the courts' inherent authority to control the order of their business. (*Id*. at pp. 756-757; see *Engram*, at pp. 1147-1148.) Similarly, in *Thurmond v. Superior Court* (1967) 66 Cal.2d 836 (*Thurmond*), a statute declared that a trial or hearing "shall be postponed" if an attorney were a member of the Legislature and the Legislature were in session. (*Id*. at p. 838, fn. 2.) The court deemed this provision directory, to protect the trial court's discretion to control the order of its business so as to safeguard the interests of all parties.[30] (*Id*. at p. 839.) It noted the "serious constitutional questions" that would otherwise arise under the separation of powers doctrine. (*Ibid*.; see *Engram*, at pp. 1149-1150.)

The *Engram* court emphasized that under the terms of section 1050, the trial preference granted to criminal cases was to be applied in accord with the policy of "expedit[ing] these proceedings to the greatest degree that is consistent with the ends of justice." (*Engram*, *supra*, 50 Cal.4th at p. 1150.) It concluded that, "particularly in light of the constitutional separation-of-powers considerations set forth in the decisions in *Lorraine*, *supra*, 220 Cal. 753, and *Thurmond*, *supra*, 66 Cal.2d 836, we find it abundantly clear that the provisions of section 1050 cannot properly be interpreted to require a trial court completely to forgo or abandon consideration of *all* civil cases or proceedings over an extended period of time when the number of criminal cases filed and pursued to trial continually

---

[30] The *Engram* court explained that the term "directory" is sometimes used to describe statutes that prescribe no remedy for their violation, and sometimes, as in *Lorraine* and *Thurmond*, simply to signify that a statute is directive or permissive rather than mandatory. (*Engram*, *supra*, 50 Cal.4th at p. 1148, fn. 7.)

overwhelms the resources available to the court for the disposition of both criminal and civil matters." (*Engram*, at p. 1152.)

One more case merits consideration. Before the court in *Verio Healthcare, Inc. v. Superior Court* (2016) 3 Cal.App.5th 1315 (*Verio*) were amendments to the statutes reviewed in *Thurmond*, *supra*, 66 Cal.2d 836. The year after *Thurmond* was decided, the Legislature amended Code of Civil Procedure sections 595 and 1054.1 to specify that a continuance was mandatory if an attorney is a member of the Legislature and the Legislature is in session, *unless* the court determines that a continuance would defeat or abridge a right to relief in specified proceedings seeking provisional relief. (*Verio*, at p. 1327.) The *Verio* court observed that while these forms of relief were discussed in *Thurmond*, the amendments "left out this portion of the *Thurmond* opinion: 'Situations other than those involving provisional remedies may also arise in which a substantial existing right would be defeated or abridged by extended continuances.' (*Thurmond*, *supra*, 66 Cal.2d at p. 839.)" (*Verio*, at p. 1329.)

Relying on *Engram*, *Thurmond*, and *Lorraine*, the *Verio* court held that "[u]nless sections 595 and 1054.1, subdivision (b) are interpreted as directory, they continue to infringe on the independence of the judiciary." (*Verio*, *supra*, 3 Cal.App.5th at p. 1329.) The statutes did not include a qualification recognizing the court's obligation to conduct proceedings "in a manner that is consistent with the ends of justice," as in *Engram*, *supra*, 50 Cal.4th at p. 1151. "To the contrary, with certain exceptions, sections 595 and 1054.1 explicitly describe the continuance or extension of time as 'mandatory.' " (*Verio*, at p. 1330.) Nevertheless, *Verio* refused to give the statutes mandatory effect. " [A]s we noted above, the exceptions are directed entirely toward provisional relief and fail to account for our high court's conclusion that a mandatory lengthy stay may hamper a court's fundamental mandate even outside the context of provisional relief. We

48

conclude, therefore, that sections 595 and 1054.1 are unconstitutional to the extent they purport to be mandatory, and should continue to be treated as directory, subject to a trial court's discretion as set forth in *Thurmond*." (*Ibid.*)

Thus, our case law establishes that while the Legislature has broad authority to regulate procedure, the constitutional separation of powers does not permit statutory restrictions that would materially impair fair adjudication or unduly restrict the courts' ability to administer justice in an orderly fashion. Repeatedly, for over 80 years, California courts have held that statutes may not be given mandatory effect, despite mandatory phrasing, when strict enforcement would create constitutional problems. Section 190.6 raises similar concerns. The statute is framed in mandatory terms, and the voters were told in the ballot materials that the five-year limit on the posttrial review process would be binding and enforceable. On the other hand, both proponents and the Attorney General contended at oral argument that the five-year limit should not be given mandatory effect, but should instead be understood as largely aspirational. They urge that the limit may be seen as providing a frame of reference for the initiative's specific reforms designed to expedite the review process.

Petitioner disagrees. He contends the enforcement provisions of section 190.6, subdivision (e) show that the review limit was meant to be mandatory. In his view, a five-year limit on posttrial proceedings is not only impracticable, but also invades the courts' inherent authority to balance the matters before them in a way that is fair to all litigants.

On balance, we conclude it is best to accept the Attorney General's and intervener's concession that the five-year limit is not mandatory. We do so for two reasons. First, regardless of how the ballot materials characterized the five-year review limit, section 190.6, subdivision (e) provides no effective mechanism to enforce the limit. It states: "The failure of the parties or of a court to comply

49

with the time limit in subdivision (b) shall not affect the validity of the judgment or require dismissal of an appeal or habeas corpus petition. If a court fails to comply without extraordinary and compelling reasons justifying the delay, either party or any victim of the offense may seek relief by petition for writ of mandate. The court in which the petition is filed shall act on it within 60 days of filing. Paragraph (1) of subdivision (c) of Section 28 of Article I of the California Constitution, regarding standing to enforce victims' rights, applies to this subdivision and subdivision (d)." (§ 190.6, subd. (e).)

Notably, the time limit for which section 190.6, subdivision (e) authorizes a writ remedy is not the five-year limit on judicial review imposed by subdivision (d). It is the briefing time limit provided in section 190.6, subdivision (b), which states, as it long has, "in all cases in which a sentence of death has been imposed on or after January 1, 1997, the opening appellate brief in the appeal to the State Supreme Court shall be filed no later than seven months after the certification of the record for completeness . . . or receipt by the appellant's counsel of the completed record, whichever is later, except for good cause." Proponents assert that section 190.6, subdivision (e)'s reference to subdivision (b) was a drafting error. They claim they meant to refer to subdivision (d). But it is not clear that the reference to subdivision (b) in subdivision (e) was merely a typographical error. Well before Proposition 66 was adopted, section 190.6 provided that the failure of the parties or the court to comply with the deadline for filing the opening brief in the automatic appeal shall not affect the validity of the judgment. Subdivision (e)'s reference to subdivision (b) continues that long-standing provision.

In any event, it would be no solution to simply replace the letter "b" with the letter "d" in section 190.6, subdivision (e). A party or victim would then be authorized to "seek relief by petition for writ of mandate" "[i]f a court fails to

50

comply" with the requirement that "the state appeal and initial state habeas corpus review" be completed within five years. (§ 190.6, subds. (d) & (e).) However, serious problems would arise from such a provision. Section 190.6, subdivision (e) contemplates relief by petition for writ of mandate if "*a* court fails to comply." (Italics added.) Yet no *single* court is in a position to comply with a comprehensive five-year limit on the resolution of all posttrial proceedings in capital cases. The review process includes both direct appeals to this court and habeas corpus proceedings that begin in the trial court and advance to the courts of appeal for appellate review. Meeting such a deadline requires the coordination of efforts by multiple courts and other actors. This court as well as the superior courts must appoint counsel. All three levels of the state courts must supervise briefing schedules and decide the legal issues presented to them. Counsel on both sides must meet their obligations to represent the interests of their clients in competent and timely fashion. The Legislature must provide funding sufficient for the superior courts to meet their greatly expanded responsibilities under Proposition 66, and for this court and the courts of appeal to expedite review in capital cases without neglecting the other matters before them. As we made clear in *Engram*, *supra*, 50 Cal.4th at page 1146, courts have the "responsibility to fairly and efficiently administer *all* of the judicial proceedings that are pending before [them]." (Italics added.)

If there were any one court responsible for compliance with the five-year review limit of section 190.6, subdivision (d), presumably it would be this court, because the review process culminates here. But as a practical matter, writ relief to require us to enforce the limit is unavailable, because there is no tribunal with authority to issue a writ of mandate to this court. (See 2 Witkin, Cal. Procedure, *supra*, Courts, § 337, p. 429; Code Civ. Proc., § 1085, subd. (a) ["A writ of mandate may be issued by any court *to any inferior tribunal* . . ." (italics added)];

51

*Modern Barber Col. v. Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 730 (*Modern Barber*); *Davis v. Lansing* (2d Cir. 1988) 851 F.2d 72, 74 [federal courts lack jurisdiction to issue mandamus relief against state courts]; *Robinson v. California Bd. of Prison Terms* (C.D.Cal. 1998) 997 F.Supp. 1303, 1308 [to the same effect, citing cases].)

Furthermore, while writs of mandate may be issued to lower courts, achievement of the five-year goal depends in large part on a variety of discretionary determinations by superior courts and courts of appeal, most of which would not be controllable by writ of mandate. It is settled that " 'mandamus will not lie to control the discretion of a court or judicial officer or to compel its exercise in a particular manner, except in those rare instances when under the facts it can be legally exercised in but one way [citations].' " (*City of Torrance v. Superior Court* (1976) 16 Cal.3d 195, 201-202, italics omitted; see 8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, § 99 et seq., p. 993 et seq.) This limitation is fundamental, and implicit in the provisions of our state Constitution governing writ jurisdiction. (*Modern Barber*, *supra*, 31 Cal.2d at p. 731.) For all these reasons, section 190.6, subdivision (e) provides no workable means of enforcing the five-year review limit in subdivision (d).

As the concurring and dissenting opinion emphasizes, the ballot materials suggested the five-year limit would be mandatory. However, nowhere were the voters informed of the details of an enforcement mechanism. The materials mentioned the availability of a court order, but did not explain how such an order could effectively result in compliance. We recognize that the last sentence of section 190.6, subdivision (e) indicates the standing provisions in article I, section 28 of the California Constitution would give victims a right to enforce the five-

52

year limit in subdivision (d).[31]  Nevertheless, the problems with reforming the terms of section 190.6 to conform with the voters' probable intent are insurmountable, which is the second reason we are persuaded that the statute cannot be given mandatory effect.

It would require extensive rewriting to create an operative enforcement mechanism.  Even if we undertook that task, any provision that would make the five-year limit mandatory would pose serious separation of powers problems.  When we exercise our power of reformation, we do so in order to *preserve* a statute's constitutionality, not to threaten it.  "[W]e have the authority to revise [a statute] in a manner that *avoids* constitutional problems . . . ."  (*People v. Sandoval* (2007) 41 Cal.4th 825, 844, italics added.)  "[N]umerous decisions of the United States Supreme Court and lower federal courts and sister states, and numerous decisions of this court, amply support the propriety of judicial reformation — including 'rewriting' — of statutes to *preserve constitutionality . . . .*"  (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 626, italics added.)  It has never been our practice to rewrite a statute only to strike it down as unconstitutional.

The concurring and dissenting opinion argues at length that the voters intended the five-year limit to be mandatory.  We do not dispute that point.  However, it remains the case that section 190.6 lacks an effective enforcement mechanism.  And while the statute is phrased in mandatory terms, the same was true of the statutes at issue in the cases we have discussed.  (*Engram*, *supra*, 50

---

[31]    "A victim, the retained attorney of a victim, a lawful representative of the victim, or the prosecuting attorney upon request of the victim, may enforce the rights enumerated in subdivision (b) in any trial or appellate court with jurisdiction over the case as a matter of right. The court shall act promptly on such a request." (Cal. Const., art. I, § 28, subd. (c)(1).)  Subdivision (b)(9) of article I, section 28 entitles victims "[t]o a speedy trial and a prompt and final conclusion of the case and any related post-judgment proceedings."

Cal.4th at p. 1152, fn. 9; *Thurmond*, *supra*, 66 Cal.2d at p. 839; *Garrison*, *supra*, 32 Cal.2d at pp. 436-437; *Lorraine*, *supra*, 220 Cal. at p. 757; *Shafter-Wasco*, *supra*, 55 Cal.App.2d at p. 488; *Verio*, *supra*, 3 Cal.App.5th at p. 1319.) The concurring and dissenting opinion notes, as we have (fn. 28, *ante*), that other states have invalidated statutes which violate the separation of powers by imposing strict time limits. However, California courts have chosen a different approach to avoid separation of powers problems. Rather than striking down statutes that might unduly interfere with judicial functions, we construe them so as to maintain the courts' discretionary control. In *Engram*, for instance, we noted "the court in *Thurmond* did not hold that the statutory provisions in question were invalid on their face or were to be totally disregarded, but rather concluded that the statutes should be applied in a manner that accorded reasonable discretion to the court to safeguard the interests of all those before the court." (*Engram*, at p. 1150.)

In the cases cited above, mandatory statutory terms were intended to expedite proceedings or control docket management, but the courts declined to infer a *broader* intent to infringe on inherent judicial authority. As the *Verio* court put it, "we are not persuaded the Legislature intended to intrude on the right of the courts ' "to control [their] order of business and to so conduct the same that the rights of all suitors before them may be safeguarded. This power has been recognized as judicial in its nature, and as being a necessary appendage to a court organized to enforce rights and redress wrongs." ' " (*Verio*, *supra*, 3 Cal.App.5th at p. 1319, quoting *Thurmond*, *supra*, 66 Cal.2d at p. 839, and *Lorraine*, *supra*, 220 Cal. at p. 756.)

Following nine decades of precedent, we too decline to infer that lawmakers intended strict adherence to a fixed deadline that would undermine the courts' authority as a separate branch of government. It is far from certain that the voters contemplated such a result. Nothing in the Proposition 66 suggests that

short shrift should be given to the decisionmaking process, or that capital posttrial review proceedings should dominate dockets to the point that other cases would be left to languish. In the absence of clearer indications that this was the voters' intent, we will not presume they meant to hamper the courts in the conduct of their business. (See *Engram*, *supra*, 50 Cal.4th at pp. 1151-1152; *Garrison*, *supra*, 32 Cal.2d at p. 436.) Deciding cases and managing dockets are quintessentially core judicial functions. They are grounded in the Constitution and may not be materially impaired by statute. (*Le Francois*, *supra*, 35 Cal.4th at p. 1104; *Mendocino*, *supra*, 13 Cal.4th at p. 54; *Brydonjack*, *supra*, 208 Cal. at p. 444.)

Accordingly, we conclude that the five-year review limit in section 190.6, subdivision (d) is directive only. Its provision that the courts "shall complete the state appeal and the initial state habeas corpus review in capital cases" within five years is properly construed as an exhortation to the parties and the courts to handle cases as expeditiously as is consistent with the fair and principled administration of justice. (*Ibid*.; see *Garrison*, *supra*, 32 Cal.2d at pp. 435-436; *Shafter-Wasco*, *supra*, 55 Cal.App.2d at p. 489.) As in *Engram*, *Garrison*, *Thurmond*, and *Lorraine*, the term "shall" is not mandatory. (*Engram*, *supra*, 50 Cal.4th at pp. 1150-1152; *Thurmond*, *supra*, 66 Cal.2d at pp. 838-840; *Garrison*, at p. 437; *Lorraine*, *supra*, 220 Cal. at pp. 754, 757; cf. *Shafter-Wasco*, at pp. 488-489.)

In *Engram* we read the terms of section 1050 requiring calendar preference for criminal cases in light of the statute's declared "policy of expediting criminal cases 'to the greatest degree *that is consistent with the ends of justice*.' " (*Engram*, *supra*, 50 Cal.4th at p. 1151, quoting § 1050, subd. (a).) The provisions establishing the preference were as facially mandatory as those of section 190.6, subdivision (d), but we rejected a construction that would lead to a "rigid and absolute rule." (*Engram*, at p. 1161.) Likewise here, section 190.6, subdivision (d) begins with a declaration that "[t]he right of victims of crime to a prompt and

final conclusion, as provided in paragraph (9) of subdivision (b) of Section 28 of Article I of the California Constitution, includes the right to have judgments of death carried out *within a reasonable time*." (§ 190.6, subd. (d), italics added.) This language makes it clear that the electorate did not intend to impose an *unreasonable* limit. The five-year period may be understood to express the voters' view of what would ordinarily constitute "a reasonable time" for completing review proceedings. However, courts must make individualized decisions based on the circumstances of each case. They retain discretion over the time required to resolve particular matters, and over the management of their dockets.

Similar considerations apply to section 1509, subdivision (f)'s time limits for superior court rulings on initial habeas corpus petitions. Petitioner offers little argument supporting his challenge to this provision, but the Habeas Corpus Resource Center, in an amicus curiae brief, contends the statute's one and two-year limits are too short for counsel and the courts to adequately perform their functions.[32] Again we observe that no issue is raised by this petition concerning the infringement of an individual prisoner's rights in a particular case. Such claims remain open. Here we consider only the effect of the time limits on judicial functions.

The limits in section 1509, subdivision (f) are plainly directory, under *Garrison*, *supra*, 32 Cal.2d at page 436. No jurisdictional consequence is provided if they are not met. Nor can these limits be deemed mandatory in any other sense, despite the unconditional language in which they are stated. There is

---

[32] The statute contemplates that an initial petition "shall [be] resolve[d] . . . within one year of filing unless the court finds that a delay is necessary to resolve a substantial claim of actual innocence, but in no instance shall the court take longer than two years to resolve the petition." (§ 1509, subd. (f).)

56

no provision for their enforcement. The ballot materials did not portray them as rigid requirements. The Legislative Analyst explained that trial courts would "generally . . . have one year to make a decision on the petition." (Voter Guide, *supra*, analysis of Prop. 66 by Legis. Analyst, p. 106.) The subject is not mentioned in the arguments for and against the measure.

We note that section 1509, subdivision (f) begins with a provision calling for proceedings to "be conducted as expeditiously as possible, *consistent with a fair adjudication*." (Italics added.) As in *Engram*, "the statute explicitly recognizes a court's fundamental and overriding obligation to administer the proceedings that are pending before it in a manner that is consistent with the ends of justice." (*Engram*, *supra*, 50 Cal.4th at p. 1151.) Therefore, "the provision cannot properly be interpreted as establishing an absolute or inflexible rule . . . in total abrogation of a trial court's ultimate control or discretion." (*Ibid*.) If in a particular case the time limits imposed by section 1509, subdivision (f) are not "consistent with a fair adjudication," as the statute requires, the voters signaled that the interest of fairness must prevail. Moreover, as with section 190.6, nothing in section 1509 suggests the voters contemplated that courts would neglect their other business in order to comply with the time limits. Proposition 66 presumes that the courts will have sufficient resources to manage their caseloads.

Our conclusion that the time limits in sections 190.6, subdivision (d) and 1509, subdivision (f) are merely directive does not empty them of meaning.[33]

[33] Established separation of powers precedent requires us to give a saving construction to the time limits in Proposition 66. However, we caution the drafters of initiative measures against the inclusion of sweeping statutory language that is inconsistent with constitutional norms. The voters should not be presented with terms whose ordinary meaning conflicts with the Constitution. Although we resolve doubts in favor of a proposition's validity, we must nevertheless review statutes adopted through the initiative process under generally applicable

*(Footnote continued on next page.)*

Legislated time limits can establish as a matter of policy that the proceedings they govern should be given "as early a hearing and decision as orderly procedure . . . will permit." (*Shafter-Wasco*, *supra*, 55 Cal.App.2d at p. 489.)  They may serve as benchmarks to guide courts, if meeting the limits is reasonably possible.  What is reasonably possible, however, will depend on a variety of factors, both structural and case-specific.

It remains to be seen how effective the procedures enacted by Proposition 66 will be in expediting the capital posttrial review process.  The time limits reflect the voters' will, which we respect.  However, they were presented to the voters by the proponents of Proposition 66 without the benefit of hearings or research exploring their feasibility or their impact on the rest of the courts' work.  As the concurring opinion explains, these are issues of considerable complexity and difficulty.  The implementation of Proposition 66 will necessarily be an ongoing process of exploration and adaptation.  The Judicial Council is tasked with monitoring the review process established by the initiative.  (§ 190.6, subd. (d).)  Its supervision will shed light on the achievability and efficacy of the measure's extensive reforms.

Much depends on the funding made available by the Legislature.  What cannot be permitted is the material impairment of judicial functions by any statute.  The superior courts must be allowed to exercise their "ultimate control or discretion over the order in which the cases pending before [them] should be considered" (*Engram*, *supra*, 50 Cal.4th at p. 1151), and to give each case the time

---

*(Footnote continued from previous page.)*

constitutional standards.  (*Calfarm Ins. Co. v. Deukmejian*, *supra*, 48 Cal.3d at pp. 814-815.)

required for reasoned decision.  The courts of appeal may not be thwarted in the exercise of their original jurisdiction to review superior court judgments in all the cases brought before them.  (Art. VI, § 11, subd. (a).)  Nor may this court be deprived of the ability to balance its responsibilities in capital cases with the other important role we have performed since the creation of the intermediate appellate courts:  "[T]o supervise and control the opinions of the several district courts of appeal, each of which is acting concurrently and independently of the others, and by such supervision to endeavor to secure harmony and uniformity in the decisions, their conformity to the settled rules and principles of law, a uniform rule of decision throughout the state, a correct and uniform construction of the constitution, statutes, and charters, and, in some instances, a final decision by the court of last resort of some doubtful or disputed question of law."  (*People v. Davis* (1905) 147 Cal. 346, 348; see Cal. Rules of Court, rule 8.500(b)(1).)

The Judicial Council, in drafting the "rules and standards of administration" for carrying out Proposition 66's reforms (§ 190.6, subd. (d)), must take care to preserve the courts' inherent authority over their dockets.

E.  *The Effective Date of Proposition 66*

Proposition 66 declares that "all sections of this act take effect immediately upon enactment."  (Prop. 66, § 19.)  However, we stayed the implementation of the measure pending our resolution of this matter.  The effective date is a question of some importance, particularly for the Judicial Council, which is tasked with developing rules and standards "[w]ithin 18 months of the effective date."  (§ 190.6, subd. (d).)  We also deem it desirable for all parties affected by the initiative measure to be allowed to strive for compliance in an efficient manner, unencumbered by considerations of retroactive application upon the dissolution of our stay.  We have in the past exercised our inherent power of reformation to revise the effective date of stayed legislation in order to avoid problems of

59

compliance with statutory deadlines.  (*California Redevelopment Assn. v. Matosantos*, *supra*, 53 Cal.4th at pp. 274-275.)  We do the same here.  The effective date of Proposition 66 shall be the date our opinion becomes final.  Provisions related to the effective date are otherwise unchanged.

III.  DISPOSITION

We discharge the order to show cause, and deny the amended and renewed petition for a writ of mandate and injunctive relief.


**CORRIGAN, A. C. J.**


**WE CONCUR:**

**WERDEGAR, J.**
**LIU, J.**
**KRUGER, J.**
**HOCH, J.***

_____

\* Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY LIU, J.**

Proposition 66 amended Penal Code section 190.6, subdivision (d) to say that state death penalty appeals and habeas corpus proceedings must be completed within five years.  All members of the court agree that this provision imposes no legally enforceable obligation.  My colleagues disagree on how they reach this conclusion:  The court holds that the five-year provision is "directive" and not mandatory (maj. opn., *ante*, at p. 55), whereas Justice Cuéllar's concurring and dissenting opinion contends that the provision is mandatory and unconstitutionally intrudes on the prerogatives of the judicial branch (conc. & dis. opn., *post*, at p. 22).

I believe both positions are reasonable.  Like Justice Cuéllar, I find it stunning that Proposition 66's proponents and the Attorney General claim that the voters intended the five-year limit to be nonbinding or aspirational when that claim is plainly belied by the ballot materials and advocacy campaign for Proposition 66.  (Conc. & dis. opn., *post*, at pp. 2–3, 11–15.)  However, the electorate passed Proposition 66 against a backdrop of precedent construing similar mandates as nonmandatory when necessary to save their constitutionality (maj. opn., *ante*, at pp. 41–49), and we presume the electorate is " 'aware of existing laws and judicial construction thereof' " (*People v. Gonzales* (2017) 2 Cal.5th 858, 869).  Although I am unsure whether I would construe voter intent as flexibly as our decisions have, I acknowledge this is one way of enforcing the

separation of powers and there is a lot of water over the dam in our case law.  So, although no one really disagrees that "the voters intended the five-year limit to be mandatory" (maj. opn., *ante*, at p. 53), our precedent supports the court's approach of imputing to the voters a further intent not to unconstitutionally impair the judicial function (*id.* at p. 55).  All members of the court agree that if the five-year limit were mandatory, it "would undermine the courts' authority as a separate branch of government."  (*Id.* at p. 54; conc. & dis. opn., *post*, at p. 27.)

I write separately to highlight that whether the five-year limit is directive or unconstitutional, it does not and could not bind those charged with implementing Proposition 66.  It is clear that a majority of the 2016 electorate voted "to shorten the time that the legal challenges to death sentences take."  (Voter Information Guide, Gen. Elec. (Nov. 8, 2016), analysis of Prop. 66 by Legis. Analyst, p. 105 (2016 Voter Guide).)  But Proposition 66 contains no plan to compress into five years a process that often takes two decades, and no entity — not this court, not the Judicial Council, not the Legislature — can simply wave a magic wand and make it so.  Although there may be ways to streamline the process, realistic reforms must emanate from a clear understanding of the way the postconviction death penalty process works in California.  As explained below, the five-year limit is not grounded in the realities of California's death penalty process or in the reasonable possibilities for reform.  Thus, in addition to lacking strict enforceability, the five-year limit cannot serve as a realistic benchmark to guide courts or the Judicial Council as they implement Proposition 66.  It is instead "an exhortation to the parties and the courts to handle cases as expeditiously as is consistent with the fair and principled administration of justice."  (Maj. opn., *ante*, at p. 55.)

## I.

Today there are nearly 750 prisoners on death row in California; they comprise roughly a quarter of all condemned inmates in the United States. The process for reviewing death judgments is complex and multilayered, and the incidence of reversible error is significant. (See U.S. Dept. of Justice, Bur. of Justice Statistics, Capital Punishment, 2013—Statistical Tables (2014) p. 19, tbl. 16, available at https://www.bjs.gov/content/pub/pdf/cp13st.pdf [as of Aug. 24, 2017] [reporting that 38 percent of the 8,466 prisoners sentenced to death between 1973 and 2013 had their convictions or sentences overturned]; Liebman et al., *Capital Attrition: Error Rates in Capital Cases, 1973–1995* (2000) 78 Tex. L.Rev. 1839, 1850 [reporting that state and federal courts nationwide found prejudicial error in 68 percent of capital cases between 1973 and 1995].)

In California, after a death judgment has been imposed in the trial court, the defendant is entitled to an automatic appeal to review any errors that may have occurred during trial. (Pen. Code, § 1239, subd. (b); all undesignated statutory references are to this code.) The defendant is also entitled to file a petition for a writ of habeas corpus to assert violations of statutory or constitutional rights not apparent in the trial record. Habeas corpus petitions may be filed in state and federal courts. (§ 1473; 28 U.S.C. § 2254.) Capital defendants are entitled to counsel on direct appeal and in state habeas proceedings. (See *Douglas v. People of State of Cal.* (1963) 372 U.S. 353, 355 [recognizing the constitutional right of indigent criminal defendants to representation on appeal]; Gov. Code, § 68662.)

On average in California, it takes three to five years after a death judgment to appoint appellate counsel. (*Jones v. Chappell* (C.D. Cal. 2014) 31 F.Supp.3d 1050, 1056 (*Jones*), revd. by *Jones v. Davis* (9th Cir. 2015) 806 F.3d 538.) In April 2016, there were 49 capital defendants waiting for attorneys to be appointed for direct appeals and 360 capital defendants waiting for attorneys to be appointed

3

for habeas corpus petitions.  (2016 Voter Guide, *supra*, analysis of Prop. 66 by Legis. Analyst, p. 105.)  About half of those waiting for appointment of habeas counsel have been waiting for over 10 years.  (*Jones*, at p. 1058.)  The dearth of attorneys willing to take on these assignments is due in part to the sheer enormity of the undertaking.  A single death penalty case can and often does dominate a lawyer's practice for well more than a decade.

Direct appeals in this court are completed on average 11.7 to 13.7 years after the death judgment.  (*Jones*, *supra*, 31 F.Supp.3d at p. 1057.)  Many appeals take considerably more time.  (See, e.g., *People v. O'Malley* (2016) 62 Cal.4th 944 [25 years from judgment of the death to resolution on appeal]; *People v. Cunningham* (2015) 61 Cal.4th 609 [19 years]; *People v. Brown* (2014) 59 Cal.4th 86 [18 years].)  State habeas review is completed on average more than 17 years after the death judgment.  (*Jones*, at p. 1059.)  In April 2016, there were 337 direct appeals and 263 state habeas corpus petitions pending in this court.  (2016 Voter Guide, *supra*, analysis of Prop. 66 by Legis. Analyst, p. 105.)

As of 2014, only 81 inmates out of the more than 900 sentenced to death in California since 1978 have completed the postconviction review process in both state and federal court.  (*Jones*, *supra*, 31 F.Supp.3d at p. 1060.)  Of those 81, about half have received relief from their death sentences, 13 have been executed, and 17 have had their executions stayed.  (*Id.* at p. 1069.)

In 2008, the California Commission on the Fair Administration of Justice (Commission) studied the death penalty postconviction process.  (Cal. Com. on the Fair Admin. of Justice, Final Report (2008) (Commission Report).)  The Commission was chaired by former Attorney General and Los Angeles District Attorney John Van De Kamp, and it included law enforcement officials, prosecutors, public defenders, and academics.  The Commission held hearings and gathered input from a broad cross-section of stakeholders.  (*Id.* at p. 113.)  The

4

Commission made several recommendations to expedite what was widely regarded as a dysfunctional process. Recognizing that difficulties in appointing appellate counsel were a major source of delay, the Commission concluded that "[t]he most direct and efficient way to reduce the backlog of death row inmates awaiting appointment of appellate counsel would be to again expand the Office of the State Public Defender." (*Id.* at p. 132.) The Commission recommended increasing the State Public Defender's budget by one-third. (*Id.* at p. 133.) In the alternative, the Commission recommended increasing the compensation of private appellate attorneys who take death penalty cases. (*Id.* at pp. 132–133.) To address the even greater delays in appointing habeas counsel, the Commission recommended expanding the Habeas Corpus Resource Center from 34 lawyers to 150 lawyers, which would have required a five-fold increase over the then-current $14.9 million annual budget. (*Id.* at p. 135.) These recommendations were not implemented.

The Commission also addressed the backlog of death penalty appeals pending in this court. This court decides 20 to 25 death penalty appeals each year and issues a published opinion in each case. It typically takes two to three years for this court to decide an appeal once it has been fully briefed. (Commission Report, at p. 147.) The Commission endorsed the proposal of then Chief Justice Ronald George to amend the state Constitution so that this court would have discretion to transfer fully briefed death penalty appeals to intermediate appellate courts, provided that the Commission's recommendations for appointing appellate and habeas counsel were also implemented. (Commission Report, at pp. 147–148.) This court also decides approximately 30 habeas corpus petitions each year; although we do not typically issue published opinions in these cases, our deliberative process includes the preparation of lengthy internal memoranda carefully examining each issue raised in each petition. The Commission endorsed

5

a proposal to allow capital habeas corpus petitions to be filed in superior court, with a right of appeal to the Court of Appeal and Supreme Court. (*Id.* at p. 148.)

In 2013, a coalition of law enforcement officers, prosecutors, and crime victims proposed a ballot initiative, called the Death Penalty Reform and Savings Act of 2014 (2014 Proposed Initiative), that was similar in many ways to Proposition 66. The 2014 Proposed Initiative did not incorporate the Commission's proposals to expand the Office of the State Public Defender or the Habeas Corpus Resource Center. But it did include some of the other Commission recommendations. One of the Proposed Initiative's key provisions was an amendment of article VI, section 11, subdivision (a) of the California Constitution to provide that Courts of Appeal have appellate jurisdiction over death penalty cases, just as they have over other cases. (2014 Proposed Initiative, § 4.) Further, the 2014 Proposed Initiative would have added a new section to article VI authorizing this court to review Court of Appeal decisions in capital cases and to summarily affirm if there are no errors affecting the judgment and there is no need to secure uniformity of law or address an important question of law. (2014 Proposed Initiative, § 5.) Also consistent with the Commission's recommendations, the 2014 Proposed Initiative would have added section 1509, subdivision (a), requiring that all habeas corpus petitions be transferred to the court imposing the capital sentence unless good cause is shown. These changes were intended to address one of the findings of the Proposed Initiative: "The California Supreme Court is overloaded with death penalty appeals, causing lengthy and unnecessary delays. Spreading these death penalty cases among the Courts of Appeal (like the federal courts do) will allow the defendants' claims to be heard sooner. The Supreme Court has suggested a similar change. Experts have concluded this change will save hundreds of millions of dollars." (2014 Proposed Initiative, § 2(7).)

6

Moreover, the 2014 Proposed Initiative would have amended article I, section 27 of the California Constitution to add a provision substantially similar to section 190.6, subdivision (d) (section 190.6(d)) as amended by Proposition 66. It would have provided that "[s]tate courts shall complete the state appeal and initial state habeas corpus review" within five years after entry of judgment or after adoption of Judicial Council rules to expedite the capital appeal process. (2014 Proposed Initiative, § 3.)

After some signature gathering, the initiative proponents decided to postpone the effort until 2016. (Nirappili, *Coalition Delays Initiative to Reform State Executions*, Mercury News (May 11, 2014) p. B4.) Proposition 66, the result of that delayed effort, retains many of the features of the 2014 Proposed Initiative. But the proponents abandoned any effort to amend the California Constitution. (See Cal. Const., art. II, § 8, subd. (b) [requiring signatures equal to 8 percent of the votes cast in the last gubernatorial election to place an initiative amending the state Constitution on the ballot, but only 5 percent for a statutory initiative].) In particular, Proposition 66 omitted the proposal to amend the state Constitution to give Courts of Appeal jurisdiction over direct appeals in capital cases, and it placed the five-year limit in a statute (section 190.6(d)) rather than in article I of the Constitution. Proposition 66 also omitted the 2014 Proposed Initiative's finding that this court is overloaded with death penalty appeals, but it retained the provision in section 1509, subdivision (a) to authorize transfer of capital habeas petitions to the superior court.

Proposition 66 does not increase the availability of appellate and habeas attorneys, beyond requiring this court to compel certain criminal appellate attorneys to take death penalty appeals against their will. (§ 1239.1, subd. (b).) It is unclear how effective this strategy will be in light of the shrinking and graying pool of private appellate attorneys. (See Miller, *Wanted: Appellate Lawyer. Pay:*

7

*$70/hr.*, The Recorder (June 15, 2006).) Although it is possible that compelling appellate attorneys to take capital cases will increase the number of capital appellate attorneys, it is also possible that this obligation will result in fewer criminal appellate attorneys or will lead to the appointment of attorneys ill-suited for the arduous and lengthy commitment required for a capital appeal.

Further, the new provision that this court "shall only grant extensions of time for briefing for compelling or extraordinary reasons" (§ 1239.1, subd. (a)) may accelerate the filing of appellate briefs. But there are reasons why capital briefs are lengthier — opening briefs of 300 to 500 pages, raising 30 to 40 claims, are common — and often take several years to complete. Capital cases involve a three-stage process in which the jury must determine (1) whether the defendant is guilty of first degree murder, (2) whether certain special circumstances are present, and (3) whether the defendant should receive the death penalty or a sentence of life without the possibility of parole. (§§ 190.2, subd. (a), 190.3; see e.g., *People v. Masters* (2016) 62 Cal.4th 1019, 1027–1041.) Each of these stages may give rise to claims of legal error, and a labyrinth of procedural default and forfeiture rules strongly incentivizes capital defendants to raise every conceivable claim of error. (See, e.g., *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Clark* (1993) 5 Cal.4th 750, 767–768; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756, 759; 28 U.S.C. § 2254(b)(1).) In addition, the record in capital cases is usually massive, often comprising more than 5,000 pages of trial transcript plus several thousand pages of exhibits, juror questionnaires, and additional materials — all of which must be carefully reviewed. Moreover, the irrevocable nature of the death penalty heightens the stakes and prompts appellate attorneys to be as thorough and careful as possible in their briefing. Whatever the statutory standard for granting extensions of time, attorneys must be given sufficient time to complete their briefs.

8

Even if these measures do accelerate the filing of an appeal in this court, Proposition 66, unlike the 2014 Proposed Initiative, does not increase the number of courts hearing death penalty appeals. Because of the sheer scale of the briefing, the enormity of the record, and the number of claims typically raised by each defendant, this court devotes considerable time and attention to capital appeals. We could increase the number of such appeals we resolve each year, but only at the expense of noncapital cases. As the court today makes clear, Proposition 66 cannot override the constitutional doctrine of separation of powers and compel this court to alter its docket by deciding more capital cases and fewer noncapital ones. (Maj. opn., *ante*, at p. 55 [construing § 190.6(d) "to maintain the courts' discretionary control over the conduct of their business"].)

Although transfer of capital habeas corpus petitions to the superior court may expedite the adjudication of those petitions, superior courts asked to help reduce this court's substantial backlog of habeas corpus cases will likely require additional resources to address petitions that are often as lengthy and time consuming as direct appeals. (See, e.g., *In re James David Beck* (filed Nov. 28, 2012, S206945) [320-page petition for writ of habeas corpus with 12 claims, numerous subclaims, and 18 volumes of exhibits].) It is unclear whether the Legislature will appropriate funds for this purpose. Nor does Proposition 66 expedite the appointment of capital habeas attorneys. And the constitutionality of Proposition 66's restrictions on successive petitions (§ 1509, subd. (b)) has yet to be fully tested. (Maj. opn., *ante*, at pp. 39–40.)

To put the postconviction process into perspective, let us consider a real example. A case not far from the norm is that of Robert Mark Edwards. He was convicted of first degree murder with burglary-murder and torture-murder special circumstances, and he was sentenced to death in September 1998. Counsel was appointed four years later in October 2002. Counsel filed a record correction

9

motion in October 2003. The record correction process was completed, and a record of appeal filed in this court, in February 2005. The record consists of 29 volumes of the clerk's transcript, with a total of 9,117 pages; this includes 6,597 pages of juror questionnaires. The reporter's transcript, i.e., the transcript of the trial, spans 39 volumes with a total of 5,957 pages. The opening brief (431 pages) was filed in December 2006; the Attorney General's brief (270 pages) was filed in February 2008, and the reply brief (140 pages) was filed in November 2008. Also in November 2008, counsel had to withdraw because he was being appointed to the superior court. New counsel was appointed in January 2009 and, after getting up to speed on the case, filed a 79-page supplemental brief in September 2010. A supplemental respondent's brief was filed in March 2011, and a supplemental reply brief was filed in April 2011. Additional supplemental briefing was ordered by this court in December 2012 to address recently decided cases of this court and the United States Supreme Court; this briefing was filed in January 2013. Altogether, the briefing raised some 38 issues. The case was argued in May 2013, and the judgment was affirmed in August 2013. (*People v. Edwards* (2013) 57 Cal.4th 658.) Meanwhile, habeas corpus counsel was not appointed until November 2010, 12 years after the death judgment. A 524-page habeas corpus petition was filed in November 2013. The Attorney General's 187-page informal response was filed in October 2014, and a 433-page reply to the informal response was filed in December 2015. The petition remains pending in this court.

In Edwards's case, 19 years have passed since the judgment of death. The direct appeal has been completed, the state habeas corpus petition has not been decided, and the case has not yet begun its lengthy sojourn in federal court. It is not clear how Proposition 66 would have appreciably accelerated the appointment of appellate or habeas counsel, shortened the record correction process, abbreviated the multiple rounds of briefing addressing numerous issues drawn

10

from a voluminous trial record, or reduced the amount of time the fully briefed case was pending in this court.

In sum, the protracted nature of the postconviction death penalty process is the product of several factors, including chronic delays in appointing appellate and habeas counsel, limitations on funding for the Office of the State Public Defender and Habeas Corpus Resource Center, the enormity of the record and the scale of the parties' briefing in light of the peculiar nature of the death penalty, and the fact that all appeals go to a single court, inevitably resulting in a bottleneck.

**II.**

Section 190.6(d), as amended by Proposition 66, provides: "The right of victims of crime to a prompt and final conclusion, as provided in paragraph (9) of subdivision (b) of Section 28 of Article I of the California Constitution, includes the right to have judgments of death carried out within a reasonable time. Within 18 months of the effective date of this initiative, the Judicial Council shall adopt initial rules and standards of administration designed to expedite the processing of capital appeals and state habeas corpus review. Within five years of the adoption of the initial rules or the entry of judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases. The Judicial Council shall continuously monitor the timeliness of review of capital cases and shall amend the rules and standards as necessary to complete the state appeal and initial state habeas corpus proceedings within the five-year period provided in this subdivision."

I agree that section 190.6(d), construed in light of our precedent, is "directive." (Maj. opn., *ante*, at p. 57.) But what does directive mean? Our case law suggests that the answer depends on the nature of the statutory directive and the judicial interest at stake.

11

In *People v. Engram* (2010) 50 Cal.4th 1131 (*Engram*), we addressed section 1050, subdivision (a)'s language that "criminal cases shall be given precedence over, and set for trial and heard without regard to the pendency of, any civil matters or proceedings." Based on the statutory context and history, we said this provision "cannot properly be interpreted to require a trial court completely to forgo or abandon consideration of *all* civil cases or proceedings over an extended period of time when the number of criminal cases filed and pursued to trial continually overwhelms the resources available to the court for the disposition of both criminal and civil matters." (*Engram*, at p. 1152.) We then went further to reject the argument that the statute forbids the allocation of certain courtrooms or judges exclusively to civil matters. (*Id.* at pp. 1153–1154.) We relied on case law demonstrating that the statute was not intended to preclude a superior court from maintaining separate departments handling civil and criminal matters in the interest of efficiently organizing and adjudicating claims within its jurisdiction. (*Ibid.*)

*Thurmond v. Superior Court* (1967) 66 Cal.2d 836 (*Thurmond*), a paternity action, involved statutory provisions requiring the court to grant a continuance when the attorney for one of the parties is a member of the Legislature and the Legislature is in session. We held that the provisions "should be given full force and effect wherever and whenever it may be done without unduly adversely affecting the rights of others," and we prescribed a number of factors the court should consider in exercising its discretion as to whether a continuance should be granted. (*Id.* at p. 840.)

In *In re Shafter-Wasco Irr. Dist.* (1942) 55 Cal.App.2d 484 (*Shafter-Wasco*), the court declined to treat as mandatory a statutory deadline requiring judicial resolution of an appeal concerning the dissolution of an irrigation district to be decided three months after the appeal is filed. The court instead construed

12

the statute as directing the court "to give this appeal as early a hearing and decision as orderly procedure in this court will permit." (*Id.* at p. 489.)

In each of these cases, the court interpreted as "directive" a seemingly mandatory statute that threatened to impair core judicial functions, and the decisions make clear that courts have authority to determine the proper weight to be given to the statutory directive. That determination is contextual. In some cases, as in *Thurmond*, the directive statute can serve as a default that constrains judicial discretion unless certain conditions apply. (*Thurmond*, *supra*, 66 Cal.2d at p. 840.) In *Engram*, the force of the statute was more vague; we construed the directive to give priority to criminal cases over civil cases as subject to the open-ended condition that "such precedence [must be] consistent with the ends of justice." (*Engram*, *supra*, 50 Cal.4th at p. 1161.) And *Shafter-Wasco*, in interpreting a statutory deadline as a directive "to give this appeal as early a hearing and decision as orderly procedure in this court will permit" (*Shafter-Wasco*, *supra*, 55 Cal.App.2d at p. 489), said it was ultimately up to the court to determine a reasonable timeframe for deciding the appeal.

Directive statutes that set realistic time limits on judicial decisions may inform how quickly cases should be decided, although the issue is ultimately left to judicial discretion. But when a time limit purports to dictate what is not "reasonably possible" to achieve (maj. opn., *ante*, at p. 58), it cannot serve as a meaningful benchmark. Such is the case with the five-year time limit in section 190.6(d). The realities of California's postconviction death penalty process mean that without a radical reorganization of this court's functions, a restructuring of the role of lower courts beyond what Proposition 66 provides, and a significant infusion of resources from the Legislature, the five-year time limit is not remotely close to realistic.

13

This impracticality is underscored by the fact that section 190.6(d) says nothing about how the five-year limit should be met. And this deficiency is compounded by the fact that section 190.6(d) differs from other statutory deadlines in terms of its scope: The five-year limit does not require one particular court to meet a particular deadline in one particular proceeding; it is directed at a complex judicial process involving multiple courts, multiple actors, and multiple proceedings. (Maj. opn., *ante*, at p. 50.) The five-year deadline imposed on the entire state death penalty postconviction process is so sweeping in its objective yet so vague on the means of accomplishing the objective that it does not provide useful guidance for those charged with implementing Proposition 66.

Section 190.6(d) purports to delegate the challenge of meeting the five-year limit to the Judicial Council, which is supposed to "continuously monitor the timeliness of review of capital cases and . . . amend the rules and standards as necessary to complete the state appeal and initial state habeas corpus proceedings within the five-year period provided in this subdivision." But how is the Judicial Council supposed to bring about the vast acceleration of the death penalty process necessary to meet the five-year deadline? The Judicial Council has no authority to direct the Legislature to appropriate more funds to expand the Office of the State Public Defender or the Habeas Corpus Resource Center. It has no authority to change the state Constitution to permit Courts of Appeal to hear death penalty appeals. And it has no authority to require this court or any other court to devote a greater proportion of its docket to death penalty cases at the expense of other cases that fall within its constitutional responsibilities.

The delegation of broad rulemaking power to the Judicial Council spared the voters (and the proponents of Proposition 66) from having to make difficult choices as to what should be sacrificed for the sake of dramatically expediting the death penalty. But these are precisely the choices that the lawmaking authority,

14

whether the Legislature or the electorate, must make with clarity, transparency, and fidelity to separation-of-powers principles if it wishes to create a mandate that can lawfully and practically guide the Judicial Council's quasi-legislative rulemaking. Such a mandate is lacking here.

Of course, section 190.6(d) is only one part of Proposition 66; the proponents of Proposition 66 stated at oral argument that the five-year limit "is not the centerpiece" of the initiative. Proposition 66 prescribes several specific reforms, such as a new rule for granting extensions of time for briefing (§ 1239.1, subd. (a)), new rules concerning appointment of counsel (*id.*, subd. (b)), and a requirement that initial habeas corpus petitions be filed in or transferred to the sentencing court absent good cause (§ 1509, subds. (a), (g)) with either party having a right to take an appeal to the Court of Appeal (§ 1509.1, subd. (a)). The Judicial Council may prescribe rules to effectuate these provisions, and the efficacy of these measures in expediting the death penalty process remains to be seen.

But whether Proposition 66 actually speeds up (or slows down) the process will have nothing to do with section 190.6(d)'s unelaborated and unrealistic directive that state death penalty appellate and habeas corpus proceedings "shall" be completed within five years. The court properly acknowledges that this provision reflects the voters' desire to shorten the postconviction death penalty process. But the five-year limit, construed as directive or simply unconstitutional, has no binding effect and provides no guidance for responsible actors charged with the fair and efficient administration of justice.

**LIU, J.**

**WE CONCUR:** **WERDEGAR, J.**
**KRUGER, J.**
**HOCH, J.***

_____
\* Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY CUÉLLAR, J.**

What voters most need so they can exercise their constitutionally protected franchise effectively is clarity and candor. Particularly at a time when public discourse dwells on foreign interference in our electoral process, social media bots, and manipulated Facebook news feeds, it is possible — perhaps even easy — to forget how millions of voters endeavor to familiarize themselves with the candidates and issues of the day, and to understand the consequences of their vote. Voters who sought to do so by studying Proposition 66, the Death Penalty Reform and Savings Act of 2016 (Proposition 66), would not recognize the initiative the majority purports to uphold today. What reasonable voters would have clearly recognized instead — based on the statutory text, the official description by the Legislative Analyst, and the arguments made by the initiative's proponents — is that Proposition 66 contained a genuine, enforceable, five-year deadline for completion of the state court appeal and resolution of the initial habeas corpus petition in death penalty cases. Candor requires us to be equally clear about whether such a deadline accords with our law: It does not. A statutory limit on the amount of time a court may spend deciding a case is an intrusion on quintessential judicial functions and violates the California Constitution's separation of powers provision. (See Cal. Const., art. III, § 3.)

Only by misconstruing this mandatory five-year time limit as nothing more than an "exhortation" for faster death penalty adjudication does the majority

sidestep this outcome. (Maj. opn., *ante*, at p. 55.) In doing so, the majority disregards the electorate's clear purpose in enacting Proposition 66 and fails to promote forthright deliberation. It distorts our statutory and constitutional jurisprudence, and — by insisting the mandate be treated as both a mere "exhortation" yet one "not empty" of legal meaning — leaves in its wake grave uncertainty about the rules and standards the Judicial Council is supposed to adopt to render meaningful that exhortation. (Maj. opn., *ante*, at pp. 55, 57.)

Proposition 66 further runs afoul of the California Constitution by purporting to authorize an appeal to *the Court of Appeal* from the decision of a superior court on an initial capital habeas corpus petition. (See § 1509.1.) The Constitution grants *this* court exclusive appellate jurisdiction "when judgment of death has been pronounced." (Cal. Const., art. VI, § 11, subd. (a).) To the extent the majority finds otherwise, I dissent with respect.

## I.

Our first task is to answer a question as simple as it is important: What kind of time limit did the voters enact? When voters face the often daunting process of considering a new statute or constitutional amendment at the ballot box, state law directs the Secretary of State to prepare a voter information guide. The guide must include a complete copy of each proposed measure, the arguments and rebuttals for and against, and an analysis prepared by the Legislative Analyst. (Elec. Code, §§ 9082, 88001.) Sometimes the guide runs hundreds of pages. But it is the primary means by which voters inform themselves about the policy choices in an election, and this court considers it a key resource in determining the meaning and validity of the laws enacted by voter initiative. So when it falls to us to interpret and apply a voter-enacted initiative — "our primary goal" being "to determine and give effect to the underlying purpose of the law" (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332) — we rely in particular on the analyses and

2

arguments contained in the voter information guide, along with the text of the initiative, in identifying the statute's purpose and determining how it should be construed. (*People v. Morales* (2016) 63 Cal.4th 399, 406.)

Now imagine a reasonable voter consulting the voter information guide to Proposition 66. What would the voter have gleaned — immediately — about the initiative's purpose? In the very first of its findings and declarations, the initiative stated that our "death penalty system is ineffective because of waste, delays, and inefficiencies." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) Prop. 66, § 2, subd. (1), p. 212 (Voter Guide).) The findings and declarations went on to lament that "[f]amilies of murder victims should not have to wait decades for justice" and that "[h]undreds of killers have sat on death row for over 20 years." (*Id.*, § 2, subd. (3), p. 213.) The findings and declarations concluded by promising that if enacted, "[a] capital case can be fully and fairly reviewed by both the state and federal courts within ten years." (*Id.*, § 2, subd. (10), p. 213.)

To fulfill that explicit promise, the initiative added and amended various provisions of the Penal Code to include several new procedures. One of them was a requirement that "the state courts *shall* complete the state appeal and the initial state habeas corpus review in capital cases" within five years of the entry of judgment. (Pen. Code, § 190.6, subd. (d), italics added; all undesignated statutory references are to the Penal Code.) The ballot pamphlet told voters, in typeface as conspicuous as it was emphatic, that this provision "***Requires Completion of Direct Appeal and Habeas Corpus Petition Process Within Five Years***." (Voter Guide, *supra*, analysis of Prop. 66 by Legis. Analyst, p. 106; see generally Elec. Code, § 9087, subd. (b) [the Legis. Analyst must provide an analysis that is "easily understood by the average voter," which "may contain background information, including . . . the effect of enacted legislation which will become effective if the measure is adopted"].) In the event the process "takes more than five years,

3

victims or their attorneys could request a court order to address the delay." (Voter Guide, *supra*, analysis of Prop. 66 by Legislative Analyst, p. 106; see Pen. Code, § 190.6, subd. (e) ["If a court fails to comply without extraordinary and compelling reasons justifying the delay, either party or any victim of the offense may seek relief by petition for writ of mandate"].) That's why proponents, in explaining "WHAT PROPOSITION 66 DOES," assured voters that if enacted, all state appeals should henceforth "be limited to 5 years." (Voter Guide, *supra*, argument in favor of Prop. 66, p. 108.)

Then the 2016 general election took place. With the aforementioned provisions at the heart of the initiative — and no doubt influenced by promises made in the Voter Guide — voters narrowly enacted Proposition 66. Petitioner then immediately filed this petition for writ of mandate. In it, he advanced a separation of powers challenge to the provision requiring California courts to resolve the automatic appeal and initial habeas corpus petition in capital cases within five years. But here's the twist: At oral argument, the initiative's proponents (intervener Californians to Mend, Not End, the Death Penalty) admitted that an actual five-year deadline would "perhaps not" be constitutional. The proponents instead let it slip that the initiative's five-year deadline is not a deadline after all, but just a "goal" that has no real consequence if it goes unmet. The Attorney General, also purportedly arguing in support of Proposition 66, added that this five-year "goal" was not "binding" and is really just "an invitation to take up the question of how long these appeals should take."

This is what might be charitably described as a novel reinterpretation of the initiative's five-year deadline for resolution of the automatic appeal and initial capital habeas corpus petition. It is at odds — entirely — with what the initiative says, how it was designed to work, and how it was sold. Even more remarkably, the majority blithely accepts this neutering of what clearly appeared to the voters

4

to be a five-year deadline into a mere palaver on the processing of death penalty cases. And not just any palaver: By reimagining the initiative as nothing more than an earnest exhortation calling on courts to consider dialing up the speed of death penalty adjudication, the majority upholds something quite different from the initiative considered and enacted by the electorate, leaving in its wake uncertainty about how we interpret initiatives and whether the time limits included in Proposition 66 have any legal effect.

A.

Section 190.6, subdivision (d) provides: "The right of victims of crime to a prompt and final conclusion, as provided in paragraph (9) of subdivision (b) of Section 28 of Article I of the California Constitution, includes the right to have judgments of death carried out within a reasonable time. Within 18 months of the effective date of this initiative, the Judicial Council shall adopt initial rules and standards of administration designed to expedite the processing of capital appeals and state habeas corpus review. *Within five years of the adoption of the initial rules or the entry of judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases.* The Judicial Council shall continuously monitor the timeliness of review of capital cases and shall amend the rules and standards as necessary to complete the state appeal and initial state habeas corpus proceedings within the five-year period provided in this subdivision." (Italics added.)

Petitioner argues that a statute purporting to dictate when a court shall hear and determine a case would unconstitutionally interfere with the judiciary and violate the separation of powers. Both the Attorney General and intervener-proponents so concede. Little wonder: With but one exception, state supreme courts have unanimously concluded that the timing of a judicial decision is a core judicial function, protected from legislative encroachment. (*State v. Buser* (2015)

5

___ P.3d ___ [302 Kan. 1, 9] (*Buser*); see, e.g., *Sands v. Albert Pike Motor Hotel* (Ark. 1968) 434 S.W.2d 288, 291-292 ["as laudable as the purpose intended may be," requiring a court to decide a workers' compensation case within 60 days is "an unconstitutional exercise of a judicial function by the legislative branch"]; *State ex rel. Kostas v. Johnson* (Ind. 1946) 69 N.E.2d 592, 595 [declaring that because "no department of the state government can be controlled or embarrassed by another department of the government, unless the Constitution so ordains," "statutes undertaking to fix the time within which courts shall act in certain cases or matters" are unconstitutional and void]; *Atchison, T. & S. F. Ry. Co. v. Long* (Okla. 1926) 251 P. 486, 489 (*Long*) ["to compel the courts to give a hearing to a particular litigant at a particular time, to the absolute exclusion of others who may have an equal claim upon its attention, strikes a blow at the very foundation of constitutional government. The right to control its order of business and to so conduct the same that the rights of all litigants may properly be safeguarded, has always been recognized as inherent in courts . . . ."]; *Schario v. State* (Ohio 1922) 138 N.E. 63, 64 ["Manifestly, when a case can be heard and determined by a court must necessarily depend very largely upon the court docket, the quantity of business submitted to the court, the nature, the importance, and the difficulties attending the just and legal solution of matters involved. It would be obviously unfair to the court, as well as unfair to other parties likewise interested in the early and expeditious determination of their causes, to require a court to suspend or delay equally important matters theretofore submitted to the court for its consideration and determination in order to give preference to the hearing and determination of some particular case or character of cases. At least that is a matter that should be most properly and wisely left to the sound discretion of the court."].) "To strip [courts] of that authority" over the control of judicial business

"would necessarily render them so impotent and useless as to leave little excuse for their existence." (*Long*, at p. 489.)

The majority does not contest a court's inherent authority to manage its docket in a manner that best promotes the pursuit of justice. (Maj. opn., *ante*, at p. 46.) What the majority claims instead is that, under our precedent, "statutes may not be given mandatory effect, despite mandatory phrasing, when strict enforcement would create constitutional problems." (*Id.* at p. 49.) But the responsibility we shoulder is to render constitutional rulings clear enough to foster meaningful deliberation rather than simply offering vague references to "constitutional problems," and to construe statutes in a manner that preserves the integrity of the democratic process. A statute's purpose is paramount and may not be disregarded. Language is not putty. And it is not for us to declare, in gross, that a legislative body will never be understood as having enacted an unconstitutional law, for the question whether the enacting body had such a purpose will depend on the particular statutory text, structure, and legislative history. So it is one thing to declare a statute unconstitutional when it cannot be saved, yet quite another to pretend a statute means what it does not simply so it can be saved. The latter course takes the court well beyond adoption of a saving construction when the statute reasonably allows it, into a realm straining the court's norms as well as its powers. (*Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 187 [" ' "If this court were to insert in the statute all or any of the . . . qualifying provisions [required to render it constitutional], it would in no sense be interpreting the statute as written, but would be rewriting the statute . . . ." ' "].) Saving an unsound construction is neither possible nor desirable.

Indeed, what we actually do when legislation might seem to regulate the time afforded the judiciary to decide motions or cases is instead quite different from what the majority describes. We require a *clear statement* that such

7

regulation was contemplated. (See *Garrison v. Rourke* (1948) 32 Cal.2d 430, 436 (*Garrison*) ["an intent to defeat the exercise of the court's jurisdiction will not be supplied by implication"].) This particular clear statement rule is one closely related to the constitutional avoidance canon, which requires courts to avoid, *where possible*, interpreting a statute in a way that might render it unconstitutional. (*Ibid.* [finding it unnecessary to decide whether a purported time limit for the resolution of an election contest would "defeat or interfere with the exercise of . . . the judicial power . . . in the absence, as here, of provisions *clearly indicating* that intent" (citations omitted, italics added)].) When faced with an attempt to impose a deadline on a court's decisionmaking power, we have sometimes found the absence of a clear statement to impose a mandatory or enforceable deadline where no " 'consequence or penalty is provided for failure to do the act within the time commanded.' " (*Edwards v. Steele* (1979) 25 Cal.3d 406, 410.) On other occasions, we have focused on "the likely consequences of holding a particular time limitation mandatory, in an attempt to ascertain whether those consequences would defeat or promote the purpose of the enactment." (*Ibid.*) As this court recently (and unanimously) reiterated, " '[t]here is " ' no simple, mechanical test' " for making this determination.' [Citation.] *The question is ultimately one of legislative intent.*" (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 343, italics added (*Kabran*).) Indeed: Because the mandatory nature of a statutory deadline depends on intended legislative purpose, we may not simply characterize such a deadline as directive where (as here) "the Legislature clearly expresses a contrary intent." (*People v. Allen* (2007) 42 Cal.4th 91, 102.)

This, too, is the principle at the heart of our analysis in *People v. Engram* (2010) 50 Cal.4th 1131 (*Engram*). There, we held that section 1050's general policy giving criminal cases precedence over civil cases did not require the Riverside County Superior Court to assign criminal cases to the limited number of

8

courtrooms "reserved for specialized civil matters or to the several judges from outside the county who had been assigned specifically to that court to assist in the trial of long-delayed civil matters." (*Engram*, at p. 1138.) One sentence in section 1050 provided that "criminal cases shall be given precedence over, and set for trial and heard without regard to the pendency of, any civil matters or proceedings." But what we explained is that "the statute explicitly declares that such precedence is to be applied '[*i*]*n accordance with*' the policy set forth in the preceding sentence, that is, in accordance with the policy of expediting criminal cases 'to the greatest degree *that is consistent with the ends of justice*.' " (*Engram*, at p. 1151, quoting § 1050, subd. (a).) Accordingly, the single sentence in section 1050 "clearly" could not be interpreted to deprive the superior court "of the ultimate control over the cases within its jurisdiction." (*Engram*, at pp. 1151-1152; see *id*. at p. 1161 ["a statute must be construed, if reasonably possible, in a manner that avoids a serious constitutional question"].)

A candid analysis of a statute's purpose was also pivotal to *In re Shafter-Wasco Irr. Dist.* (1942) 55 Cal.App.2d 484. The Court of Appeal construed a statute providing that an appeal of a judgment concerning an irrigation district's dissolution " 'must be heard and determined within three months after the taking of such appeal.' " (*Id*. at p. 486.) The Court of Appeal acknowledged that "[s]uch language is usually construed as mandatory," but cautioned that it is also " 'in many cases . . . directory merely.' " (*Id*. at p. 488.) Because "courts should construe statutes so they may be held constitutional where it is reasonably possible to do so" (*id*. at p. 488), the Court of Appeal concluded that this language could and would be construed as reflecting a purpose to grant the appeal "as early a hearing and decision as orderly procedure in this court will permit" (*id*. at p. 489).

And in *Garrison*, *supra*, 32 Cal.2d 430, we held that a statute providing that a court " 'shall' " (*id*. at p. 435) decide an election contest within 10 days should

9

not be interpreted as mandatory where "the consequence or penalty for the failure of the court to file findings of fact and conclusions of law within the designated period was not included in the statute" (*ibid*.) and where a mandatory effect would "lead to the result of defeating the aims and purposes of the statute" (*id*. at p. 437).

What we may *not* do, under the guise of the avoidance canon, is " 'rewrite the law or give the words an effect different from the plain and direct import of the terms used.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1008; accord, *Salinas v. United States* (1997) 522 U.S. 52, 59-60.) For good reason: Invoking the canon when there's no plausible interpretation of a statute that can avoid a constitutional conflict does justice neither to the enacted statute, the voters' will, nor the constitutional values at stake. Courts do not have the power to disregard a clear statement that a judicial deadline is mandatory, nor to construe a mandatory deadline to be something other than what it is. Yet that is precisely what the majority confesses it has done.

I respectfully submit that the majority's construction of the five-year deadline in section 190.6, subdivision (d) is no exercise in judicial restraint, but instead an undisclosed and unjustified judicial reformation of the statute. That provision, as enacted by the voters, clearly states that "[w]ithin five years of the adoption of the initial rules or the entry of [the death] judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases." True: By itself, the word "shall" in subdivision (d) does not necessarily indicate that a mandatory or compulsory meaning was intended, for we have frequently construed the word "shall" to be directory. (See *Engram*, 50 Cal.4th at p. 1151, fn. 8; *Garrison*, *supra*, 32 Cal.2d at p. 437; *Thurmond v. Superior Court* (1967) 66 Cal.2d 836, 839 (*Thurmond*); *Lorraine v. McComb* (1934) 220 Cal. 753, 757 (*Lorraine*).) What the majority — and Justice Liu's concurring opinion — neglect to mention is that we have never done so in the face

10

of a clear indication that the time limit or other restriction on judicial discretion was designed precisely to have mandatory effect. (Cf. *Engram*, at p. 1151 [the provision of section 1050 granting criminal cases precedence in trial setting over civil cases was explicitly subject to the policy set forth in the preceding sentence "of expediting criminal cases 'to the greatest degree *that is consistent with the ends of justice*' "];[1] *Garrison*, at p. 437 [a mandatory interpretation would "defeat[] the aims and purposes of the statute"]; *Thurmond*, at p. 839 [a mandatory interpretation "was not intended by the Legislature"]; *Lorraine*, at p. 757 ["We cannot ascribe to the legislature the intent to make the action of the parties compulsory upon the court in each instance"].) In each of these cases, a directory interpretation *advanced* the legislative purpose.

Which is exactly the opposite of what a directory interpretation does to the most reasonable understanding of the electorate's purpose in enacting the five-year deadline. Subdivision (e) of section 190.6 expressly provides a mechanism by which crime victims can seek to enforce the deadline: "If a court fails to comply without extraordinary and compelling reasons justifying the delay, either party or any victim of the offense may seek relief by petition for writ of mandate." In their briefs, *all* of the parties agreed that Proposition 66 "requires" or "directs" state courts to complete the automatic appeal and review of the initial state habeas corpus petition within five years, and that the five-year deadline is — and was intended to be — enforceable through a petition for writ of mandate. The penalty set forth in section 190.6, subdivision (e) thus confirms that the voters' unambiguous purpose was to enact a mandatory, enforceable deadline, not "an

---

[1] Because the countervailing policy was explicitly set forth in section 1050 itself, the majority is just plain wrong in claiming that "[t]he provisions establishing the preference [at issue in *Engram*] were as facially mandatory as those of section 190.6, subdivision (d)." (Maj. opn., *ante*, at p. 55.)

11

exhortation . . . to handle cases . . . expeditiously." (Maj. opn., *ante*, at p. 55; see *Kabran*, *supra*, 2 Cal.5th at p. 343.)

Note that a *different* subdivision of section 190.6 already provided, prior to Proposition 66, that "it is the Legislature's *goal* that the appeal be decided and an opinion reaching the merits be filed within 210 days of the completion of the briefing." (§ 190.6, subd. (c), italics added.) The voters' approval of different language in subdivision (d) strongly suggests that a different purpose was intended. (See *Klein v. United States of America* (2010) 50 Cal.4th 68, 80.) Note too that the Penal Code, prior to the enactment of Proposition 66, was replete with precatory language to expedite death penalty cases. (E.g., §§ 190.6, subd. (a) ["The Legislature finds that the sentence in all capital cases should be imposed expeditiously"]; 1239.1, subd. (a) ["It is the duty of the Supreme Court in a capital case to expedite the review of the case"].) It is not a reasonable inference that the voters sought merely to echo such provisions' effect when they adopted statutory language providing "Within five years of the adoption of the initial rules or the entry of judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases." (§ 190.6, subd. (e).)

Although the text and structure at issue here are sufficient to demonstrate the voters' purpose, the materials in the voter information guide extinguish whatever doubts could conceivably remain. As stated above, a heading in the Voter Guide's analysis told voters in bold and italicized type that Proposition 66 "***Requires Completion of Direct Appeal and Habeas Corpus Petition Process Within Five Years***." (Voter Guide, *supra*, analysis of Prop. 66 by Legis. Analyst, p. 106.) The Legislative Analyst went on to explain that "[i]f the process takes more than five years, victims or their attorneys could request a court order to address the delay." (*Ibid.*) Whether this remedy is workable or not in principle,

12

every last one of the cases cited by the majority lacks the essential ingredient clearly present here: a statutory provision explicitly providing for a penalty or consequence if the time limit were exceeded. It's quite telling that "neither the initiative's text nor its supporting materials describe any intention" to merely elaborate on the existing precatory language to expedite death penalty cases. (*People v. Valencia* (2017) 3 Cal.5th 347, 357 (*Valencia*).) This deadline has teeth — indeed, the kind of teeth a reasonable voter would have readily observed.

So did the Legislative Analyst, who referred, *five times*, to the five-year "requirement" or stated that the initiative "requires" completion of state court review within five years. (Voter Guide, *supra*, analysis of Prop. 66 by Legis. Analyst, pp. 106-107.)[2] In describing "WHAT PROPOSITION 66 DOES," intervener-proponents, too — in sharp contrast to their revisionist concession at oral argument — confirmed to voters that "[a]ll state appeals should be limited to 5 years" if the initiative were enacted. (Voter Guide, *supra*, argument in favor of Prop. 66, p. 108.) And the uncodified findings and declarations in the initiative itself were replete with representations that the initiative "will" mean that defendant's legal claims will be heard sooner and that victims "will" receive timely justice. (Voter Guide, *supra*, Prop. 66, § 2, subds. (6), (10), p. 213; cf. *Valencia*, *supra*, 3 Cal.5th at p. 360 ["the alleged effect on the Three Strikes Reform Act is not reflected in the uncodified provisions of Proposition 47 that set forth the purposes of the measure"].) Indeed, the mandatory five-year deadline represented a significant statutory change, whose fiscal impact the Legislative Analyst sought to estimate. (Voter Guide, *supra*, analysis of Prop. 66 by the

---

[2] The ballot pamphlet referred to "time limits," "time frame," and "time lines" *seven* times. (Voter Guide, *supra*, Prop. 66, pp. 104-109.) Not once did the materials indicate that compliance with these time limits, time frame, and time lines would be optional.

13

Legis. Analyst, p. 107 ["the requirement that each challenge generally be completed in five years . . . could result in the filing of fewer, shorter legal documents"; "the ongoing fiscal impact of the measure on state costs related to legal challenges to death sentences is unknown"]; *ibid.* ["the state would incur annual cost increases in the near term to process hundreds of pending legal challenges within the time limits specified in the measure"; "such costs could be in the tens of millions of dollars annually for many years"]; cf. *Valencia*, *supra*, 3 Cal.5th at p. 365 ["the analysis provides no [fiscal] estimate of any effect on third strike offenders and their crimes nor any discussion of the fiscal effects on the state prison system"].)  By construing the five-year deadline as mandatory, we *promote*, instead of defeat, the repeatedly highlighted purpose of the initiative.  (Cf. *Engram*, *supra*, 50 Cal.4th at p. 1150 [construing the preference for criminal cases as mandatory would be inconsistent with the statutory purpose " 'to expedite these proceedings to the greatest degree that is consistent with the ends of justice' "]; *Garrison*, *supra*, 32 Cal.2d at p. 437 [construing the 10-day limit as mandatory would "lead to the result of defeating the aims and purposes of the statute"].)  In short, all relevant ballot materials reinforced the idea that the five-year deadline was mandatory and could be enforced by a petition for writ of mandate.

The campaign for Proposition 66 itself did so, too.  (See *California Housing Finance Agency v. Patitucci* (1978) 22 Cal.3d 171, 177 ["evidence of [the proposition's] purpose may be drawn from many sources"]; *id.* at p. 178 [examining newspaper and campaign literature concerning the proposition]; see generally *People v. Hodges* (1999) 21 Cal.4th 109, 114 ["we are obliged to interrogate the electorate's purpose, as indicated in the ballot arguments and elsewhere"].)  The website for "No on 62, Yes on 66" pledged that "Proposition 66 will ensure justice for both victims and defendants by [¶] **Reforming the**

14

**Appeals Process**," which included four bullet points, the first of which was "Limit all state appeals to 5 years."[3]  Proposition 66 supporter (and San Bernardino County District Attorney) Michael Ramos wrote that "Proposition 66 ensures that all appeals are heard within five years."[4]  An editorial in the online Times of San Diego reiterated that "Prop. 66 reforms will speed up the appeals process, ensuring appeals are heard within 5 years."[5]  Even the president and CEO of the Criminal Justice Legal Foundation, which appears here as counsel for intervener-proponents, stated that Proposition 66 "compresses the process."[6]  No one on the "Yes on 66" side was telling voters "It's really just a goal, not a deadline."  (Cf. *Valencia*, *supra*, 3 Cal.5th at p. 350 ["the ballot materials for Proposition 47 supplied no notice to voters that the measure intended to amend the resentencing criteria of the Three Strikes Reform Act"].)  When we are trying to determine what the voters enacted, what voters were told matters.[7]  After all, the question

---

**3**      <https://noprop62yesprop66.com/get-the-facts/> (cached by Google as it appeared on June 27, 2017).

**4**      Ramos, *Don't abolish death penalty, make the system work*, San Bernardino Sun (Aug. 23, 2016) <http://www.sbsun.com/opinion/20160823/dont-abolish-death-penalty-make-the-system-work-michael-a-ramos> (as of Aug. 24, 2017).

**5**      Hestrin, *Proposition 66 Will Fix California's Death Penalty System* (July 30, 2016) < http://timesofsandiego.com/opinion/2016/07/30/proposition-66-will-fix-californias-broken-death-penalty-system/> (as of Aug. 24, 2017).

**6**      Wright, *Death Penalty Dilemma:  Will Vote on Props. 62 and 66 Hinge on Costs?* (Nov. 4, 2016) <https://calmatters.org/articles/can-cost-change-voters-minds-about-the-death-penalty-backers-of-props-62-and-66-hope-so/> (cached by Google as it appeared on July 5, 2017).

**7**      Following the proponents' lead, nonpartisan organizations and media outlets likewise described the five-year deadline as mandatory.  The League of Women Voters of California said that "[b]oth direct appeals and *habeas* petitions would have to be completed within five years from the time of sentencing" <https://cavotes.org/vote/elections/ballot-measures/proposition-66-death-penalty-procedures> (as of Aug. 24, 2017).  Southern California Public Radio said "it

*(Footnote continued on next page.)*

15

whether a time limit is mandatory or directive "is ultimately one of legislative intent." (*Kabran*, *supra*, 2 Cal.5th at p. 343.) Where, as here, the text, structure, and history do not permit us to characterize the five-year deadline as merely a goal, the avoidance canon "has no role to play." (*Warger v. Shauers* (2014) ___ U.S. ___, ___ [135 S.Ct. 521, 529].)

Given this backdrop, there is a straightforward, readily-grasped constitutional flaw in section 190.6, subdivision (d). So far as I can see, courts across the country have found a violation of the separation of powers in every single case addressing a legislative attempt to impose an enforceable judicial deadline. (See, e.g., *Buser*, *supra*, 302 Kan. at p. 2 [invalidating a statutory deadline that required parties to file a joint request with the court " 'that such decision be entered without further delay' " if the Supreme Court failed to file its decision on a submitted matter within 180 days]; *Com. v. Omholt* (Mont. 1983) 662 P.2d 591, 593 [invalidating a statutory deadline that authorized a referral to the judicial standards commission when a court failed to issue a decision in 90 days]; *State ex rel. Watson v. Merialdo* (Nev. 1954) 268 P.2d 922, 926 [invalidating a statutory deadline that required the judge's salary be withheld for

_____

*(Footnote continued from previous page.)*

would place time limits on legal appeals that now drag on for 20 years or more" <http://www.scpr.org/news/2016/10/03/64988/election-2016-faq-proposition-66-death-penalty-pro/> (as of Aug. 24, 2017). (See also Editorial, *Abolish the death penalty*, L.A. Times (Sept. 4, 2016) p. A21 ["Proposition 66 also directs the courts to conclude both the direct state appeal and any habeas corpus petitions . . . within five years"]; Egelko, *Voters facing stark death-penalty choice*, S.F. Chronicle (Sept. 15, 2016) p. A9 ["It would require the state Supreme Court to rule on a prisoner's direct appeal within five years"]; Calefati, *Californians have chance to weigh fate of a costly and 'broken' system*, S.J. Merc. News (Sept. 30, 2016) p. 1A ["Proponents of Proposition 66 say the measure would accelerate the appeals process . . . by requiring state courts to issue decisions on the cases within five years"].)

16

failure to issue a decision in 90 days]; *In re Grady* (Wis. 1984) 348 N.W.2d 559, 569-570 [same].)**8** The five-year deadline in section 190.6, like the deadlines in the cases above, includes a penalty or consequence for its violation: Section 190.6, subdivision (e) authorizes a party or victim to petition for writ of mandate to enforce the deadline. Accordingly, the separation of powers doctrine requires us to strike down this mandatory five-year deadline.

## B.

The majority's efforts to avoid this conclusion are far from convincing.

The majority's misguided analysis begins, but does not end, with its reliance on an exceedingly narrow and unjustified reading of section 190.6, subdivision (e).**9** In the majority's view, "the delay" that may be the subject of a

----

**8**      Notice how the existence of time limits in a constitution for specified aspects of the judicial function does nothing at all to validate *legislative* attempts to impose *other* time limits or otherwise diminish concern over the threat to the separation of powers. The validity of a legislatively imposed time limit depends on the time limit's own compatibility with constitutional principles, and is not appropriately cast in a positive light simply because the constitution itself incorporates certain specific time limits that apply to the judiciary. (*Holliman v. State* (Ga. 1932) 165 S.E. 11, 15 [invalidating a statute setting a 90-day deadline to grant or refuse all applications for certiorari, despite a constitutional provision setting a deadline for disposing of certified cases; "We do not think it is within the power of the General Assembly, by any exercise of its legitimate legislative functions, to impose limitations and restrictions upon the discharge of purely judicial functions upon a distinct co-ordinate branch of the government which is alike independent of the two other coordinate branches of the State government — executive and legislative. The sovereign State, the people, may by constitutional amendment declare a subordination of one of these powers to another. But, until they do, the court can not recognize such subordination, or regard the surrender of the functions delegated to it by the constitution we have sworn to support, as otherwise than a breach of the sacred obligations we assume upon our induction into office."]; see also *State ex rel. Kostas v. Johnson*, *supra*, 69 N.E.2d at p. 595.)

**9**      Section 190.6, as amended by Proposition 66, provides:

"(a) The Legislature finds that the sentence in all capital cases should be imposed expeditiously.

*(Footnote continued on next page.)*

17

petition for writ of mandate is limited to the delay in filing the opening appellate brief under subdivision (b).  (See maj. opn., *ante*, at p. 50.)  But there is no such limitation in the part of subdivision (e) that authorizes the writ of mandate.  There

---

*(Footnote continued from previous page.)*

"(b) Therefore, in all cases in which a sentence of death has been imposed on or after January 1, 1997, the opening appellate brief in the appeal to the State Supreme Court shall be filed no later than seven months after the certification of the record for completeness under subdivision (d) of Section 190.8 or receipt by the appellant's counsel of the completed record, whichever is later, except for good cause. However, in those cases where the trial transcript exceeds 10,000 pages, the briefing shall be completed within the time limits and pursuant to the procedures set by the rules of court adopted by the Judicial Council.

"(c) In all cases in which a sentence of death has been imposed on or after January 1, 1997, it is the Legislature's goal that the appeal be decided and an opinion reaching the merits be filed within 210 days of the completion of the briefing. However, where the appeal and a petition for writ of habeas corpus is heard at the same time, the petition should be decided and an opinion reaching the merits should be filed within 210 days of the completion of the briefing for the petition.

"(d) The right of victims of crime to a prompt and final conclusion, as provided in paragraph (9) of subdivision (b) of Section 28 of Article I of the California Constitution, includes the right to have judgments of death carried out within a reasonable time. Within 18 months of the effective date of this initiative, the Judicial Council shall adopt initial rules and standards of administration designed to expedite the processing of capital appeals and state habeas corpus review. Within five years of the adoption of the initial rules or the entry of judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases. The Judicial Council shall continuously monitor the timeliness of review of capital cases and shall amend the rules and standards as necessary to complete the state appeal and initial state habeas corpus proceedings within the five-year period provided in this subdivision.

"(e) The failure of the parties or of a court to comply with the time limit in subdivision (b) shall not affect the validity of the judgment or require dismissal of an appeal or habeas corpus petition. If a court fails to comply without extraordinary and compelling reasons justifying the delay, either party or any victim of the offense may seek relief by petition for writ of mandate. The court in which the petition is filed shall act on it within 60 days of filing. Paragraph (1) of subdivision (c) of Section 28 of Article I of the California Constitution, regarding standing to enforce victims' rights, applies to this subdivision and subdivision (d)."

*is* such a limitation in the *first* sentence of subdivision (e) — which addresses the validity of the underlying judgment or the viability of the appeal — but it is quite obvious that this sentence and the writ of mandate sentence serve different purposes and thus have different scopes of operation. The first sentence of new subdivision (e) represents a slight modification of section 190.6, former subdivision (d), which provided: "The failure of the parties or the Supreme Court to meet or comply with the time limit provided by this section shall not be a ground for granting relief from a judgment of conviction or sentence of death." (Stats. 1996, ch. 1086, § 1, p. 7656.) Because the only "time limit provided by this section" (*ibid.*) at that time was the briefing deadline in subdivision (b), it became necessary, once section 190.6 had been amended to include another time limit, to clarify that the first sentence of subdivision (e) applied only to the deadline in subdivision (b). But the second sentence in subdivision (e) is entirely new. It does not purport to create a remedy against a *party* — yet it is a party, after all, who does or does not comply with a briefing deadline. Rather, the second sentence creates a remedy against a *court*: "*either* party" or "any victim" may "petition for writ of mandate" against "a court" for "the delay." (§ 190.6, subd. (e), italics added.)

Now consider the implication of inferring a restriction in the scope of this sentence, as the majority proposes. Doing so would mean that the "party" who had failed to submit a timely opening appellate brief would be able to seek relief from "a court" for "the delay" in the party's timely filing of *its own* brief — a remedy without a right if there ever was one. Given its context, the structure of the statute, and the materials presented to the voters, we can safely conclude that what the second sentence in subdivision (e) means is precisely what it says: Either party, or any victim, may seek relief by petition for writ of mandate when a court fails to comply with a deadline set forth in section 190.6.

19

What's more, a reasonable member of the electorate would also have considered the concluding sentence of section 190.6, subdivision (e). This sentence expressly provides that a victim's right to enforcement of the Victims' Bill of Rights (Cal. Const., art. I, § 28) includes standing to enforce the rights set forth in section 190.6, subdivision (d) — i.e., the five-year deadline. Subdivision (d), in turn, explicitly links the five-year deadline to the constitutional "right of victims of crime to a prompt and final conclusion, as provided in paragraph (9) of subdivision (b) of Section 28 of Article I of the California Constitution, includ[ing] the right to have judgments of death carried out within a reasonable time." The majority's reading — which denies victims standing to enforce the five-year deadline — simply makes the final sentence of subdivision (e) disappear.

The majority says it must construe the five-year deadline as directory "regardless of how the ballot materials characterized" it because there is no "workable" means of enforcing the deadline. (Maj. opn., *ante*, at pp. 49, 52.) The majority cited no support for this conclusion because none exists, nor did it offer any compelling argument for why this approach makes sense. That the scheme is unworkable is both true and easily understood. Of course there's no tribunal in which a party could seek a writ of mandate directed to us. But even more important, compliance with the five-year deadline depends in large part on a series of discretionary determinations by superior courts, the Court of Appeal, and this court — yet mandamus cannot be used to " ' "control the discretion of a court or judicial officer or to compel its exercise in a particular manner, except in those rare instances when under the facts it can be legally exercised in but one way [citations]." ' " (*City of Torrance v. Superior Court* (1976) 16 Cal.3d 195, 201-202.) So the majority is right to conclude that the mandate mechanism — no matter how it is interpreted — is a hollow promise.

20

Yet the question before us is not the workability of an arrangement involving a petition for writ of mandate to enforce the five-year deadline. It is instead whether a reasonable voter would have understood the *purpose* of the mandate mechanism to make the five-year deadline not merely an aspiration, but an enforceable reality. And subdivision (e) of section 190.6 is indeed a clear statement that the five-year deadline is mandatory, not directory. Everything before us — the text and structure of the initiative, its unambiguous purpose, the ballot materials, and the construction endorsed by all of the parties — would lead a reasonable voter to believe that this provision, which had attracted so much attention, constituted a real deadline, and one that could be enforced by a petition for writ of mandate. When the text of a voter initiative provides that government "shall" complete some action within a specified period of time (§ 190.6, subd. (d)), the analysis of the initiative in the ballot pamphlet confirms that the new law "requires" completion of some action within the specified period of time (Voter Guide, *supra*, analysis of Prop. 66 by Legis. Analyst, pp. 106-107), and the proponents' argument there and in its general campaign promises that the new law "will" achieve that objective (see *ante*, fn. 3 and accompanying text), a reasonable voter would conclude that the initiative imposes an enforceable deadline. So, too, when the initiative goes so far as to authorize aggrieved parties to obtain a judicial writ to enforce the time limit, a reasonable voter would feel confident that the new law enacts real, meaningful control over the judicial function.

Moreover, nothing in our case law, the case law from any other jurisdiction, or in the inherent logic of constitutional or statutory interpretation makes the characterization of a statutory time limit for judicial processes turn on whether the enforcement mechanism would be "workable." (Maj. opn., *ante*, at p. 52.) It's doubtful that any mechanism to enforce a statutory deadline on the resolution of a case or motion could *ever* be entirely workable, since such a deadline (as the

21

majority concedes) would necessarily interfere with the court's control over its docket and thus violate the separation of powers. (See maj. opn., *ante*, at p. 54.) The majority's interpretive move, in reality, is to declare that it would never recognize *any* deadline as mandatory. Our court has the power to take a "different" approach from that of every other court inside or outside of California (*ibid*.), but it is hard to see how this approach squares with our mission, when interpreting a statute, to construe it in a manner that gives effect to the legislative purpose. (See *Goodman v. Lozano*, *supra*, 47 Cal.4th at p. 1332.)

Equally unpersuasive is the majority's next justification for construing the clearly mandatory deadline as merely directory. According to the majority, it was not sufficient that the text, structure, context, and legislative history demonstrated that the deadline was mandatory. Rather, the ballot materials also needed to inform the voters about "the details of an enforcement mechanism" and "how such an order could effectively result in compliance." (Maj. opn., *ante*, at p. 52.) If such a requirement is to be plucked out of thin air — as I fear this one has been — then it needs a compelling substantive or institutional justification that the majority does not provide. To my knowledge, we have never required the voters to sit through a constitutional law lecture before we would be willing to interpret a law as it was written.

Such a requirement strikes me as inconsistent with the very 83-year-old case the majority purports to be vindicating. Unlike this case, *Lorraine* did not even involve a constitutional challenge (*Lorraine*, *supra*, 220 Cal. at p. 756) — we instead considered only the mandatory/directory character of a statute providing that a court " 'shall' " postpone a trial or hearing for up to 30 days " 'when all attorneys of record of parties who have appeared in the action agree to such postponement.' " (*Id*. at p. 754.) Tellingly, we did not inquire whether the Legislature had sufficiently ruminated about "the details" of the rule's operation or

22

what effect it would have on a court.  Instead, in accordance with our longstanding rule that the mandatory/directory distinction "is ultimately one of legislative intent" (*Kabran*, *supra*, 2 Cal.5th at p. 343), we focused on whether the Legislature had "the intent to make the action of the parties compulsory upon the court in each instance." (*Lorraine*, at p. 757; see also *Thurmond*, *supra*, 66 Cal.2d at p. 839.)  Finding no such intent, we declared the statutory text to be properly interpreted as directory.  (*Lorraine*, at p. 757.)**10**

That's quite a contrast with the five-year deadline here, which even the majority concedes was meant to be mandatory.  (Maj. opn., *ante*, at pp. 49, 52-53.) When a statute encroaches on a court's discretion in managing its docket — and there is a clear statement the statute is mandatory, not directory — then we have no option but to provide the public and the other branches with the requisite clarity of decision and doctrine by declaring the statute unconstitutional as a violation of

---

**10**     The majority is equally misguided in suggesting that no separation of powers violation would arise until death penalty cases "dominate dockets to the point that other cases would be left to languish" or cause us to give "short shrift . . . to the decisionmaking process." (Maj. opn., *ante*, at p. 55.)  The separation of powers protects against not only those intrusions, but also against the insidious effects of a mandatory deadline on a court's management of its docket and the ability to devote its attention to the whole range of cases meriting timely justice.  (See *Engram*, *supra*, 50 Cal.4th at p. 1146; *Thurmond*, *supra*, 66 Cal.2d at p. 839; accord, *State ex rel. Emerald People's Util. v. Joseph* (Or. 1982) 640 P.2d 1011, 1016-1018 (conc. opn. of Peterson, J.).)  The constitutional violation is complete in the legislative intrusion on the judicial function of deciding when to hear and determine cases.  (See Levin & Amsterdam, *Legislative Control Over Judicial Rulemaking: A Problem in Constitutional Revision* (1958) 107 U. Pa. L.Rev. 1, 31-32.)  So a mandatory five-year deadline — which is what the initiative provides, what the voters were told they were getting, and what was enacted — *necessarily* infringes on a court's inherent authority.  There is no requirement that the voters demonstrate "a *broader* intent to infringe on inherent judicial authority" for us to respect their choice (maj. opn., *ante*, at p. 54), and one strains to understand how they could have made their intended purpose any clearer here.

23

the separation of powers. Indeed, that is precisely what *Verio Healthcare, Inc. v. Superior Court* (2016) 3 Cal.App.5th 1315 (*Verio*) held.

At issue in *Verio* were amendments to two civil procedure statutes we had previously construed in *Thurmond, supra,* 66 Cal.2d 836 to be directory. (*Verio, supra,* 3 Cal.App.5th at p. 1325-1326.) In 1968, one year after *Thurmond*, the Legislature amended each of those statutes to add a new provision stating that a continuance or extension of time requested by a party or attorney who is a member of the Legislature then in session "is mandatory," unless the court determined that the continuance or extension of time would defeat or abridge a right to relief in specified proceedings. (Code Civ. Proc., §§ 595, 1054.1, subd. (b).) In contrast to the majority's approach in this case, the *Verio* court recognized that the clearly mandatory provisions of the amended statutes rendered them distinguishable from the statutes we construed in *Lorraine, Thurmond,* and *Engram.* (*Verio,* at pp. 1329-1330.) Precisely because the 1968 amendments "explicitly describe[d] the continuance or extension of time as 'mandatory,' " the court held "that sections 595 and 1054.1 are unconstitutional to the extent they purport to be mandatory." (*Id.* at p. 1330.)

The majority holds out *Verio* as an example of a court interpreting a statute as directory, despite its mandatory phrasing. *Verio* does not even mildly support the majority's position. The *Verio* court "refused to give the statutes mandatory effect" (maj. opn., *ante,* at p. 48) for the simple reason that the amendments making the statutes mandatory had been struck down as unconstitutional. (*Verio, supra,* 3 Cal.App.5th at p. 1330.) The remainder of the statutes, though, could still be given effect in a manner consistent with our jurisprudence on severability and the statutory design. (See *Legislature v. Eu* (1991) 54 Cal.3d 492, 535.) The invalid mandatory provisions were set forth in a separate subdivision (see Code Civ. Proc., § 1054.1, subd. (b)) or a separate paragraph (*id.,* § 595, 2d par.) and

24

were grammatically severable.  (See *Verio*, at p. 1325.)  The invalid mandatory provisions were functionally severable, in that their removal would not affect or disrupt the operation of either statute.  And the court could be sure that the Legislature would have maintained the pre-amended version of the statutes, had it foreseen the invalidation of the 1968 amendments, because " '[t]he legislative policy of granting continuances of court proceedings so as not to interfere with the functions of the Legislature . . . has been the law since 1880.' " (*Verio*, at p. 1326, quoting *Thurmond*, *supra*, 66 Cal.2d at p. 840.)  These aspects of the case showcase why *Verio* did not interpret mandatory language as directory.  It instead *invalidated* the mandatory provisions.  The remaining statutory text, excised of the unconstitutional provisions, was the same statutory text we had already construed as directory in *Thurmond*.  Consequently, *Verio* declared that *those* statutes "should *continue* to be treated as directory."  (*Verio*, at p. 1330, italics added.)

Ironically, it is the part of *Verio* that is on point — the part declaring mandatory provisions unconstitutional — that the majority ignores.  Instead the majority relies on the part of *Verio* that read directory language to be directory, but that part is of no assistance here.  No one — not the majority, not the Attorney General, not the intervener-proponents — claims the five-year deadline is somehow severable from the mandatory aspects of the initiative.  (See Katyal & Schmidt, *Active Avoidance:  The Modern Supreme Court and Legal Change* (2015) 128 Harv. L.Rev. 2109, 2121, fn. 47 ["When a court uses the rewriting power, it is, in effect, implicitly assuming the outcome of the severability analysis and acting with less candor and transparency than a court that does the analysis explicitly"].)  And nothing in the record suggests the voters would have preferred a directory interpretation of the five-year deadline to its invalidation.  To the contrary:  Several statutes already offered what the majority calls "an exhortation to the parties and courts to handle cases as expeditiously as is consistent with the

25

fair and principled administration of justice." (Maj. opn., *ante*, at p. 55; see §§ 190.6, subds. (a), (c), 1239.1, subd. (a).) There is no reason to think the voters, when they enacted Proposition 66, wanted merely to pile on. As a sister state supreme court explained nearly a century ago, "[F]or us to merely hold the provisions of the act under consideration directory would afford poor consolation, for it was doubtless the intention of those sponsoring this measure to provide a method for a speedy disposition of such matters, and to hold the provisions of the measure merely directory would enable the courts to take as much time as they saw fit to dispose of the questions presented, which would be no improvement over the method provided by law as it existed before this measure was initiated." (*Long*, *supra*, 251 P. at p. 490.)

Litigants and policymakers are unlikely to discover much improvement — or "benefit" (maj. opn., *ante*, at p. 44, fn. 28) — in the majority's implausible construction of the five-year deadline, either. It would be exceptionally difficult, and potentially quite fraught, for the Judicial Council to implement whatever might allegedly remain of the five-year time limit while preserving "the courts' inherent authority over their dockets." (*Id*. at p. 59.) So I agree with Justice Liu: The Judicial Council is under no compulsion to adopt rules or standards meant somehow to expedite judicial review of death penalty cases beyond those that implement the specific reforms enumerated in other parts of Proposition 66. (See §§ 1239.1, subds. (a), (b), 1509, subds. (a), (g), 1509.1, subd. (a).) As he points out, section 190.6, subdivision (d) "does not provide useful guidance for those charged with implementing Proposition 66" regarding the acceleration of judicial review and therefore cannot "lawfully and practically guide the Judicial Council's quasi-legislative rulemaking." (Conc. opn. of Liu, J., *ante*, at pp. 14-15.) To require more from the Judicial Council than rulemaking to implement the specific reforms above would amount to a risky bet that some other entity will swoop in to

26

enforce the separation of powers, which is a bedrock of our constitutional republic and a dividing line *the courts* are charged with policing. Either the five-year deadline is unconstitutional (as I have argued) or it is of no legal effect (as Justice Liu contends). But any implication that the Judicial Council must also make rules aimed vaguely at accelerating the process, with no hint as to what such rules might be, brings to mind the guidance a European monarch is envisioned as offering to John Adams — stepping into the shoes of George Washington as our second president — in the musical "Hamilton": "Good luck!" (Miranda, Hamilton: An American Musical, act II, scene 10.)

"Good luck" might be in order as well for those who contemplate a challenge to the constitutionality of other statutes and may now wonder whether this court will instead redraft laws to avoid "constitutional problems." (Maj. opn., *ante*, at p. 49.) It is not judicial modesty that authorizes a court to distort the text of a statute in a way that subverts its purpose. Nor does judicial restraint justify a court deliberately reading a law to mean something other than what the voters enacted. When the majority says that it will construe statutes to be directory — despite their "mandatory phrasing," despite what "the voters were told," and despite what "the voters intended" as the statute's purpose (maj. opn., *ante*, at pp. 49, 53) — the act becomes precisely the opposite of judicial modesty. The court instead substitutes its own preferences, without justification, for those embodied in legislation. (See Manning, *The Nondelegation Doctrine as a Canon of Avoidance* (2000) Sup. Ct. Rev. 223, 255-256.) And while it may sometimes be possible for the legislative branch to correct a mistaken judicial construction of a statute it had duly enacted, that's an unlikely prospect here. Under the terms of the initiative, the newly minted five-year "goal" just announced by the majority and given some degree of legal weight by it can now be overturned only by a vote of three-fourths of the membership of each house of the Legislature, or by a whole new initiative.

27

(See Voter Guide, *supra*, Prop. 66, § 20, p. 218.)  Because, practically speaking, our word will be the last word, we really ought to fairly construe the law the voters actually enacted.

When we construe Proposition 66, we find that nothing in the initiative or the record suggests that reasonable voters would have understood the initiative to enact merely a "guideline[]" or a "goal."   (Maj. opn., *ante*, at pp. 44, fn. 28, 52; cf. *Valencia*, *supra*, 3 Cal.5th at p. 364 [refusing to adopt a permissible construction that would "be inconsistent with [the initiative]'s uncodified findings, declarations, purpose, and intent"].)  Rather than redraft the initiative while casting aside its purpose, we should interpret the five-year deadline in section 190.6 to mean what it says, and analyze its constitutionality fairly and fully.  Having undertaken that task, I would invalidate those portions of section 190.6, subdivision (d) that purport to impose a deadline for completion of "the state appeal and the initial state habeas corpus review in capital cases" and to charge the Judicial Council with promulgating rules and standards to ensure the completion of such review "within the five-year period provided in this subdivision."

II.

The five-year deadline is not Proposition 66's only constitutional defect. The majority also errs in upholding new section 1509.1, subdivision (a), which purports to vest the Court of Appeal with appellate jurisdiction in capital habeas corpus proceedings:  "Either party may appeal the decision of a superior court on an initial petition under Section 1509 to the court of appeal."  Under our state Constitution, *this* court has "exclusive" appellate jurisdiction " 'in death penalty cases.' "  (*Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 124 (*Thompson*).)

The majority concedes this new provision constitutes a "significant departure" from existing practice governing appellate review of capital habeas

28

corpus petitions. (Maj. opn., *ante*, at p. 21.) But it is more than that: It is also unconstitutional. Unlike the majority, I would read the constitutional grant of appellate jurisdiction to this court (Cal. Const., art. VI, § 11, subd. (a)) in conjunction with related constitutional provisions, the Legislature's long-standing interpretation of our appellate jurisdiction, the purpose behind vesting this court with appellate jurisdiction in death penalty cases, and the virtually uniform practice of our sister states. When interpreted using our ordinary canons of construction, it is clear that our exclusive appellate jurisdiction encompasses an appeal from *any* attempt to attack the death judgment, including an appeal from a capital habeas corpus proceeding.

Like most states that have retained the death penalty, California has entrusted appellate jurisdiction in death penalty cases to the state court of last resort. Under our state Constitution, "[t]he Supreme Court has appellate jurisdiction when judgment of death has been pronounced." (Cal. Const., art. VI, § 11, subd. (a).) Although this court generally has the power to transfer a case in its jurisdiction to the Court of Appeal (or to transfer a case from the Court of Appeal to itself), the Constitution explicitly withholds such authority when the case is "an appeal involving a judgment of death." (*Id.*, art. VI, § 12, subd. (d).) Certainly an appeal from a judgment granting or denying a habeas corpus petition attacking a death judgment is "an appeal involving a judgment of death." (*Ibid.*)

So it is the task of this court — and only this court — to exercise "exclusive jurisdiction 'in death penalty cases' because of 'the extreme nature of the penalty.' " (*Thompson*, *supra*, 25 Cal.4th at p. 124, quoting Cal. Const. Revision Com., Proposed Revision (1966) p. 91.) Our concern over the gravity of the death penalty is widely shared by our sister jurisdictions. The high court has pointed out that a system providing for judicial review "in a court with statewide jurisdiction . . . promote[s] the evenhanded, rational, and consistent imposition of death

29

sentences under law." (*Jurek v. Texas* (1976) 428 U.S. 262, 276; accord, *State v. Ramirez* (Ariz. 1994) 871 P.2d 237, 243; *People v. Gaines* (Ill. 1984) 473 N.E.2d 868, 878; see generally Uelman, *Crocodiles in the Bathtub: Maintaining the Independence of State Supreme Courts in an Era of Judicial Politicization* (1997) 72 Notre Dame L.Rev. 1133, 1138 ["The traditional answer, of course, is that consistency in administering the ultimate punishment demands final review by the same body of judges in every case"].)

An appeal in a death penalty case encompasses more than the automatic appeal. It includes, for instance, an appeal from a petition for writ of error *coram nobis*, an appeal from a petition for writ of habeas corpus, or an appeal from any other extraordinary writ attacking the judgment. Even if the details governing the procedure for these proceedings may vary, the need for evenhanded, rational, and consistent imposition of the death penalty does not: It is the same *regardless* of which means is used to attack the judgment. (See *State v. Fourth Dist. Court of Appeal* (Fla. 1997) 697 So.2d 70, 71 ["Collateral proceedings in death penalty cases are essentially attacks on the imposition of the death penalty. Because this Court has jurisdiction over death penalty cases, it is logical that such attacks be directed to this Court."]; *People v. Gaines*, *supra*, 473 N.E.2d at p. 879 ["Statewide review, in this court, of post-conviction cases involving the death penalty will further the governmental interest in uniform and expeditious review of death sentences"]; *State v. Niccum* (N.C. 1977) 238 S.E.2d 141, 143-144 [because an appeal from a judgment that " 'includes a sentence of death or imprisonment for life' " lies directly to the supreme court, it "logically" follows that an appeal from a habeas corpus judgment involving a sentence of death or life imprisonment lies to the supreme court].)

Which is precisely how the Legislature, for at least the past 90 years, has interpreted the Constitution's exclusive grant of appellate jurisdiction in capital

30

cases.  In 1927, the Legislature enacted former section 1506, which then provided that "[a]n appeal may be taken to the district court of appeal by the [P]eople from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant after his conviction, in all criminal cases prosecuted by indictment or information in a court of record, *excepting criminal cases where judgment of death has been rendered*, and in such cases to the supreme court . . . ." (Stats. 1927, ch. 628, § 1, p. 1061, italics added.)  (The current version still includes an identical provision governing appeals in "criminal cases where judgment of death has been rendered."  (§ 1506.))  The italicized language plainly purported to construe the 1904 predecessor to article VI, section 11, subdivision (a) of the Constitution, since it repeated that key language verbatim:  "The Supreme Court shall have appellate jurisdiction on appeal from the superior courts . . . on questions of law alone, in all *criminal cases where judgment of death has been rendered . . . .*"  (Cal. Const., former art. VI, § 4, as amended Nov. 8, 1904, italics added.)

None of this is happenstance.  We noted long ago the "pains that were there taken [by the Legislature] to limit the instances in which an appeal from the superior court in habeas corpus proceedings would be allowed" and acknowledged that "[t]he power of the Legislature to enact section 1506 has never been successfully challenged."  (*In re Flodstrom* (1955) 45 Cal.2d 307, 310.)  Even earlier, in *In re Alpine* (1928) 203 Cal. 731, we recognized that "[s]ection 1506 provided for the first time in our legislative history that an appeal may be taken from the order of a superior court discharging a defendant after conviction to the district court of appeal, except in cases where judgment of death has been rendered, and in such cases to the supreme court." (*Alpine*, at p. 745; see *id.* at pp. 745-746 ["Whatever doubt that existed [in 1913], as to whether a *habeas corpus* proceeding may fairly be said to be included in the terms of the constitution . . .

31

has been removed by the unmistakable language of the statute that it is so included within the constitutional language. And we can see no objection on constitutional grounds against the power of the legislature to so provide."]; *In re Ketchel* (1968) 68 Cal.2d 397, 399.)

One year after former section 1506 was enacted, former article VI, section 4 of the Constitution was amended. But the amendment left this court's appellate jurisdiction unchanged: "in all *criminal cases where judgment of death has been rendered.*" (Cal. Const., former art. VI, § 4, as amended Nov. 6, 1928, italics added; see *id.*, former art. VI, § 4b [granting appellate jurisdiction to the Court of Appeal "except where *judgment of death has been rendered*" (italics added)].) These provisions were amended again in 1966, this time to read as they do today, but the amendment "did not alter the scope of this court's exclusive jurisdiction in capital cases." (*Thompson*, *supra*, 25 Cal.4th at p. 124.)

As even intervener-proponents acknowledge, section 1506 deems the "final order of a superior court made upon the return of a writ of habeas corpus discharging a [capital] defendant or otherwise granting all or any part of the relief sought" to be a "criminal case[] where judgment of death has been rendered" — and, accordingly, one that can be appealed only to this court.[11] The Legislature's

---

[11] The Legislature has characterized a habeas corpus proceeding as a "Special Proceeding[] of a Criminal Nature." (Pen. Code, pt. 2, tit. 12, ch. 1, § 1473 et seq.) Neither the parties nor the majority explains why the Legislature's characterization of capital habeas corpus proceedings as "criminal" should not be determinative for purposes of defining this court's exclusive appellate jurisdiction under article VI, section 11. (Cf. *In re Scott* (2003) 29 Cal.4th 783, 815 [a habeas corpus proceeding is not "a criminal case" within the meaning of Cal. Const., art. I, § 15's bar on persons being compelled in a criminal case to be a witness against themselves because a habeas corpus proceeding "cannot result in added punishment for the petitioner"]; *id.* at p. 815, fn. 6 ["We need not, and do not, decide whether a habeas corpus proceeding is civil or criminal for other purposes"].)

construction of the constitutional provisions governing this court's appellate jurisdiction is thus fully consistent with the contextual reading of article VI, sections 11 and 12, above. It is also consistent with a principle clearly reflected in the Constitution — and supported by its history — that this court has mandatory, exclusive appellate jurisdiction in "death penalty cases." (Cal. Const. Revision Com., Speech Materials (Apr. 18, 1966), p. 13 ["The proposed article makes the appellate jurisdiction of the Supreme Court discretionary, except for death penalty cases"]; Cal. Const. Revision Com., Proposed Revision (Feb. 1966) p. 81 ["The proposed Article VI makes the appellate jurisdiction of the Supreme Court discretionary, except in death penalty cases"]; *id*. at p. 91 ["except in death penalty cases where, because of the extreme nature of the penalty, jurisdiction was given to the Supreme Court"]; Cal. Const. Revision Com., Progress Report to the State Legislature (Oct. 1965) p. 37 ["An exception to full discretionary jurisdiction will be made by retaining Supreme Court jurisdiction of appeals in death penalty cases"]; Transactions of the Commonwealth Club of Cal., *Ballot Proposals for Nov. 1966* (Oct. 3, 1966; vol. 42, pt. 2) The Commonwealth p. 324 [describing the proposed constitutional amendment as "eliminating direct appeal to the Supreme Court except in death penalty cases"];[12] see also Voter Guide, Gen. Elec. (Nov. 6, 1984), analysis of Prop. 32 by Legis. Analyst, p. 28 ["if this measure is approved by voters, the Supreme Court would continue to be responsible for hearing death penalty appeals, and it would not be able to transfer these cases to a court of appeal for review"]; Legis. Analyst, Analysis of Sen. Const. Amend. No. 29 (as

_____

[12]     The Commonwealth Club's publication declared that "voters increasingly have turned to the Commonwealth Club Reports, such as those contained herein, for aid in appraising the ballot amendments" (Transactions of the Commonwealth Club of Cal., *supra*, at the frontispiece), and we have ourselves cited on occasion to the Commonwealth Club's discussion of legislation as evidence of its intended purpose and scope. (E.g., *Leuschen v. Small Claims Court* (1923) 191 Cal. 133, 136.)

amended Apr. 10, 1984) p. 2 ["its provisions do not apply to appeals involving the death penalty. These cases currently must be reviewed directly by the Supreme Court, rather than being appealed first to the courts of appeal."]; Assem. Office of Research, 3d reading analysis of Sen. Const. Amend. No. 29 (as amended Apr. 10, 1984) p. 2 [the transfer provisions "[w]ould not apply to an appeal involving a death penalty judgment"]; see also Grodin et al., The California State Constitution: A Reference Guide (1993) p. 126 ["Subsection (d) makes clear that the supreme court alone has responsibility . . . for deciding death penalty cases"].) This court has routinely understood the term "death penalty cases" to include capital habeas corpus proceedings. (E.g., *In re Bacigalupo* (2012) 55 Cal.4th 312, 314; *In re Morgan* (2010) 50 Cal.4th 932, 937-938; *In re Carpenter* (1995) 9 Cal.4th 634, 659.)

Section 1506 was enacted against the backdrop of these constitutional constraints. It carries " 'a "strong presumption in favor of the Legislature's interpretation of a provision of the Constitution," ' " and its " 'focused legislative judgment on the question enjoys significant weight and deference by the courts.' " (*Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 192-193.) Indeed, around the time the Legislature enacted section 1506, this court had acknowledged that "the contemporaneous and long continued construction thereof by the legislature is entitled to great deference, and may be supposed to reflect the views of policy and modes of reasoning which prevailed among the framers of the Constitution." (*People v. S. Pac. Co.* (1930) 209 Cal. 578, 595.) Yet the majority fails to accord the Legislature's long-standing interpretation due weight — or any weight at all. The majority states only that section 1509.1 effects "an implied repeal" of section 1506. (Maj. opn., *ante*, at p. 28.) This euphemism significantly underplays the stakes here. Only *one* of these provisions can be constitutional. Either the Supreme Court has appellate jurisdiction over capital habeas corpus

34

proceedings (in which case section 1506 is constitutional, and new section 1509.1 is not), or the Court of Appeal has appellate jurisdiction over capital habeas corpus proceedings (in which case new section 1509.1 is constitutional, and section 1506 is not). The majority chooses the latter option — and thus upends 90 years of settled law and belatedly declares that we were without jurisdiction "in its most fundamental sense" (maj. opn., *ante*, at p. 15) to hear the People's appeal in *In re Carpenter*, *supra*, 9 Cal.4th 634 and any other direct appeal from the superior court in a capital habeas corpus proceeding. Even worse, the reasons provided by the majority fail to justify this sudden about-face.

It is the majority's primary contention that article VI, section 11 of the California Constitution is limited to an appeal from the "case in which [the death] judgment was rendered." (Maj. opn., *ante*, at p. 24.) But the majority cites nothing to support this theory — unless one counts a single sentence in a Judicial Council report that postdated the election at which article VI, section 11 was adopted. (See *Valencia*, *supra,* 3 Cal.5th at p. 364, fn. 5 [" 'We cannot presume that the electorate as a whole was aware of statements made . . . in a magazine article published after the election"].) Even so, the sentence — "Under Section 11, the direct appellate jurisdiction of the Supreme Court is restricted to those cases in which judgment of death has been pronounced" (Judicial Council of Cal., Ann. Rep. (1967) pt. 1, ch. 3, p. 76) — does not support the majority's idiosyncratic reading of the constitutional provision's actual text. What is important under article VI, section 11 is not that the appeal from a proceeding attacking the death judgment itself be an appeal *from* the judgment of death, but that a judgment of death has *actually* been pronounced. Over a century ago, we explained that our "appellate jurisdiction 'in all criminal cases *where judgment of death has been rendered*' " excluded an appeal from an order, "made before judgment," setting aside a charge of capital murder. (*People v. White* (1911) 161

35

Cal. 310, 310.)  Although the information charged a crime punishable by death, we explained that "neither judgment of death nor any other judgment *has yet been rendered*."  (*Ibid*., italics added; cf. Utah Code Ann. § 78A-3-102(3)(i) ["The Supreme Court has appellate jurisdiction . . . over . . . appeals from the district court involving a conviction *or charge* of a first degree or capital felony" (italics added)].)

So where judgment of death has been pronounced — and the appeal challenges that judgment — appellate jurisdiction resides in this court.  (Cf. *Thompson*, *supra*, 25 Cal.4th at p. 122 ["our exclusive jurisdiction over death penalty appeals" did not include an appeal where "[p]laintiffs challenged not the legality of that [death] judgment but the time at which Thompson's spiritual adviser of choice had to leave him before the execution"].)  Indeed, this court has already declared that "appellate jurisdiction in criminal cases where judgment of death has been rendered" extends at least to "proceedings which attack such a judgment by motion to vacate or petition for the writ of error *coram nobis*." (*People v. Shorts* (1948) 32 Cal.2d 502, 511.)  Given the pervasive uncertainty as to whether certain defects "should be raised by motion to vacate the judgment or by application for habeas corpus" (*People v. Thomas* (1959) 52 Cal.2d 521, 528) or whether "review should be by means of a writ of error *coram nobis* or through a writ of habeas corpus" (*People v. Kirk* (1946) 76 Cal.App.2d 496, 498) — and this court's persistent readiness to deem one type of petition to be the other, when necessary (e.g., *People v. Stanworth* (1974) 11 Cal.3d 588, 594, fn. 5; *People v. Enriquez* (1967) 65 Cal.2d 746, 750 ["It matters not whether this petition be treated as a petition for habeas corpus or one in *coram nobis*"]) — it seems exceedingly unlikely that a reasonable voter understood this elusive distinction to have *jurisdictional* significance in capital cases.  As we have previously noted, a challenge to a criminal conviction by means of a petition for writ of habeas corpus

36

can still qualify as "a continuation of that earlier action." (*Maas v. Superior Court* (2016) 1 Cal.5th 962, 979; see *Yokley v. Superior Court* (1980) 108 Cal.App.3d 622, 628 ["the habeas corpus proceeding is a continuation of the original trial"].) I see no reason why the electorate would have crafted a different method of appellate review for habeas corpus proceedings — and the majority offers none.

I respectfully, but strongly, disagree with the majority that an interpretation of our appellate jurisdiction incorporating the full range of relevant considerations — including functional ones — would somehow be "anomalous." (Maj. opn., *ante*, at p. 27.) It *does* matter whether the Court of Appeal has jurisdiction to review a superior court's capital habeas corpus ruling on appeal, rather than review that same ruling when the capital inmate files a new original petition there. Consider the purpose underlying our exclusive appellate jurisdiction in death penalty cases, and the difference between review by appeal and review by a new original writ petition. A system of direct review to the state court of last resort "promote[s] the evenhanded, rational, and consistent imposition of death sentences under law." (*Jurek v. Texas*, *supra*, 428 U.S. at p. 276.) A system in which an appeal can be taken to the intermediate appellate court, by contrast, creates uncertainty. It allows for the possibility of conflicting rulings on a matter of ultimate concern: life, or death. An appeal triggers the right to present oral argument and an entitlement to a written opinion with reasons stated. (*People v. Medina* (1972) 6 Cal.3d 484, 489-490.) A petition for an extraordinary writ (such as a petition for writ of habeas corpus), on the other hand, can be summarily denied without oral argument or a written statement of reasons. (See *id*. at p. 490.) Indeed, summary denial of a habeas corpus petition or other petition for an extraordinary writ does not establish law of the case or have any res judicata effect in future proceedings. (*Gomez v. Superior Court* (2012) 54 Cal.4th 293, 305, fn.

6.)  Nor does it have any precedential effect.  (*Thompson*, *supra*, 25 Cal.4th at p. 125.)

That's why virtually every one of our death penalty sister states requires that appeals from the death judgment as well as appeals from all postconviction proceedings attacking that judgment go directly to the state's highest court.[13]  The laws of these other states do not control here.  But the approach to the review of death penalty cases in our sister states is near uniform.  And this near-uniform practice also happens to conform to the approach endorsed by the American Bar Association.  (ABA Stds. for Post Conviction Remedies, std. 22-5.1 ["Appellate review should be available through the same courts authorized to hear appeals from judgments of conviction"].)  All this should cause us to wonder precisely what it is about the California Constitution that demonstrates an intent or purpose

---

[13]  Ariz. Rev. Stat. § 13-755(A); Ariz. R. Crim. P. 31.4(b)(2); Ark. Sup. Ct. R. 1-2(a)(2); *Ward v. State* (Ark. 2002) 84 S.W.3d 863, 864; Colo. Rev. Stat. §§ 16-12-206(3), 18-1.3-1201(6)(a); Fla. Const., art. V, § 3(b)(1); *State v. Fourth Dist. Court of Appeal*, *supra*, 697 So.2d at p. 71; Ga. Const., art. VI, § VI, par. III(4), (8); Ga. Code Ann. §§ 15-3-3.1(a)(2), 17-10-35(b); Idaho Code §§ 19-2719(6), 19-2827(a), (b); Ill. Const., art. VI, § 4(b); *People v. Gaines*, *supra*, 473 N.E.2d at p. 878; Ind. Const., art. VII, § 4; Ind. R. App. P. 4(A)(1)(a); Ind. R. Post-Conviction Remedies § 7; Kan. Stat. Ann. § 21-6619(a); *Zimmer v. State* (Kan. 1979) 477 P.2d 971, 974; Ky. Const., § 110(2)(b); *Cardine v. Commonwealth* (Ky. 2003) 102 S.W.3d 927, 928; Miss. Code Ann. §§ 9-4-3(1), 99-39-25(1), 99-39-28; Miss. R. App. P. 22(c)(8); Mo. Const., art. V., § 3; *Barton v. State* (Mo. 2016) 486 S.W.3d 332, 336; Neb. Const., art. V, § 2; *Ex parte Tail* (Neb. 1944) 14 N.W.2d 840, 844; N.M. Const., art. VI, § 2; N.M. Stat. Ann. § 34-5-8(A)(3), (4); N.C. Gen. Stat. § 7A-27(a)(1); *State v. Niccum*, *supra*, 238 S.E.2d at p. 144; 42 Pa. Cons. Stat. §§ 9546(d), 9711(h)(1); S.C. Code Ann. § 14-8-200(b)(1); *State ex rel. Riley v. Martin* (S.C. 1980) 262 S.E.2d 404, 406; Tex. Const., art. V, § 5(b); Tex. Crim. Proc. Code Ann. art. 11.071, § (4)(a); Utah Code §§ 78A-3-102(3)(i), 78A-4-103(2)(f); Va. Code Ann. § 17.1-406(B); Wash. Rev. Code. § 10.95.100; Wash. R. App. P. 16.3(b), (c).

to deviate from the general path.**14**  Indeed, given this court's "unique role in overseeing the imposition of capital punishment in this state" (*In re Reno* (2012) 55 Cal.4th 428, 522), there should be *some* signal that the voters who enacted these constitutional provisions contemplated a deviation from the overwhelmingly common practice if the majority's view were the correct one, and one would expect some explanation from the majority as to why.  But none appears.

What becomes apparent instead is the risk that the majority's narrow construction of article VI, section 11 of the California Constitution will eviscerate the provision's purpose of promoting "the evenhanded, rational, and consistent imposition of death sentences under law." (*Jurek v. Texas*, *supra*, 428 U.S. at p. 276.)  Under California law, a capital prisoner may challenge the validity of the statute under which the prisoner was convicted or sentenced "at any time" — not just in the automatic appeal, but also in the initial petition for writ of habeas corpus.  (*In re Clark* (1993) 5 Cal.4th 750, 765, fn. 4; see *id.* at p. 798; Pen. Code, § 1509, subd. (d) [limiting the claims that may be raised in a successive petition].)  The majority leaves intact this court's exclusive appellate jurisdiction when those claims are presented in the automatic appeal, and rightly so.  Such claims go to the heart of our concerns over the evenhanded, rational, and consistent imposition of the death penalty.  But that purpose would be completely undermined if (as the majority now holds) those same claims go instead to the Court of Appeal when a party is appealing from a capital habeas corpus proceeding.  (See *State v. Fourth Dist. Court of Appeal*, *supra*, 697 So.2d at p. 71; *People v. Gaines*, *supra*, 473

---

**14**      The two exceptions — Ohio and Oregon — define their high court's appellate jurisdiction more narrowly than we do.  (See Ohio Const., art. IV, § 2(B)(2)(c) ["direct appeals from the courts of common pleas or other courts of record inferior to the court of appeals as a matter of right in cases in which the death penalty has been imposed"]; Or. Rev. Stat. § 138.012(1) ["[t]he judgment of conviction and sentence of death entered under [the death penalty statute] is subject to automatic and direct review by the Supreme Court"].)

N.E.2d at p. 879; *State v. Niccum*, *supra*, 238 S.E.2d at pp. 143-144.) Such a scheme would multiply the risk of conflicting rulings — even though the prospect of conflicting rulings on these issues was precisely the evil at which article VI, section 11 was directed. It is simply not reasonable to interpret the constitutional provision to countenance such a result. Which is why I would find section 1509.1 unconstitutional insofar as it purports to direct an appeal to the Court of Appeal from a superior court ruling on a capital habeas corpus petition.

The remaining question is whether the provision barring the use of a "successive petition" (read "new petition" (maj. opn., *ante*, at pp. 21-22, fn. 14)) "as a means of reviewing a denial of habeas relief" (§ 1509.1, subd. (a)) is severable or was instead dependent on the assumption that review would be available by appeal. Our analysis properly begins by taking account of Proposition 66's severability clause (see *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270 (*Matosantos*)), which provides: "If any provision of this act, or any part of any provision, or its application to any person or circumstance is for any reason held to be invalid or unconstitutional, the remaining provisions and applications which can be given effect without the invalid or unconstitutional provision or application shall not be affected, but shall remain in full force and effect, and to this end the provisions of this act are severable." (Voter Guide, *supra*, Prop. 66, § 21, p. 218.) Although a severability clause establishes a presumption in favor of severance, this court also considers whether the invalid provision is grammatically, functionally, and volitionally severable. (*Matosantos*, at pp. 270-271.) An invalid provision can be severed from the remainder of the enactment "if, and only if, it is 'grammatically, functionally and volitionally separable.' " (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 613.)

40

Severability is not possible here under any reasonable understanding of what's meant by grammatically, functionally, *and* volitionally. Nothing in the text of Proposition 66, its structure, or its history reveals a purpose to preclude appellate courts altogether from reviewing a sentencing court's ruling on a habeas corpus petition. Just the opposite: the initiative proposed merely to shift the means of review from the filing of a new petition in a higher court to an appeal to a higher court. "Volitional" severability turns on whether "the remainder of the measure probably would have been adopted by the people even if they had foreseen the success of petitioners' . . . challenge." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 356; see *Matosantos*, *supra*, 53 Cal.4th 231, 271.) The switch from one avenue (filing of a new petition) to the other (appeal) plainly was dependent on the assumption that the latter offered an available means of review. (See *Gerken v. Fair Political Practices Com.* (1993) 6 Cal.4th 707, 718.) Had reasonable voters foreseen that the appeal mechanism would be invalidated, one cannot say " '*with confidence*' " that they would have adopted the ban on new petitions as a means of review. (*Id*. at p. 714.) So I would invalidate section 1509.1 in its entirety.

III.

The bait-and-switch undertaken by the proponents of Proposition 66 — and countenanced by the majority — will do nothing but breed cynicism in the electorate and supply further kindling to those who doubt the efficacy and workability of constitutional democracy. As an inducement to support this initiative, voters were promised that state court review of death penalty judgments could and would be completed within five years. That promise, as the majority concedes, was a sham. But the way to prevent similar swindles in the future is to be clear about what section 190.6, subdivision (d) says and why it is unconstitutional. What the majority offers instead — a "saving construction" to a

41

clearly unconstitutional statute (maj. opn., *ante*, at p. 57, fn. 33), accompanied by a "caution" against presenting the voters with "statutory language that is inconsistent with constitutional norms" (*ibid*.) — ill-serves the constitutional principles at stake, hinders forthright deliberation, and encourages initiative proponents to repeat the bait-and-switch in the future.

It is the voters' job to decide whether to enact laws by initiative. It is our job to interpret and give effect to those duly enacted laws when called upon to do so, but also to uphold the supreme law of the land — our state and federal constitutions — when the challenged law transgresses those founding documents. When the courts treat voters as adults (i.e., listen to what they are saying and take seriously what they are trying to accomplish), then we will have earned their respect — respect that is sorely needed on those rare occasions when we must explain why a law duly enacted by the voters, but contrary to the Constitution, cannot take effect. (See *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 930 ["the initiative power is strongest when courts give effect to the voters' formally expressed intent"].)

This is one such occasion. What was presented to the voters in Proposition 66 was a mandatory five-year deadline for resolution of the state court appeal and the initial habeas corpus petition for capital inmates. That's what the voters enacted. We know the resulting deadline is mandatory from its text, its structure, the deadline's description in the ballot materials, statements by the initiative's proponents, and general media coverage of the Proposition 66 campaign. And our established precedent underscores why we are not free to construe a deadline as directory where, as here, the enacting body "clearly expresses a contrary intent." (*People v. Allen*, *supra*, 42 Cal.4th at p. 102; see *Kabran*, *supra*, 2 Cal.5th at p. 343 ["The question is ultimately one of legislative intent"]; *Garrison*, *supra*, 32 Cal.2d at p. 435 [statute will be construed as mandatory where "that result is

42

expressly provided or otherwise clearly intended"].) When we foist a directory interpretation with potentially vague and unspecified consequences on a provision that cannot reasonably support it, we impair the candid public deliberation that makes democracy effective.

A mandatory deadline, as all the parties agree, is not constitutional. Because that is precisely what the voters enacted, we must be equally clear and invalidate it. (See *Valencia*, *supra*, 3 Cal.5th at p. 386 (conc. opn. of Kruger, J.) ["In interpreting a voter initiative, we are bound to respect both the choices the voters have made and the limits of those choices"].) I therefore cannot join the majority in upholding some newly manufactured version of section 190.6, subdivision (d). When we twist the words of an initiative and ignore its clear purpose under the guise of "saving" it from being declared unconstitutional, then we are merely offering a pacifier as a substitute for a law the voters enacted, and encouraging initiative proponents to deceive voters about the actual effectiveness of a proposed law. (See *Valencia,* at p. 374 ["adopting the construction . . . as to the scope of a phrase in a measure without notice to the voters, not mentioned by the . . . Legislative Analyst, and contrary to the stated purposes and assurances described in the measure's own preamble, would not protect the voters' right to directly enact laws *but could very likely encourage the subversion and manipulation of that democratic right*" (italics added)].)

Nor can I join the majority in upholding section 1509.1. With respect, I dissent from those parts of the judgment.

                                                             **CUÉLLAR, J.**

**I CONCUR: IKOLA, J.***
_____
\*       Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Briggs v. Edmund G. Brown, Jr.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S238309
**Date Filed:** August 24, 2017

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Orrick, Herrington & Sutcliffe, Christina Von der Ahe Rayburn and Lillian Jennifer Mao for Petitioner.

Michael J. Hersek for Habeas Corpus Resource Center as Amicus Curiae on behalf of Petitioner.

Sanger Swysen & Dunkle, Robert M. Sanger, Stephen K. Dunkle; Clarke Johnston Thorp & Rice, Thomas H. Speedy Rice; Law Office of Melissa Bobrow and Melissa Bobrow for California Attorneys for Criminal Justice and Death Penalty Focus as Amici Curiae on behalf of Petitioner.

Hilary Potashner, Federal Public Defender (Central District) and Heather Williams, Federal Public Defender (Eastern District) for Offices of the Federal Public Defenders as Amicus Curiae on behalf of Petitioner.

Gibson, Dunn & Crutcher, Matthew S. Kahn, Kevin Yeh, Ryan P. McGinley-Stempel and Theane Evangelis for Constitutional Law Amici as Amicus Curiae on behalf of Petitioner.

O'Melveny & Myers, Brett J. Williamson, Anne M. Steinberg, Alix R. Sandman, Matthew T. Kline and Susannah K. Howard for The Innocence Network, American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern California and American Civil Liberties Union of San Diego and Imperial Counties as Amici Curiae on behalf of Petitioner.

Kathleen A. Kenealy, Acting Attorney General, Xavier Becerra, Attorney General, Douglas J. Woods, Assistant Attorney General, Marc A. LeForestier and Jose A. Zelidon-Zepeda, Deputy Attorneys General, for Respondents.

Michele Hanisee, Ivy B. Fitzpatrick; Joe Brandon; Steven J. Walter; Cyril Yu; Maeve Fox; Michael A. Caves; Andrew Soloman; Matt De Moura; Karen Jensen; and Robert Maddock for Association of Deputy District Attorneys for Los Angeles County, Riverside County Deputy District Attorney Association, San Diego County Deputy District Attorneys Association, Association of Orange County Deputy District Attorneys, Ventura County Prosecutor's Association, Kern County Prosecutors Association, Sacramento County Deputy District Attorneys Association, Yolo County Deputy District Attorneys Association, Solano County Association of Deputy District Attorneys and Sonoma County Prosecutors' Association as Amici Curiae on behalf of Respondents.

**Counsel:**

David A. Sanders, Daniel M. Lindsay and Justin C. Delacruz for California Correctional Peace Officers Association as Amicus Curiae on behalf of Respondents.

Stephen M. Wagstaffe, Mark Zahner and Frank C. Meyer IV for California District Attorneys Association as Amicus Curiae on behalf of Respondents.

Nina Salarno Besselman for Crime Victims United of California as Amicus Curiae on behalf of Respondents.

Hayes & Ortega, Dennis J. Hayes and Michelle C. Hribar for Los Angeles County Professional Peace Officers Association as Amicus Curiae on behalf of Respondents.

Tony Rackauckas, District Attorney (Orange) and Holly M. Woesner, Deputy District Attorney, for Orange County District Attorney as Amicus Curiae on behalf of Respondents.

Bell, McAndrews & Hiltachk, Charles H. Bell, Jr., Terry J. Martin; Criminal Justice Legal Foundation, Kent S. Scheidegger and Kymberlee C. Stapleton for Intervener

Mastagni Holstedt, David P. Mastagni, David E. Mastagni and Isaac S. Stevens for Peace Officers Research Association of California as Amicus Curiae.

The Law Offices of Brooks Ellison and Patrick J. Whalen for California Attorneys, Administrative Law Judges and Hearing Officers in State Employment as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christina Von der Ahe Rayburn
Orrick, Herrington & Sutcliffe
2050 Main Street, Suite 1100
Irvine, CA  92614
(949) 567-6700

Jose A. Zelidon-Zepeda
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5781

Kent S. Scheidegger
Criminal Justice Legal Foundation
2131 L Street
Sacramento, CA  95816
(916) 446-0345